**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Thomas P. Smith, Jr.**
**Alison T. Conn**
**Chevon Walker**
**Ariel Atlas**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-0090 (Walker)**
WalkerCh@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>-against-<br><br>**NADIM AHMED a/k/a NADIM KHAN,**<br>**MEHREEN SHAH a/k/a MONA SHAH,**<br>**NURIDE TRANSPORTATION GROUP, LLC,**<br>**NYC GREEN TRANSPORTATION GROUP, LLC,**<br>**MED TRANS EB-5 FUND, LLC,**<br>**NYC EV MOBILITY LLC,**<br>**GRAVITAS NYC REGIONAL CENTER, LLC**<br>**f/k/a NYC TRANSPORTATION REGIONAL**<br>**CENTER, LLC, and**<br>**MONA SHAH & ASSOCIATES, PLLC,**<br><br>Defendants. | **COMPLAINT**<br><br>**23 Civ. 10210**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Nadim Ahmed a/k/a Nadim Khan ("Ahmed"), Mehreen Shah a/k/a Mona Shah

("Shah"), NuRide Transportation Group, LLC ("NuRide"), NYC Green Transportation Group,

LLC ("NYC Green"), Med Trans EB-5 Fund, LLC ("Med Trans"), NYC EV Mobility LLC ("EV

Mobility"), Gravitas NYC Regional Center, LLC f/k/a NYC Transportation Regional Center, LLC

("the Regional Center"), and Mona Shah & Associates, PLLC ("MSA Law") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.     Through a series of unregistered securities offerings, from approximately June 2014 through November 2022 (the "Relevant Period"), Defendants raised over $66 million from more than 100 investors seeking unconditional permanent residency status in the United States via the United States EB-5 Immigrant Investor Program ("EB-5 Program").

2.     Under the EB-5 Program, investors are eligible for unconditional permanent residency status in the United States if they made a qualifying investment in a new commercial enterprise in the United States that will create a certain number of permanent full-time jobs for qualified U.S. workers.

3.     During the Relevant Period, Ahmed used his company, NuRide, to structure, operate, and offer and sell securities in the form of interests in transportation-related companies, including NYC Green, Med Trans, and EV Mobility (the "NuRide EB-5 Offerings"), which defendants represented would be operated in a manner that would meet the requirements for qualifying investments in the EB-5 Program.

4.     For years, however, to induce investors to part with their money, Ahmed, NuRide, and NYC Green made misrepresentations to investors about management's investment in and the structure of NYC Green as well as the use of investor proceeds.

5.     Specifically, Ahmed, NuRide, and NYC Green falsely represented to NYC Green investors that management had already contributed $11 million to NYC Green though management had made no such investment.

6.     Also, despite representing to investors that NYC Green was structured to serve as the new commercial enterprise that would comply with the EB-5 Program, Ahmed, NuRide, and

NYC Green used NYC Green assets to fulfill a transportation service contract to which NuRide, not NYC Green, was a party and the direct revenue recipient.

7.      Additionally, between January and March 2018, instead of using an NYC Green investor's money as represented, Ahmed, through NuRide and NYC Green, used the investor's money to pay a portion of a settlement between another of Ahmed's companies and the Commission.

8.      Throughout the Relevant Period, Shah and her law firm, MSA Law, promoted the NuRide EB-5 Offerings to potential investors throughout the United States and abroad, provided legal services to NuRide and its affiliates, purportedly vetted the eligibility of the investors to participate in the unregistered offerings, and represented investors before the United States Citizenship and Immigration Services ("USCIS") in connection with their applications for participation in the EB-5 Program.

9.      In addition, the Med Trans offering was sponsored and managed by the Regional Center, a company Shah owned.

10.     The NuRide EB-5 Offerings were not registered with the Commission.

11.     To date, none of the investors in the NuRide EB-5 Offerings have received unconditional permanent residency status in connection with their investment or a return of their investment.

## VIOLATIONS

12.     By virtue of the foregoing conduct and as alleged further herein, Defendants Ahmed, NYC Green, and NuRide have violated Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

13.     By virtue of the foregoing conduct and as alleged further herein, Defendants Shah, MSA Law, EV Mobility, Med Trans, and the Regional Center have violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

14.     By virtue of the foregoing conduct and as alleged further herein, Defendant Ahmed aided and abetted Defendants NYC Green's and NuRide's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

15.     By virtue of the foregoing conduct and as alleged further herein, Defendant NuRide aided and abetted Defendant NYC Green's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

16.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

17.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

18.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act

Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendant Ahmed from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently enjoining Defendants Ahmed and NuRide, and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them, including through any entity they own or control, from, directly or indirectly, (i) participating in the offer or sale of any security which constitutes, or is promoted as constituting, a qualifying investment in a "commercial enterprise" under the United States Government EB-5 visa program administered by the United States Citizenship and Immigration Service; and (ii) participating in the management or supervision of, or otherwise exercising any control over, any commercial enterprise or project that has issued or is issuing any securities which constitute, or are promoted as constituting, qualifying investments under the EB-5 visa program; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

20.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

21.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants may be found in, are inhabitants of, or transact business in the Southern District of New York. Defendants MSA Law, the Regional Center, and Med Trans have offices located in and, with Defendant Shah, transact business in the Southern

District of New York. Defendants NYC Green and NuRide transact business in this District. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including that NYC Green, EV Mobility, and Med Trans were marketed in this District. Additionally, certain investors in NYC Green, EV Mobility, and Med Trans resided in this District at the time of their investments.

## DEFENDANTS

22.    Ahmed, 63, is a resident of Old Westbury, New York, and at all times relevant was the Executive Chairman of NuRide.

23.    Shah, 56, is a resident of Albertson, New York, and at all times relevant was an attorney licensed in New York and the United Kingdom and the managing partner of MSA Law.

24.    NuRide, a New York limited liability company organized in 2014, has its principal place of business in Long Island City, New York.

25.    NYC Green, a New York limited liability company, organized in 2014, shares a principal place of business with NuRide and EV Mobility in Long Island City, New York. NuRide is the manager of NYC Green.

26.    Med Trans is a New York limited liability company, organized in 2017. According to its operating agreement, Med Trans shares a principal place of business with MSA Law and the Regional Center at 232 Madison Avenue, New York, New York. At least one 2019 version of its offering memorandum states that Med Trans shares a principal place of business with NuRide, NYC Green, and EV Mobility in Long Island City, New York.

27.    EV Mobility, a New York limited liability company, organized in 2021, shares a principal place of business with NuRide and NYC Green in Long Island City, New York. Ahmed was Executive Chairman of EV Mobility.

28.    The Regional Center, a New York limited liability company, was organized in 2014,

and shares a principal place of business with MSA Law at 232 Madison Avenue, New York, New York. Shah is an owner and managing member of the Regional Center. The Regional Center is and at all relevant times has been the manager, managing member, and sponsor of Med Trans.

29.     MSA Law, a law firm and New York professional service limited liability company, organized in 2014, has its principal place of business at 232 Madison Avenue, New York, New York.

**FACTS**

**I.     THE NURIDE EB-5 OFFERINGS**

30.     From approximately June 2014 through November 2022, Ahmed used his company, NuRide, to structure, operate, and offer and sell securities in the form of interests in transportation-related companies, including NYC Green, Med Trans, and EV Mobility, which Defendants represented would be operated in a manner that would meet the requirements for qualifying investments in the EB-5 Program.

31.     To qualify for unconditional permanent residency status under the EB-5 Program, an investor must invest a certain amount of capital in a new commercial enterprise ("NCE") that will create at least 10 full-time jobs.

32.     The minimum investment for each of the NuRide EB-5 Offerings was $500,000.

33.     USCIS administers the EB-5 Program.

34.     NYC Green and EV Mobility were "direct" investment EB-5 projects, and Med Trans was a "regional center" project.[1]

---

[1]     A regional center is an economic unit, public or private, in the United States, involved with promoting economic growth. USCIS designates regional centers for participation the EB-5 program. https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-EB-5/EB-5-immigrant-investor-regional-centers (November 6, 2023).

### A.     Marketing of the NuRide EB-5 Offerings

35.     Ahmed and NuRide marketed the NuRide EB-5 Offerings throughout the United States and abroad on NuRide's website, through participation in seminars and conferences, and in publications and websites, including ones that catered to EB-5 Program participants and members of the EB-5 industry.

36.     During the Relevant Period, Shah and MSA Law employees provided potential investors with information about various EB-5 investment projects, including the NuRide EB-5 Offerings.

37.     Information about the NuRide EB-5 Offerings that Shah and MSA Law employees provided to potential investors included descriptions and marketing materials, such as brochures.

38.     Additionally, in connection with the NuRide EB-5 Offerings, Shah and MSA Law employees at times provided investors with contact information for the developers and/or management affiliated with the NuRide EB-5 Offerings, including NuRide.

39.     Shah and MSA Law encouraged potential investors in NYC Green, Med Trans, and EV Mobility, to meet with project management, including Ahmed and other NuRide personnel, to discuss the investments.

40.     Before investors made their investments in NYC Green, Med Trans, and EV Mobility, Shah and MSA Law employees provided them with offering documents for each investment, including offering memoranda, business plans, operating agreements, subscription agreements, and an investor eligibility questionnaire.

### B.     The NuRide EB-5 Offerings Were Unregistered Securities Offerings

41.     Section 5 [15 U.S.C. § 77e] of the Securities Act makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the Commission and is in effect as to such offer or sale.

42.     Defendants purported to offer and sell securities in the NuRide EB-5 Offerings without registration with the Commission pursuant to exemptions, including Regulation D of the Securities Act.

43.     The NuRide EB-5 Offerings were not eligible for exemptions from registration with the Commission.

44.     Exemption from registration pursuant to Rule 506(c) [17 C.F.R. § 203.506(c)] of Regulation D requires that "[a]ll purchasers of securities sold . . . are accredited investors." [2]

45.     Shah and MSA Law assessed investor eligibility for investment in the NuRide EB-5 Offerings, which purportedly included review of each investor's eligibility questionnaire to determine whether the investor was accredited.

46.     Prior to investing in NYC Green, Med Trans, or EV Mobility, MSA Law employees, acting at Shah's direction, provided investors with an investor eligibility questionnaire to complete, which included a section to list assets, including financial accounts and real property, the value and source of those assets, the investor's liabilities, overall net worth, and income.

47.     For each of the NuRide EB-5 Offerings, at least one investor's eligibility form indicated that the investor was not accredited.

48.     Despite the clear indication that these investors were not accredited, the Defendants permitted the investors to invest in the NuRide EB-5 Offerings and collected more than $500,000 from each of them.

---

[2]     Rule 501(a) [17 C.F.R. § 230.501(a)] of Regulation D of the Securities Act, which governs the limited offer and sale of securities without registration, defines an accredited investor, in relevant part, as "any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:"  "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000," excluding the person's primary residence, and "[a]ny natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year."

49.     During the Relevant Period, for their above-described roles in the NuRide EB-5 Offerings, Shah and MSA Law were paid by NuRide.

## II.    NYC GREEN

### A.    The Unregistered NYC Green Securities Offering

50.     Between approximately June 2014 and December 2018, Ahmed, NuRide, NYC Green, Shah, and MSA Law offered and/or sold interests in NYC Green to investors in exchange for a subscription amount of $500,000 each and up to a $50,000 administrative fee from each investor.

51.     NYC Green's proposed plan, or the "NYC Green Project," according to its offering memoranda,[3] was to develop or assemble a fleet of for-hire vehicles, including handicap accessible, livery, and luxury cars.

52.     Between 2014 and 2018, the NYC Green offering memoranda were revised to reflect purported expansions of the project, for example, from a proposed plan to operate a fleet of approximately 425 in-house and affiliated vehicles, to a plan to operate a fleet of 825 in-house vehicles, and from employing over 650 individuals to employing more than 948 individuals on a permanent basis.

53.     The NYC Green offering memoranda included wire instructions for investors to send their investments to a bank located in New York, New York.

54.     NYC Green's offering memoranda stated that the NYC Green business would "operate in *all* five Boroughs of New York City: Manhattan, Queens, Brooklyn, Bronx and Staten Island."

55.     Since its 2014 formation, Ahmed and NuRide have controlled NYC Green's

---

[3]     Unless otherwise specified, reference herein to the NYC Green offering memoranda refers to versions distributed to investors from 2014 through 2018, including any applicable riders modifying the disclosures in the body of the memo.

operations.

56.     At NYC Green's formation, NuRide owned 100% of its interests and, at all times

relevant, has continued to claim to hold a majority interest in NYC Green.

57.     Between June 2014 and December 2018, Shah and MSA Law provided NYC

Green's offering documents, including an offering memorandum, and its attachments, including a

business plan, operating agreement, subscription agreement, and investor eligibility questionnaire, to

potential investors.

58.     In addition to the possibility of unconditional permanent residency, NYC Green's

offering memoranda stated that NYC Green intended to make distributions to investors.

59.     Versions of the NYC Green offering memorandum dated from at least November

12, 2015 and later, described a distribution to investors of 0.5% per year of the investor's capital

contribution.

60.     Some investors negotiated an interest rate, or preferred return distribution amount,

higher than 0.5%.

61.     NYC Green initially raised $40 million.  An amendment to the NYC Green offering

memorandum dated October 20, 2017, expanded the NYC Green offering to allow for additional

investors to invest an additional $9,500,000 in NYC Green, bringing the total of investor funds

raised to $49.5 million.  This amendment stated that NYC Green "expects to create additional full-

time permanent jobs," that the "funds will be used for greater fleet expansion, job creation and

technology upgrades," and that NYC Green "will provide 0.5% equity to each additional investor."

62.     Ahmed, NuRide and NYC Green pooled investors' money in NYC Green bank

accounts at a bank in New York, New York, and represented that NYC Green would invest those

funds in the NYC Green business.

63.     In order for NYC Green investors to be eligible for unconditional permanent

residency status in the United States through the EB-5 Program, NYC Green's business would need to be successful enough to generate 10 jobs per investor, consistent with the EB-5 Program.

64.    NYC Green investors had no involvement in the management or day-to-day operations of NYC Green, consistent with the NYC Green offering memoranda, which stated that "[a]ll management and other power relating to the day-to-day control of the LLC [defined as NYC Green] will be held and exercised by the Manager . . ."

65.    Additionally, the NYC Green offering memoranda, in a section titled "Control of Issuer," described investors' oversight as "significantly limited" and stated that "the Manager will be solely responsible for making all decisions of the Issuer pertaining to the utilization of the Offering proceeds and the results therefrom. Additionally, the Manager is generally responsible by the terms of the Operating Agreement for the operations of the Issuer."

66.    The NYC Green offering was not registered with the Commission.

67.    The NYC Green offering memoranda asserted that "[t]he interests offered hereby have not been registered under the Securities Act of 1933 . . . and are being offered and sold only to a limited number of qualified investors in reliance on an exemption from Registration under Section 4(2) of the Securities Act, Regulation D, and/or Regulation S promulgated thereunder . . .."

68.    The NYC Green offering memoranda further stated that "offers will be made only to investors who are 'accredited investors' as defined in Regulation D promulgated under the Securities Act."

69.    Defendants offered and sold interests in NYC Green to multiple investors whose represented net worths and annual incomes were below that of accredited investors.

70.    Ahmed, NuRide, and NYC Green promoted the NYC Green investment on NuRide's internet website, available throughout the United States, and secured investments from investors in multiple states through the instrumentalities of interstate commerce.

71.     NuRide employees participated in podcasts hosted by Shah, which were available in the United States through MSA Law's website and standard podcast platforms, on which the NuRide employees spoke about NuRide-affiliated businesses.

72.     For example, on a May 2016 podcast, which featured a NuRide employee, Shah described NYC Green as a "successful direct-pooled project," asked the NuRide employee to explain how the NYC Green project could generate 800 to 1,000 jobs, and remarked to her guest, that "you're looking for 80 investors."

73.     Between approximately June 2014 and December 2018, NYC Green collected approximately $49.5 million from at least 99 investors in exchange for interest in NYC Green and collected an additional administrative fee from each investor.

74.     To date, not a single NYC Green investor has received unconditional permanent residency status based on his or her NYC Green investment.

75.     In a section titled, "Administrative Fee," the NYC Green offering memoranda stated that "[t]he Administrative Fee is used to reimburse the Manager and the LLC for the organizational expenses of the Offering, and to otherwise compensate the Manager for its efforts associated with setting up [NYC Green] and conducting the Offering."

76.     In a section titled, "Compensation," the NYC Green offering memoranda stated that "[t]he Manager or its members or manager may receive an economic benefit from the Project and [NYC Green]."

77.     Between 2014 and 2018, NuRide received millions of dollars from NYC Green.

78.     Pursuant to a January 2015 employment agreement, Ahmed was to be paid a base salary of $200,000 as an employee of NuRide.

79.     Between 2014 and 2018, Ahmed received at least $1.1 million in salary, plus the use of a new Mercedes automobile and reimbursement of various expenses, from NuRide.

80.     Between 2014 and 2018, Ahmed received salaries of over $118,000, plus health insurance, from MSA Law.

**B.     Misrepresentations to NYC Green Investors**

81.     The NYC Green offering memoranda stated that NYC Green was created to raise EB-5 investment capital and create the required jobs under the EB-5 Program.

82.     NYC Green also represented in its offering memoranda that it "intends to utilize all of the proceeds of this offering . . . to finance and develop the Project as described herein."

83.     According to the NYC Green offering memoranda and business plans, NYC Green was both the NCE and job creating entity ("JCE") for purposes of the EB-5 Program.

84.     Versions of the NYC Green offering memorandum dated from at least November 12, 2015 and later, further stated that "investment will be directly into the NCE and JCE" and "[t]he business operations will arise from the NCE/JCE" and "[t]he job creation will consist of direct employees and who will receive wages directly from the NCE."

85.     These representations were material.

**(1)     Ahmed, NuRide, and NYC Green Falsely Claimed That Management Had Contributed $11 Million to the NYC Green Project**

86.     In its offering memoranda and business plans attached thereto, NYC Green touted an $11 million non-investor contribution to potential investors.

87.     This representation was material.

88.     In particular, business plans provided to investors from 2014 through 2018, stated that NYC Green "was formed with an initial investment of $11 million from its principals."

89.     A 2014 NYC Green offering memorandum described the $11 million principal contribution as "non-EB5 capital," and detailed how invested funds would be used. The relevant section of the offering memorandum stated as follows:

> The LLC estimates that the total capital required to finance the

Project is approximately $31,000,000, including $20,000,000 from
EB-5 capital and $11,000,000 from non-EB5 capital. The usage of
EB-5 capital $20,000,000 is as follows: $15,000,000 will be used to
purchase cars (425 vehicles at approximately $35,000/per car);
$3,000,000 is to be used to upgrade the office and develop
technology and $2,000,000 is to be used for marketing and
advertiasing [sic]. Other operating expenses include: operational
salaries (taken from industry standards); rent (based on 10,000 square
feet of operational facilities); insurances covering liability, Workman's
Comp and health insurance. Payroll expenses, interest and
amortization; utilities; repairs; maintenance; fuel costs; depreciation
of the vehicles and equipment along with legal, professional, license
fees and permit renewal fees and miscellaneous expenses.

90.    Versions of the NYC Green offering memorandum dated from at least November
2015 and later again represented the $11 million principal investment and reflected an increase in
investor funds to be collected.

The LLC estimates that the total capital required to finance the
Project is approximately $51,000,000, including $40,000,000 from
EB-5 capital and $11,000,000 from non-EB5 capital. The anticipated
usage of EB-5 capital $40,000,000 includes the following :
$28,000,000 will be used to purchase cars (880 vehicles at
approximately $35,000/per car and 25 sprinters at approximately
$75,000/per vehicle); $7,000,000 is to be used to upgrade the office
and develop technology and $4,500,000 is to be used for marketing

and advertising. Other operating expenses include: operational salaries (taken from industry standards); rent (based on 10,000 square feet of operational facilities); insurances covering liability, Workman's Comp and health insurance. Payroll expenses, interest and amortization; utilities; repairs; maintenance; fuel costs; depreciation of the vehicles and equipment along with legal, professional, license fees and permit renewal fees and miscellaneous expenses.

91.     Despite NYC Green, NuRide and Ahmed's representations to investors that NYC Green's principals had contributed $11 million of the capital required for the NYC Green project, its principals, including NuRide, made no $11 million investment in NYC Green.

### (2)     NYC Green Operations Were Inconsistent with Representations to Investors

92.     Additionally, despite NYC Green, NuRide and Ahmed's representations to investors that NYC Green would be the JCE and NCE, Ahmed, through NuRide, arranged for NuRide to (i) use NYC Green's assets, including money and its fleet of vehicles, (ii) act as party to NYC Green's largest revenue-producing contract, and (iii) create jobs that should have been created through NYC Green.

93.     Specifically, from at least September 2017 through August 2023, in connection with a series of contracts with a ride-sharing company, NYC Green provided vehicles and drivers used to generate revenue with the ride-sharing company (the "Ride-Share Deal").

94.     Despite the use of NYC Green's assets, including vehicles purchased with NYC Green investor funds, to earn these revenues, NYC Green was not a party to any of the contracts with the ride-sharing company.

95.     Instead, NuRide was a party to the contracts with the ride-sharing company and, as such, NuRide, not NYC Green, was routinely paid the revenue from the Ride-Share Deal.

96.    The ride-share company sent the revenue from the Ride-Share Deal directly to NuRide.

97.    Once in NuRide's bank account, for which Ahmed was a signatory, Ahmed or others acting at his direction, through NuRide, commingled the Ride-Share Deal revenue with other funds and spent the money, including on payroll for NuRide employees.

98.    Ahmed and NuRide transferred a portion of the Ride-Share Deal revenues to NYC Green when and as needed to cover specific expenses, such as salaries for drivers.

99.    Ahmed and NuRide did not consistently record NYC Green's profits earned from the Ride-Share Deal in NYC Green's accounting records.

100.    Between September 2017 through August 2023, the time that NuRide was receiving revenues from the Ride-Share Deal, Ahmed received regular compensation from NuRide and its affiliates.

101.    The structure and operation of NYC Green's business was inconsistent with Ahmed, NuRide, and NYC Green's representations to investors that their funds would be used to operate NYC Green's business and the creation of jobs through NYC Green, requirements upon which investors' eligibility for the EB-5 Program depended.

102.    Indeed, in response to their applications for unconditional permanent residency status in the United Sates, USCIS sent multiple NYC Green investors a notice of the agency's intent to deny the investors' petitions, citing, among other issues, NuRide's role in NYC Green's business.

103.    In notices of intent to deny the applications for unconditional permanent residency status by some NYC Green investors, USCIS noted that many of the records submitted in support of the investor's application referenced "NuRide" or "NuRide Transportation Group" rather than NYC Green.  USCIS concluded: "Given that these exhibits highlight the performance of NuRide Transportation Group, LLC rather than the NCE, the record lacks evidence demonstrating the

NCE [NYC Green] engaging in legitimate business activities."

104.    USCIS has not approved any NYC Green investor for unconditional permanent residency pursuant to the EB-5 Program based on his or her investment in NYC Green.

### (3)    Ahmed Used NYC Green Investor Funds to Pay a 2018 Settlement with the Commission

105.    In March 2018, Edwin Shaw LLC ("Edwin Shaw"), an entity co-owned by Ahmed and Shah, with its principal place of business in this District, reached a settlement with the Commission (without admitting or denying the Commission's findings) for violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] (the "Edwin Shaw Settlement").

106.    In connection with the Edwin Shaw settlement, Edwin Shaw was required to pay the Commission $544,744.20.

107.    Ahmed, through NuRide and NYC Green, used NYC Green investor funds to pay a portion of the Edwin Shaw Settlement.

108.    On or about January 29, 2018, an NYC Green investor ("NYC Green Investor A") transferred $510,000 to an NYC Green bank account ending in 0269 ("NYC Green Account 1") as part of an EB-5 investment in NYC Green.

109.    Prior to the NYC Green investor's January 29, 2018, deposit, NYC Green Account 1 had an account balance of $45.

110.    Ahmed was a signatory on NYC Green Account 1.

111.    On or about February 5, 2018, $450,000 was transferred from NYC Green Acct 1 to another NYC Green bank account ending in 0072 ("NYC Green Account 2").

112.    Prior to the February 5, 2018, deposit from NYC Green Account 1, NYC Green Account 2 had a balance of $2,064.89.

113.    Ahmed was also a signatory on NYC Green Account 2.

114.    That same day, $450,000 was transferred from NYC Green Account 2 to a NuRide

bank account ending in 0080 (the "NuRide Account").

115.    Prior to the February 5, 2018, deposit of $450,000 from NYC Green Account 2, the NuRide Account had a balance of no more than $23,750.

116.    Ahmed was also a signatory on the NuRide Account.

117.    On the same day of the February 5, 2018, deposit, $106,254.92 was transferred from the NuRide Account to Edwin Shaw's Account ending in 6958 (the "Edwin Shaw Account").

118.    On Edwin Shaw Account documents, Ahmed is listed as President of Edwin Shaw and a signatory of the Edwin Shaw Account.

119.    Prior to the $106,254.92 deposit from NuRide, the Edwin Shaw Account had a balance of $30,266.85.

120.    Also on February 5, 2018, $129,744.20, nearly the entire balance of the Edwin Shaw Account, was transferred to an escrow account of Edwin Shaw's attorney.

121.    The description on the Edwin Shaw Account February 2018 bank statement for the $129,744.20 transfer to Edwin Shaw's counsel included a Commission internal case number and the following information:  Settlement of Edwin Shaw, LLC.

122.    On or about March 13, 2018, a cashier's check was issued in the amount of $544,744.20, payable to the Commission, from the Edwin Shaw attorney escrow account.

## II.    THE UNREGISTERED MED TRANS SECURITIES OFFERING

123.    From at least February 2018 through approximately October 2020, Ahmed, NuRide, Shah, MSA Law, the Regional Center, and Med Trans offered and/or sold interests in Med Trans to investors for a subscription amount of $500,000 each and up to a $50,000 administrative fee from each investor.

124.    Sixteen investors collectively invested $8 million in Med Trans seeking to participate in the EB-5 Program.

125.    Med Trans' offering memorandum provided to investors stated, "[w]e have structured the Interests to be qualifying investments under the EB-5 Program, with the intent that Investors may obtain permanent U.S. residency through their participation in a new commercial enterprise that creates at least ten permanent, full-time jobs per Investor."

126.    Additionally, Med Trans' offering memorandum stated that the proceeds of the offering would be loaned to "Project Companies" that will use it to "develop, equip, staff, launch and operate a 200-vehicle, non-emergency medical transportation fleet with multiple supporting facilities and services, in the greater New York City, New York area, along with related technology, which we refer to as the 'Project' . . .."

127.    According to Med Trans' offering memorandum, non-managing members [or investors] were entitled to receive a "Non-Managing Member Return," which was at least 2.5% of the non-managing member's capital invested in the Project Company per annum, as well as potential residual profit sharing after the Managing member received its own 2.5% return.

128.    Med Trans investors or non-managing members of Med Trans, according to its offering memorandum, would "not participate in the active day-to-day management of the Company or the decisions made by [the] Managing Member."

129.    Also, according to the Med Trans' operating agreement, "the management, control, and operation of (and the determination of policy with respect to) the Company and its activities shall be vested exclusively in the Managing Member (acting directly or through its duly appointed agents) . . .."

130.    Med Trans' offering memorandum stated that "[NuRide] formed [Med Trans] to direct EB-5 capital into the Project under the sponsorship of [the Regional Center]."

131.    The Regional Center was the regional center sponsor of the Med Trans project and managing member of Med Trans.

132.    According to Med Trans' offering memorandum, as sponsor of the Med Trans project, the Regional Center was to receive "an affiliation fee of 4% per annum, with $15,000 due on signing of the Sponsorship Agreement and an administrative fee of $5,000 per investor" from Med Trans.

133.    Med Trans' offering memorandum stated that "[t]he initial installment of the affiliation fee was paid by [NuRide]."

134.    Med Trans' offering memorandum also stated that "if USCIS requires regional centers to pay an annual fee in the future, [Med Trans] will pay 50% of that fee."

135.    Between 2018 and 2020, Shah was managing member and an owner of the Regional Center.

136.    The contact information listed on the Med Trans offering memorandum is the same as that of MSA Law.

137.    NuRide, with Ahmed as principal managing member and executive chairman, was manager of the project companies to which Med Trans invested capital would be lent.

138.    Consistent with the other NuRide EB-5 offerings, the Med Trans offering was not registered with the Commission.

139.    Med Trans' offering memorandum stated, "[w]e expect to offer the Interests within the U.S., and to U.S. Persons, pursuant to 506(c) of Regulation D, which permits advertising and other general solicitation of investors, but restricts resulting sales to persons who are 'accredited investors' as defined in Rule 501 of Regulation D and whom the Company [Med Trans] has verified as accredited investors."

140.    Despite this assertion, at least one investor who represented a net worth and annual income below that of an accredited investor was offered and sold interests in Med Trans.

141.    Ahmed, NuRide, and Med Trans promoted the Med Trans investment on NuRide's

internet website, available throughout the United States, and secured investments from investors in at least five states through the instrumentalities of interstate commerce.

142.    Med Trans was also promoted on MSA Law's website, available throughout the United States.

143.    To date, no Med Trans investor has received unconditional permanent residency status pursuant to the EB-5 Program based on his or her Med Trans investment.

## III.    THE UNREGISTERED EV MOBILITY SECURITIES OFFERING

144.    Between approximately October 2021 through November 2022, Ahmed, NuRide, Shah, MSA Law, and EV Mobility offered and/or sold interests in EV Mobility to investors in exchange for a subscription amount of $500,000 each and up to a $50,000 administrative fee from each investor.

145.    Seventeen investors collectively invested $8.5 million in EV Mobility seeking to participate in the EB-5 Program.

146.    According to EV Mobility's offering memorandum, EV Mobility was formed "for the development and operation of electric vehicles as for-hire vehicles and a vehicle autobody and windshield repair service center."

147.    EV Mobility's offering memorandum stated that the managing member, as opposed to EB-5 investors, "exercise[d] all management power and other powers relating to day-today control of [EV Mobility] . . .."

148.    In EV Mobility's business plan, Ahmed is listed as executive chairman of EV Mobility and principal managing member and executive chairman of EV Mobility's manager.

149.    Between 2021 and 2022, Ahmed was also a signatory on EV Mobility's bank accounts.

150.    Additionally, Ahmed's contact information at NuRide was listed on the EV Mobility

Operating Agreement.

151.    Pursuant to EV Mobility's offering memorandum, investors were entitled to receive an annual return of at least 2.5% of their capital contribution per annum, project performance permitting.

152.    According to EV Mobility's offering memorandum, EV Mobility "structured the Interests to be qualifying investments under the EB-5 Program, with the intent that Investors may obtain permanent U.S. residency through their participation in a new commercial enterprise that creates at least ten permanent, full-time jobs per Investor."

153.    The EV Mobility offering was not registered with the Commission.

154.    EV Mobility's offering memorandum stated, "[w]e also expect to offer the Interests within the U.S., and to U.S. Persons, pursuant to Rule 506(c) of Regulation D, which permits advertising and other general solicitation of investors, but restricts resulting sales to persons who are 'accredited investors' as defined in Rule 501 of Regulation D and whom the Company has verified as accredited investors."

155.    Despite this assertion, at least one investor who represented a net worth and annual income below that of an accredited investor was offered and sold interests in EV Mobility.

156.    Shah and MSA Law marketed EV Mobility at conferences and seminars throughout the United States and at least one virtual conference available via the internet throughout the United States.

157.    For example, in October 2021, Shah participated in a seminar in Michigan that was featured on internet platform Eventbrite and described as an event that will "Present Information on How to Obtain USA Green Card Through Investment and a Chance to Talk One-On-One With Immigration Attoraney [sic]."

158.    The seminar was hosted by ILW.com, which describes itself as "the Leading

Immigration Law Publisher."[4]

159.    The Eventbrite website promoting the event also noted that "Green card is an investment away!"

160.    Shah was listed as a speaker from MSA Law.

161.    The website also listed a "Project Speaker" from "NYC EV Mobility LLC (Tesla Project)."

162.    The "Project Speaker" was an employee of NuRide at the time.

163.    Shah also promoted the October 2021 ILW webinar on her own EB-5 website.

164.    To date, no EV Mobility investor has received unconditional permanent residency status pursuant to the EB-5 Program based on his or her EV Mobility investment.

## IV.    TOLLING AGREEMENTS

165.    Shah has entered into tolling agreements with the Commission, tolling the statute of limitations applicable to this action for the period of September 29, 2023 through December 28, 2023.

166.    MSA Law has entered into a tolling agreement with the Commission, tolling the statute of limitations applicable to this action for the period of September 29, 2023 through December 28, 2023.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(Ahmed, NuRide, and NYC Green)**

167.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 122.

168.    Ahmed, NuRide, and NYC Green, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or

---

[4]        https://ilw.com.

communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

169.    By reason of the foregoing, Ahmed, NuRide, and NYC Green, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Ahmed, NuRide, and NYC Green)

170.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 122.

171.    Ahmed, NuRide, and NYC Green, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

172.    By reason of the foregoing, Ahmed, NuRide, and NYC Green, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and (c)
### (All Defendants)

173.    As to defendants Ahmed and NuRide, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 164.

174.    As to defendants Shah and MSA Law, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 104 and 123 through 166.

175.    As to defendant NYC Green, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 122.

176.    As to defendants Med Trans and the Regional Center, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 49 and 123 through 143.

177.    As to defendant EV Mobility, the Commission re-alleges and incorporates by reference the allegations in paragraphs 1 through 49 and 144 through 164.

178.    Defendants, directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

179.    By reason of the foregoing, Defendants violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Ahmed)

180.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 122.

181.    As alleged above, NuRide and NYC Green violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

182.    Ahmed knowingly or recklessly provided substantial assistance to NuRide and NYC Green with respect to its violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

183.    By reason of the foregoing, Ahmed is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting NuRide's and NYC Green's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and, unless enjoined, Ahmed will again aid and abet these violations.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (Ahmed)

184.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 122.

185.    As alleged above, NuRide and NYC Green violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

186.    Ahmed knowingly or recklessly provided substantial assistance to NuRide and NYC Green with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5b] thereunder.

187.    By reason of the foregoing, Ahmed is liable pursuant to Exchange Act Section 20(e)

[15 U.S.C. § 78t(e)] for aiding and abetting NuRide's and NYC Green's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Ahmed will again aid and abet these violations.

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (NuRide)

188.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 122.

189.    As alleged above, NYC Green violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

190.    NuRide knowingly or recklessly provided substantial assistance to NYC Green with respect to its violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

191.    By reason of the foregoing, NuRide is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting NYC Green's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and, unless enjoined, NuRide will again aid and abet these violations.

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (NuRide)

192.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 122.

193.    As alleged above, NYC Green violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

194.    NuRide knowingly or recklessly provided substantial assistance to NYC Green with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5b] thereunder.

195.    By reason of the foregoing, NuRide is liable pursuant to Exchange Act Section 20(e)

[15 U.S.C. § 78t(e)] for aiding and abetting NYC Green's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, NuRide will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Ahmed, NuRide, and NYC Green and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a) and (c) and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

### II.

Permanently enjoining Shah, Med Trans, EV Mobility, the Regional Center, and MSA Law and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a) and 77e(c)];

### III.

Permanently enjoining Ahmed and NuRide, and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them, including through any entity they own or control, from, directly or indirectly, (i) participating in the offer or sale of any security which constitutes, or is promoted as constituting, a qualifying investment in a "commercial enterprise" under the United States Government EB-5 visa program administered by the United States Citizenship and Immigration Service; and (ii) participating in the management or supervision

of, or otherwise exercising any control over, any commercial enterprise or project that has issued or is issuing any securities which constitute, or are promoted as constituting, qualifying investments under the EB-5 visa program;

## IV.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## V.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## VI.

Permanently prohibiting Ahmed from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

## VII.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
       November 21, 2023

                                   /s/Antonia M. Apps

ANTONIA M. APPS
REGIONAL DIRECTOR
Thomas P. Smith, Jr.
Alison T. Conn
Chevon Walker
Ariel Atlas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0090 (Walker)
WalkerCh@sec.gov