**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

-against-

**NADIM AHMED a/k/a NADIM KHAN,**
**MEHREEN SHAH a/k/a MONA SHAH,**
**NURIDE TRANSPORTATION GROUP, LLC,**
**NYC GREEN TRANSPORTATION GROUP, LLC,**
**MED TRANS EB-5 FUND, LLC,**
**NYC EV MOBILITY LLC,**
**GRAVITAS NYC REGIONAL CENTER, LLC f/k/a**
**NYC TRANSPORTATION REGIONAL CENTER,**
**LLC, and**
**MONA SHAH & ASSOCIATES, PLLC,**

**Defendants.**

**23 Civ. 10210 (VSB)**

---

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Chevon Walker
Ariel Atlas
Counsel for Plaintiff
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-0090 (Walker)

March 4, 2024

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

SUMMARY OF THE ALLEGATIONS ................................................................................2

I.    The NuRide EB-5 Offerings .......................................................................................4

      A.  Marketing of the NuRide EB-5 Offerings..........................................................4

      B.  The NuRide EB-5 Offerings Were Unregistered Securities Offerings ..............5

II.   NYC Green .................................................................................................................6

      A.  The Unregistered NYC Green Securities Offering .............................................6

      B.  Misrepresentations to NYC Green Investors......................................................8

            (1) Management Contribution ......................................................................9

            (2) NYC Green Operations..........................................................................9

            (3) 2018 Settlement with the Commission .................................................10

III.  The Unregistered Med Trans Securities Offering....................................................11

IV.   The Unregistered EV Mobility Securities Offering.................................................13

V.    Tolling Agreements ..................................................................................................14

STANDARD OF REVIEW ..............................................................................................14

ARGUMENT ...................................................................................................................15

I.    Interests Offered and Sold in the NuRide EB-5 Offerings Are Securities ..............15

II.   The SEC's Claims Are Timely.................................................................................19

      A.  The NDAA Applies Retroactively....................................................................19

      B.  The Complaint Alleges Violations within Relevant Statutes of Limitation....24

III.  The Complaint's Securities Fraud Allegations Satisfy Fed. R. Civ. P. 9(b) .........26

IV.    The Complaint Adequately Alleges Violations of
       Sections 5(a) and (c) of the Securities Act..............................................................30

       A.   The Complaint Establishes a Prima Facie Case for Violations of
            Sections 5(a) and (c) of the Securities Act ......................................................30

       B.   The Complaint Adequately Alleges Section 5 Violations Against Mona Shah ..............32

CONCLUSION ...........................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Aaron v. SEC*, 446 U.S. 680 (1945) ...................................... 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................... 14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ...................................... 27

*Bank Markazi v. Peterson*, 572 U.S. 212 (2016) ...................................... 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................... 14

*Cambridge Capital LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420 (S.D.N.Y. Sept. 30, 2021) ....... 28

*Connecticut Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127 (2d Cir. 2021) ............... 19

*Defer LP v. Raymond James Financial, Inc.*, 654 F. Supp. 2d 204 (S.D.N.Y. 2009) ........... 28, 29

*DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242 (2d Cir. 1987) ...................... 27

*Fed. Ins. Co. v. Gander & White Shipping, Inc.*, No. 19 Civ. 7209 (ALC), 
2020 WL 3833408 (S.D.N.Y. July 8, 2020) ...................................... 15

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) ...................................... 15

*Harris v.Mills*, 572 F.3d 66 (2d Cir. 2009) ...................................... 15

*In re Enter. Mortg. Acceptance Co., LLC, Secs. Litig. v. Enter. Mortg. Acceptance Co.*, 
391 F.3d 401 (2d Cir. 2004) ...................................... 21, 22

*In re Merrill Lynch Auction Rate Securities Litigation*, 704 F. Supp. 2d 378 (S.D.N.Y. 2010) ... 29

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) ...................................... 22

*Landgraf v. Usi Film Prod.*, 511 U.S. 244 (1994) ...................................... 21, 22

*Lehman Bros. Commercial Corp. v. China Int'l United Petroleum and Chem. Co., Ltd.*, 
No. 94 Civ. 8304, 1995 WL 608313 (S.D.N.Y. Oct. 16, 1995) ...................................... 28

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160 (2d Cir. 2015) ........... 35

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) ...................................... 29

*Martin v. Hadix*, 527 U.S. 343 (1999) ...................................... 21

*Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5788 (DLC),
   1995 WL 261518 (S.D.N.Y. May 3,1995) ........................................ 28

*Rosen ex rel. Egghead.com, Inc. v. Brookhaven Capital Mgmt. Co.*,
   194 F. Supp. 2d 224 (S.D.N.Y. 2002) ............................................ 30

*SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023) ............................... 19, 20, 21

*SEC v. Almagarby*, No., -- F.4th --, No. 21-13755,
   2024 WL 618517 (11th Cir. Feb. 14, 2024) .................................... 24

*SEC v. Alpert*, No. 17 Civ. 1879 (LTS),
   2018 WL 1156012 (S.D.N.Y. Mar. 2, 2018) ................................. 15, 31

*SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982) ................... 17

*SEC v. Botvinnik*, No. 18-cv-8182 (VSB), 2019 WL 4738900 (S.D.N.Y. Sept. 29, 2019).......... 15

*SEC v. Bronson*, 14 F. Supp. 3d 402 (S.D.N.Y. 2014). ................................. 32

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ...................................... 30

*SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941) .................... 34

*SEC v. Cohen*, 332 F. Supp. 3d 575 (E.D.N.Y. 2018) ................................. 22

*SEC v. Feminella*, 947 F. Supp. 722 (S.D.N.Y. 1996) ................................ 28

*SEC v. Fowler*, 6 F.4th 255 (2d. Cir. 2021) ...................................... 19, 20

*SEC v. Gallison*, 588 F. Supp. 3d 509 (S.D.N.Y. 2022) ............................... 23

*SEC v. Gentile*, 939 F.3d 549 (3d Cir. 2019) ..................................... 22, 23

*SEC v. Graham*, 823 F. 3d 1357 (11th Cir. 2016) ................................... 23

*SEC v. Hui Feng*, 935 F.3d 721 (9th Cir. 2019) ................................... 17

*SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ................... 17

*SEC v. O'Meally*, No. 06-cv-6483 (LTS), 2008 WL 4090461 (S.D.N.Y. Sept. 3, 2008)............. 18

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ................................... 30

*SEC v. Sason,* 433 F. Supp. 3d 496 (S.D.N.Y. 2020) ................................ 32

*SEC v. Sharp*, 626 F. Supp. 3d 345 (D. Mass. 2022) .................................................................. 20

*SEC v. Softpoint*, 958 F. Supp. 846 (S.D.N.Y. 1997) .......................................................... 25, 34

*SEC v. Stubos*, 634 F. Supp. 3d 174, (S.D.N.Y. 2022) ...................................... 19, 20, 21, 22, 23

*SEC v. Tecumseh Holding Corp.*, No. 03 Civ. 5490 (SAS),
    2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) .................................................................. 34

*SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......................................... 17

*SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346 (JSR),
    2023 WL 4858299 (S.D.N.Y. July 31, 2023) .................................................................. 18

*SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044 (2d Cir. 1976).......................................... 25

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)........................................................................ 15, 16

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................................ 28, 29

*SEC v. Xia*, No. 21-cv-5350 (PKC), 2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022),
    *appeal filed*, No. 22-3137 (2d Cir. Dec. 14, 2022) ...................................... 17, 20, 21, 24

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) .................................................. 27

**Statutes**

15 U.S.C. § 77e .............................................................................................................. passim

15 U.S.C. § 77o(a) .................................................................................................................. 34

15 U.S.C. § 77q(a) .................................................................................................. 2, 20, 24, 25

15 U.S.C. § 78j(b) .................................................................................................. 2, 20, 24, 25

15 U.S.C. § 78o(a) ...................................................................................................................11

15 U.S.C. § 78u(d) .............................................................................................. 19, 20, 24, 25, 26

28 U.S.C. § 2462 ............................................................................................................ passim

National Defense Authorization Act for Fiscal Year 2021 ("NDAA"),
    Pub. L. No. 116-283, 134 Stat. 3388 (2021)........................................................ 19, 20, 24

**Rules**

17 C.F.R. § 230.506(c) ........................................................................................... 5, 32

17 C.F.R. § 240.10b-5 ........................................................................................ 2, 24, 25

Fed. R. Civ. P. 8(a) ........................................................................................... 2, 27, 28

Fed. R. Civ. P. 9(b) .............................................................................................. passim

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 14

Plaintiff, Securities and Exchange Commission ("Commission" or "SEC"), respectfully submits this Memorandum of Law in Opposition to the Motions to Dismiss the SEC's November 21, 2023 Complaint ("Complaint") by Defendants Nadim Ahmed ("Ahmed"), NuRide Transportation Group, LLC ("NuRide"), NYC Green Transportation Group, LLC ("NYC Green"), and NYC EV Mobility LLC ("EV Mobility") (collectively the "Ahmed Defendants") (DE 32-33) and Defendants Mehreen Shah a/k/a Mona Shah ("Shah"), Mona Shah & Associates, PLLC ("MSA Law"), Med Trans EB-5 Fund, LLC ("Med Trans"), and Gravitas NYC Regional Center, LLC ("Gravitas") (collectively the "Shah Defendants") (DE 28-29.) For the reasons set forth below, the Court should deny the Motions to Dismiss in their entirety.

## PRELIMINARY STATEMENT

For years, Defendants offered and sold unregistered securities that they claimed were structured to comply with a United States EB-5 Immigrant Investor Program ("EB-5 Program") through which investors could seek permanent residency status and possibly obtain a financial return on their investment. Defendants collected over $66 million from more than 100 investors, not one of whom has received unconditional permanent residency status through their investment. All Defendants participated in one or more of the unregistered offerings. Additionally, Defendants Ahmed, NuRide, and NYC Green lied to NYC Green investors about a purported financial contribution by management that did not, in fact, exist and about the structure of NYC Green's operations, while misappropriating NYC investor funds to pay the settlement owed by a separate company in an unrelated SEC enforcement case.

All Defendants are charged with violations of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)] and Defendants Ahmed, NuRide, and NYC Green are additionally charged with fraud violations under Section 17(a) of the Securities

Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

In their motions asking the Court to dismiss all the claims against them, Defendants disregard the well-pleaded allegations of the SEC's Complaint and applicable law.

*First*, the Complaint adequately alleges that Defendants offered and sold securities, which involved an expectation of profits produced by the efforts of others, satisfying the *Howey* test.

*Second*, the SEC's claims are timely because they were filed within the applicable limitations periods and because the National Defense Authorization Act for Fiscal Year 2021, which imposed certain of the relevant limitations periods, has retroactive application.

*Third*, the Complaint's securities fraud allegations satisfy Fed. R. Civ. P. 9(b) and 8(a), stating "with particularity the circumstances constituting fraud or mistake" and providing Defendants Ahmed, NuRide, and NYC Green with fair notice of the SEC's fraud claims.

*Lastly*, although Defendants improperly attempt to shift their burden to prove any affirmative defense to the SEC, the Complaint adequately alleges violations of Section 5 against all Defendants, meeting the SEC's burden to establish a *prima facie* case.

For these reasons and those set forth below, Defendants' motions should be denied in their entirety.

### SUMMARY OF THE ALLEGATIONS

Through a series of unregistered securities offerings, from approximately June 2014 through November 2022 ("the Relevant Period"), Defendants collected over $66 million from more than 100 investors seeking unconditional permanent residency in the United States via the EB-5 Program. (Compl. ¶ 1.) To qualify for unconditional permanent residency status under the

EB-5 Program, an investor must invest a certain amount of capital in a new commercial enterprise ("NCE") that will create at least 10 full-time jobs. (Compl. ¶¶ 31, 63.)

During the Relevant Period, Ahmed used his company, NuRide, to structure, operate, and offer and sell securities in the form of interests in transportation-related companies, including NYC Green, Med Trans, and EV Mobility (the "NuRide EB-5 Offerings"), which Defendants represented would be operated in a manner that would meet the requirements for qualifying investments in the EB-5 Program. (Compl. ¶ 3.) The minimum investment for each of the NuRide EB-5 Offerings was $500,000. (Compl. ¶ 32.) The NuRide EB-5 Offerings were not registered with the Commission and, to date, none of the investors in the NuRide EB-5 Offerings have received unconditional permanent residency status in connection with their investment. (Compl. ¶¶ 10-11, 66, 74, 104, 138, 143, 153, 164.)

For years, however, Ahmed, NuRide, and NYC Green made misrepresentations to investors concerning (1) a purported $11 million investment in NYC Green made by management that did not happen, (2) the structure of NYC Green and its purported compliance with the EB-5 Program, and (3) the use of investor funds. (Compl. ¶¶ 4-7.) Specifically:

- Ahmed, NuRide and NYC Green falsely represented to NYC Green investors that management had already contributed $11 million to NYC Green, but, in fact, management had made no such investment. (Compl. ¶ 5.);

- Despite representing to investors that NYC Green was structured to serve as a new commercial enterprise that would comply with the EB-5 Program, Ahmed, NuRide, and NYC Green used NYC Green assets to fulfill a contract to which NuRide, not NYC Green, was a party and the direct revenue recipient. (Compl. ¶ 6.); and

3

- Between January and March 2018, instead of using an NYC Green investor's money as represented, Ahmed, through NuRide and NYC Green, used the investor's money to pay a portion of a settlement between another of Ahmed's companies and the Commission. (Compl. ¶ 7.)

During the Relevant Period, Shah and her law firm, MSA Law, among other things, promoted the NuRide EB-5 Offerings to potential investors throughout the United States and abroad and purportedly vetted the eligibility of the investors to participate in the unregistered offerings. (Compl. ¶ 8.) The Med Trans Offering was sponsored and managed by Gravitas, of which Shah was owner and managing member. (Compl. ¶ 9, 135.)

## I.     The NuRide EB-5 Offerings

### A.     Marketing of the NuRide EB-5 Offerings

Ahmed and NuRide marketed the NuRide EB-5 Offerings throughout the United States and abroad on NuRide's website, through participation in seminars and conferences, and in publications and websites, including ones that catered to EB-5 Program participants and members of the EB-5 industry. (Compl. ¶ 35.) Shah and MSA Law employees also provided potential investors with information about the NuRide EB-5 Offerings, including marketing brochures, and contact information for developers and/or management affiliated with the NuRide EB-5 Offerings, including NuRide. (Compl. ¶¶ 36-38.) Shah and MSA Law encouraged potential investors to meet with project management, including Ahmed and other NuRide personnel, to discuss their investments. (Compl. ¶ 39.) Before investors made their investments in NYC Green, Med Trans, and EV Mobility, Shah and MSA Law employees provided them with offering memoranda, business plans, operating agreements, subscription agreements, and an investor eligibility questionnaire. (Compl. ¶ 40.)

4

**B.      The NuRide EB-5 Offerings Were Unregistered Securities Offerings**

Section 5 [15 U.S.C. § 77e] of the Securities Act makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the Commission and is in effect as to such offer or sale. (Compl. ¶ 41.) Defendants purported to offer and sell securities in the NuRide EB-5 Offerings without registration with the Commission pursuant to exemptions, including Regulation D of the Securities Act; however, the NuRide EB-5 Offerings were not eligible for exemptions from registration with the Commission. (Compl. ¶¶ 42-43.)

Exemption from registration pursuant to Rule 506(c) [17 C.F.R. § 203.506(c)] of Regulation D requires that "[a]ll purchasers of securities sold . . . are accredited investors." (Compl. ¶ 44.) Shah and MSA Law assessed investor eligibility for investment in the NuRide EB-5 Offerings, which purportedly included review of each investor's eligibility questionnaire to determine whether the investor was accredited. (Compl. ¶ 45.) For their roles in the NuRide EB-5 Offerings, Shah and MSA Law were paid by NuRide. (Compl. ¶ 49.)  Prior to investing in NYC Green, Med Trans, or EV Mobility, MSA Law employees, acting at Shah's direction, provided investors with an investor eligibility questionnaire to complete, which included a section to list the investors' financial information. (Compl. ¶ 46.) For each of the NuRide EB-5 Offerings, at least one investor's eligibility form indicated that the investor was not accredited. (Compl. ¶ 47.) Despite the clear indication that these investors were not accredited, the Defendants permitted the investors to invest in the NuRide EB-5 Offerings and collected more than $500,000 from each of them. (Compl. ¶ 48.)

II.       **NYC Green**

    A.       **The Unregistered NYC Green Securities Offering**

Between approximately June 2014 and December 2018, Ahmed, NuRide, NYC Green, Shah, and MSA Law offered and/or sold interests in NYC Green to investors in exchange for a subscription amount of $500,000 each and up to a $50,000 administrative fee from each investor. (Compl. ¶ 50.) NYC Green's proposed plan, according to its offering memoranda, was to develop or assemble a fleet of for-hire vehicles, including handicap accessible, livery, and luxury cars. (Comp. ¶ 51.) The NYC Green offering memoranda included wire instructions for investors to send their investments to a bank located in New York, New York, and stated that NYC Green's business would "operate in all five Boroughs of New York City." (Compl. ¶¶ 53-54.)  Since its 2014 formation, Ahmed and NuRide have controlled NYC Green's operations, and at NYC Green's formation, NuRide owned 100% of its interests and, at all times relevant, has continued to claim to hold a majority interest in NYC Green. (Compl. ¶¶ 55-56.)

Between June 2014 and December 2018, Shah and MSA Law provided NYC Green's offering documents, including an offering memorandum, and its attachments, including a business plan, operating agreement, subscription agreement, and investor eligibility questionnaire, to potential investors. (Compl. ¶ 57.)

In addition to the possibility of unconditional permanent residency, NYC Green's offering memoranda stated that NYC Green intended to make distributions to investors. (Compl. ¶ 58.) Versions of the NYC Green offering memorandum dated from at least November 12, 2015 and later, described a distribution to investors of 0.5% per year of the investor's capital contribution, which some investors negotiated higher. (Compl. ¶¶ 59-60.)

While NYC Green initially raised $40 million, an amendment to the NYC Green Offering memorandum dated October 20, 2017, expanded the NYC Green Offering to allow for investors to invest an additional $9,500,000 in NYC Green, bringing the total of investor funds raised to $49.5 million from at least 99 investors. (Compl. ¶¶ 61, 73.) The amended memorandum stated that NYC Green "expects to create additional full-time permanent jobs," that the "funds will be used for greater fleet expansion, job creation and technology upgrades," and that NYC Green "will provide 0.5% equity to each additional investor." (Compl. ¶ 61.) Ahmed, NuRide and NYC Green pooled investors' money in NYC Green bank accounts at a bank in New York, New York, and represented that NYC Green would invest those funds in the NYC Green business. (Compl. ¶ 62.)

NYC Green investors had no involvement in the management or day-to-day operations of NYC Green, consistent with the NYC Green offering memoranda, which stated that "[a]ll management and other power relating to the day-to-day control of the LLC [defined as NYC Green] will be held and exercised by the Manager . . ." (Compl. ¶¶ 64-65.)

The NYC Green offering memoranda asserted that the interests were not registered under the Securities Act of 1933, claimed the interests would be offered and sold to qualified investors, and claimed to be operating under exemptions to registration, including Regulation D of the Securities Act. (Compl. ¶¶ 67-68.) However, Defendants offered and sold interests in NYC Green to multiple investors whose represented net worths and annual incomes were below that of accredited investors. (Compl. ¶ 69.) Ahmed, NuRide, and NYC Green promoted the NYC Green investment on NuRide's internet website, available throughout the United States, and secured investments from investors in multiple states through the instrumentalities of interstate commerce. (Compl. ¶ 70.) NuRide employees participated in podcasts hosted by Shah, which

were available in the United States through MSA Law's website and standard podcast platforms, on which the NuRide employees spoke about NuRide-affiliated businesses, including a May 2016 podcast. (Compl. ¶¶ 71-72.)

The NYC Green offering memoranda described that the administrative fee would be used to reimburse the manager and the LLC for expenses of the offering and between 2014 and 2018, NuRide received millions from NYC Green. (Compl. ¶¶ 75-77.) Pursuant to a January 2015 employment agreement, Ahmed was to be paid a base salary of $200,000 as an employee of NuRide. (Compl. ¶ 78.) Between 2014 and 2018, Ahmed received at least $1.1 million in salary, plus the use of a new Mercedes automobile and reimbursement of various expenses, from NuRide, in addition to salaries of over $118,000, plus health insurance, from MSA Law. (Compl. ¶¶ 79-80.)

### B.    Misrepresentations to NYC Green Investors

The NYC Green offering memoranda stated that NYC Green was created to raise EB-5 investment capital and create the required jobs under the EB-5 Program, stating that it "intends to utilize all of the proceeds of this offering . . . to finance and develop the Project as described herein." (Compl. ¶¶ 81-82.) According to the NYC Green offering memoranda and business plans, NYC Green was both the NCE and job creating entity ("JCE") for purposes of the EB-5 Program and versions of the NYC Green offering memorandum dated from at least November 12, 2015 and later stated that "investment will be directly into the NCE and JCE" and "[t]he business operations will arise from the NCE/JCE" and "[t]he job creation will consist of direct employees and who will receive wages directly from the NCE." (Compl. ¶¶ 83-84.) These representations were material. (Compl. ¶ 85.)

### (1) Management Contribution

In its offering memoranda and business plans, NYC Green touted an $11 million non-investor contribution to potential investors, which constituted a material misrepresentation. (Compl. ¶¶ 86-87) In particular, business plans provided to investors from 2014 through 2018, stated that NYC Green "was formed with an initial investment of $11 million from its principals." (Compl. ¶ 88.) A 2014 NYC Green offering memorandum and versions dated from at least November 2015 and later described the $11 million principal contribution as "non-EB5 capital," and detailed that the invested funds would be used for business expenses. (Compl. ¶¶ 89-90.) Despite NYC Green, NuRide and Ahmed's representations to investors, NYC Green's principals, including NuRide, never made a $11 million investment in NYC Green. (Compl. ¶ 91.)

### (2) NYC Green Operations

Additionally, despite NYC Green, NuRide and Ahmed's representations to investors that NYC Green would be the JCE and NCE, Ahmed, through NuRide, arranged for (i) NuRide to use NYC Green's assets, including money and its fleet of vehicles, (ii) NuRide, not NYC Green, to be the named party to NYC Green's largest revenue-producing contract, and (iii) NuRide to create jobs that should have been created through NYC Green. (Compl. ¶ 92.) Specifically, from at least September 2017 through August 2023, in connection with a series of contracts with a ride-sharing company, NYC Green provided vehicles and drivers used to generate revenue with the ride-sharing company (the "Ride-Share Deal"). (Compl. ¶ 93.) Despite the use of NYC Green's assets, including vehicles purchased with NYC Green investor funds, to earn these revenues, NuRide, not NYC Green, was a party to the contracts with the ride-sharing company and was routinely paid the revenue from the Ride-Share Deal. (Compl. ¶¶ 94-96.) Once in

NuRide's bank account, for which Ahmed was a signatory, Ahmed or others acting at his direction, through NuRide, commingled the Ride-Share Deal revenue with other funds and spent the money, including on payroll for NuRide employees. (Compl. ¶ 97.) Ahmed and NuRide transferred a portion of the Ride-Share Deal revenues to NYC Green when and as needed to cover specific expenses, such as salaries for drivers, but did not consistently record NYC Green's profits earned from the Ride-Share Deal in NYC Green's accounting records. (Compl. ¶¶ 98-99.) Between September 2017 through August 2023, the time that NuRide was receiving revenues from the Ride-Share Deal, Ahmed received regular compensation from NuRide and its affiliates. (Compl. ¶ 100.)

The structure and operation of NYC Green's business was inconsistent with Ahmed, NuRide, and NYC Green's representations to investors that their funds would be used to operate NYC Green's business and for the creation of jobs through NYC Green, requirements upon which investors' eligibility for the EB-5 Program depended. (Compl. ¶ 101.) Indeed, in response to their applications for unconditional permanent residency status in the United Sates, USCIS sent multiple NYC Green investors a notice of the agency's intent to deny the investors' petitions, citing, among other issues, NuRide's role in NYC Green's business, and concluded that, "[g]iven that these exhibits highlight the performance of NuRide Transportation Group, LLC rather than the NCE, the record lacks evidence demonstrating the NCE [NYC Green] engaging in legitimate business activities." (Compl. ¶¶ 102-103.)

### (3)   2018 Settlement with the Commission

In March 2018, Edwin Shaw LLC ("Edwin Shaw"), an entity co-owned by Ahmed and Shah, with its principal place of business in this District, reached a settlement with the

Commission (without admitting or denying the Commission's findings) for violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] (the "Edwin Shaw Settlement") and Edwin Shaw was required to pay the Commission $544,744.20. (Compl. ¶¶ 105-106.)

Ahmed, through NuRide and NYC Green, used NYC Green investor funds to pay a portion of the Edwin Shaw Settlement. (Compl. ¶ 107.) On or about January 29, 2018, an NYC Green investor ("NYC Green Investor A") transferred $510,000 to an NYC Green bank account ending in 0269 ("NYC Green Account 1") as part of an EB-5 investment in NYC Green. (Compl. ¶ 108.) Between January 29 and February 5, 2018, through a series of transactions between two NYC Green bank accounts and a NuRide bank account (Ahmed was a signatory on all accounts involved), a portion of NYC Green Investor A's funds was sent to an Edwin Shaw account (the "Edwin Shaw Account") for which Ahmed was listed as a signatory and President of Edwin Shaw. (Compl. ¶¶ 108-19.) On February 5, 2018, $129,744.20, nearly the entire balance of the Edwin Shaw Account, was transferred to an escrow account of Edwin Shaw's attorney. (Compl. ¶ 120.) The description on the Edwin Shaw Account bank statement for the $129,744.20 transfer to Edwin Shaw's counsel included a Commission internal case number and the following information: Settlement of Edwin Shaw, LLC. (Compl. ¶ 121.) On or about March 13, 2018, a cashier's check was issued in the amount of $544,744.20, payable to the Commission, from the Edwin Shaw attorney escrow account. (Compl. ¶ 122.)

## III.   The Unregistered Med Trans Securities Offering

From at least February 2018 through approximately October 2020, Ahmed, NuRide, Shah, MSA Law, Gravitas (referred to in the Complaint as the "Regional Center"), and Med Trans offered and/or sold interests in Med Trans to investors for a subscription amount of $500,000 each and up to a $50,000 administrative fee from each investor, with sixteen investors

collectively investing $8 million in Med Trans seeking to participate in the EB-5 Program. (Compl. ¶¶ 123-24.)

Med Trans' offering memorandum stated, "[w]e have structured the Interests to be qualifying investments under the EB-5 Program." (Compl. ¶ 125.) Med Trans' offering memorandum also stated that non-managing members [or investors] were entitled to receive a "Non-Managing Member Return," which was at least 2.5% of the non-managing member's capital invested in the Project Company per annum, as well as potential residual profit sharing after the Managing member received its own 2.5% return and stated that investors would "not participate in the active day-to-day management of the Company or the decisions made by [the] Managing Member" who held such control. (Compl. ¶¶ 126-29.) Also, Med Trans' offering memorandum stated that "[NuRide] formed [Med Trans] to direct EB-5 capital into the Project under the sponsorship of" Gravitas, a managing member of Med Trans. (Compl. ¶¶ 130-31.) According to Med Trans' offering memorandum, as sponsor of the Med Trans project, Gravitas was to receive an affiliation fee, the initial installment of which was paid by NuRide, and an administrative fee of $5,000 per investor from Med Trans. (Compl. ¶¶ 132-33.) The contact information listed on the Med Trans offering memorandum is the same as that of MSA Law, and Shah was the owner and managing member of Med Trans. (Compl. ¶¶ 135-36.) NuRide, with Ahmed as principal managing member and executive chairman, was manager of the project companies to which Med Trans invested capital would be lent. (Compl. ¶ 137.)

Med Trans' offering memorandum asserted an expectation to offer the interests in the U.S. under an exemption from Registration under the Securities Act that restricts sales to accredited investors. (Compl. ¶ 139.) Despite this assertion, at least one investor who represented a net worth and annual income below that of an accredited investor was offered and sold interests

in Med Trans. (Compl. ¶ 140.) Ahmed, NuRide, and Med Trans promoted the Med Trans

investment on NuRide's internet website, available throughout the United States, and secured

investments from investors in at least five states through the instrumentalities of interstate

commerce, and Med Trans was promoted on MSA Law's website, available throughout the

United States. (Compl. ¶¶ 141-42.)

## IV.    The Unregistered EV Mobility Securities Offering

Between approximately October 2021 through November 2022, Ahmed, NuRide, Shah,

MSA Law, and EV Mobility offered and/or sold interests in EV Mobility to investors in

exchange for a subscription amount of $500,000 each and up to a $50,000 administrative fee

from each investor, with seventeen investors collectively investing $8.5 million in EV Mobility

seeking to participate in the EB-5 Program. (Compl. ¶¶ 144-45.)

EV Mobility's offering memorandum stated that the managing member, as opposed to

EB-5 investors, "exercise[d] all management power and other powers relating to day-to-day

control of [EV Mobility] . . .." and its business plan listed Ahmed as executive chairman of EV

Mobility and principal managing member and executive chairman of EV Mobility's manager.

(Compl. ¶¶ 147-48.) Between 2021 and 2022, Ahmed was also a signatory on EV Mobility's

bank accounts and his contact information at NuRide was listed on the EV Mobility Operating

Agreement. (Compl. ¶¶ 149-50.) Pursuant to EV Mobility's offering memorandum, investors

were entitled to receive an annual return of at least 2.5% of their capital contribution per annum,

project performance permitting, and that EV Mobility "structured the Interests to be qualifying

investments under the EB-5 Program, with the intent that Investors may obtain permanent U.S.

residency." (Compl. ¶¶ 151-52.) EV Mobility's offering memorandum also asserted an

expectation to offer the interests in the U.S. under an exemption from Registration under the

Securities Act that restricts sales to accredited investors; however, at least one investor who represented a net worth and annual income below that of an accredited investor was offered and sold interests in EV Mobility. (Compl. ¶¶ 154-55.)

Shah and MSA Law marketed EV Mobility at conferences and seminars throughout the United States and at least one virtual conference available via the internet throughout the United States. (Compl. ¶ 156.) For example, in October 2021, Shah participated in a seminar in Michigan on how to obtain a green card in the U.S. through investment, which was featured on internet platform Eventbrite. (Compl. ¶¶ 157.) Shah was listed as a speaker from MSA Law and the website also listed a "Project Speaker" (a NuRide employee at the time) from "NYC EV Mobility LLC (Tesla Project)." (Compl. ¶¶ 160-62.) Shah also promoted the October 2021 webinar on her own EB-5 website. (Compl. ¶ 163.)

## V.      Tolling Agreements

Shah and MSA Law has entered into tolling agreements with the Commission, tolling the statute of limitations applicable to this action for the period of September 29, 2023 through December 28, 2023. (Compl. ¶¶ 165-66.)

## STANDARD OF REVIEW

"To survive a motion to dismiss [under Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The Court's function on a motion dismiss is 'not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" *Fed. Ins. Co. v. Gander & White Shipping, Inc.*, No. 19 Civ. 7209 (ALC), 2020 WL 3833408, at *1 (S.D.N.Y. July 8, 2020) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). In deciding the motion, the Court must assume "the truth of the facts asserted in the Complaint" and draw "all reasonable inferences from those facts in favor of the plaintiff." *SEC v. Alpert*, No. 17 Civ. 1879 (LTS), 2018 WL 1156012, at *2 (S.D.N.Y. Mar. 2, 2018) (citing *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir. 2009)); *accord Fed. Ins. Co.*, 2020 WL 3833408, at *1 (same).

## ARGUMENT

## I.      Interests Offered and Sold in the NuRide EB-5 Offerings Are Securities

The Shah Defendants, joined by the Ahmed Defendants, argue that "the SEC has not adequately pled that the NuRide EB-5 Offerings are securities under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)." (Brief of Shah Defendants ("Shah Defs. Br.") 7 n.3; Brief of Ahmed Defendants ("Ahmed Defs. Br.") 9 n.2.) While Defendants raise their argument only in footnotes and this Court has held that an argument so raised may be deemed waived, in the event the Court is inclined to consider Defendants' argument, the SEC will address it. *SEC v. Botvinnik*, No. 18-cv-8182 (VSB), 2019 WL 4738900, at *15 (S.D.N.Y. Sept. 29, 2019) (citation omitted). Defendants incorrectly argue that the interests offered and sold, as alleged in the Complaint, fail to satisfy one element of the *Howey* analysis, which requires that the investment involve an expectation of profits produced by the efforts of others. (Shah Defs. Br. 7 n.3.) *See Howey*, 328 U.S. at 298-99 (1946) ("[A]n investment contract for purposes of the Securities Act [and thus a security] means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promotor or a third

party."). Defendants do not argue that the Complaint has not satisfied the other two elements of *Howey*: (1) investment of money (2) in a common enterprise. *Id.*

The Complaint has sufficiently alleged an expectation of profits produced by the efforts of others for the NuRide EB-5 Offerings, consistent with *Howey*. First, as alleged in the Complaint, offering memoranda for each of the NuRide EB-5 Offerings describe distribution of profits, in varying percentages, to investors in connection with their investment. (Compl. ¶¶ 58-60, 127, 151.) Second, the Complaint alleges that the offering memoranda for each of the NuRide EB-5 Offerings indicated that the investors would have no involvement in the management or day-to-day operations of NYC Green, Med Trans, or EV Mobility, and that operations would instead be handled by management. (Compl. ¶¶ 64, 128-29, 147-148.)  For example, the NYC Green offering memoranda stated that "the Manager [NuRide] will be solely responsible for making all decisions of the Issuer pertaining to the utilization of the Offering proceeds and the results therefrom. Additionally, the Manager [NuRide] is generally responsible by the terms of the Operating Agreement for the operations of the Issuer." (Compl. ¶¶ 25, 65.) In fact, the Med Trans offering memorandum refers to investor returns as a "non-managing member return." (Compl. ¶ 127.)

Further, the Complaint alleges that, according to their offering memoranda, each offering was structured to comply with the EB-5 Program and create jobs, which would make investors eligible for unconditional permanent residency status in the United States. (Compl. ¶¶ 3, 30-31, 63, 81-82, 125, 152.) Defendants incorrectly argue that the SEC has not pled that the investors expected to generate profits because their overarching goal was to obtain permanent residency status. (Shah Defs. Br. 7 n.3.) However, "*Howey* is an objective test that provides the flexibility necessary for the assessment of a wide range of investment vehicles." *SEC v. Kik Interactive Inc.*,

492 F. Supp. 3d 169, 183 (S.D.N.Y. 2020). The expectation of profits "inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 371 (S.D.N.Y. 2020) (citation omitted). In a case concerning EB-5 investments, a court in the Eastern District of New York rejected Defendants' exact argument and held that "[t]he inquiry under *Howey* is objective, and investors' subjective motivations are categorically immaterial." *SEC v. Xia*, No. 21-cv-5350 (PKC), 2022 WL 17539124, at *20 (E.D.N.Y. Dec. 8, 2022) (citing *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982), *appeal filed*, No. 22-3137 (2d Cir. Dec. 14, 2022). The *Xia* court held that the offering memoranda, which included the possibility of financial return on investment was sufficient to "create an objective expectation that purchasers would profit by investing." 2022 WL 17539124, at *20. "Nothing in *Howey* stands for the impractical proposition that the expectation of profit must be an investor's only or overriding motivation, but only that such expectation in the form of 'financial returns on [the] investment' must be present as part of the scheme." *Id.* at 21 (citations omitted); *see also SEC v. Hui Feng*, 935 F.3d 721, 727 (9th Cir. 2019) (holding that the EB-5 investor's interest in a visa is tied to the project's financial success). This reasoning squarely applies here, where the Complaint alleges that each of the NuRide EB-5 Offerings' memoranda described a common enterprise, which could provide a financial return for investors in addition to an opportunity for unconditional permanent residency.

Within the same footnote, Defendants claim that "the SEC has offered only the qualified position that EB-5 investments 'may involve securities offerings.'" (Shah Defs. Br. 7 n.3 (citing ER 315-319 (USCIS and SEC, "Investor Alert-Investment Scams Exploit Immigrant Investor Program") (Oct. 1, 2013) ("Investor Alert")).) While it is unclear what, if any, argument

Defendants seek to support with this claim, it is inappropriately raised in a motion to dismiss as there are no such allegations in the Complaint. *SEC v. O'Meally*, No. 06-cv-6483 (LTS), 2008 WL 4090461, at *3 (S.D.N.Y. Sept. 3, 2008) ("on a motion to dismiss, the Court is not permitted to consider factual allegations outside the complaint"). To the extent Defendants claim inadequate notice of their obligations under the Securities laws or the SEC's interpretation of those laws, such a claim is not plausibly alleged. The very SEC Investor Alert cited by the Defendants contained two hyperlinks to SEC enforcement cases charging violations of the Securities laws in connection with EB-5 offerings and referred to securities in the EB-5 context.[1] (ER 315-319 (USCIS and SEC, "Investor Alert-Investment Scams Exploit Immigrant Investor Program") (Oct. 1, 2013).) For example, the 2013 Investor Alert stated that "the SEC has taken emergency enforcement action to stop allegedly fraudulent securities offerings made through EB-5," and included a description of "unregistered investments." *Id.* Further, Defendants cannot credibly claim to have been unaware that they were offering and selling securities subject to registration under the Securities Act. As the Complaint alleges, the offering memoranda for the NuRide EB-5 Offerings all claimed that the offerings were in compliance with securities registration obligations. (Compl. ¶¶ 67, 139, 154.) Indeed, "[t]he question whether 'fair notice' has been provided should be assessed from the perspective of a reasonable person *in the defendant's industry* rather than from that of a member of the general public." *SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346 (JSR), 2023 WL 4858299 at *10 n.5 (S.D.N.Y. July 31, 2023). Defendants, all of whom operated regularly in the EB-5 investment space, do not plausibly allege that they did not have fair notice of their obligations under the federal securities laws.

---

[1]      https://www.sec.gov/oiea/investor-alerts-bulletins/investor-alerts-ia_immigrant

**II.      The SEC's Claims Are Timely**

The Defendants argue that this Court should dismiss all claims of misconduct alleged to have occurred more than five years before the filing of the Complaint. (Ahmed Defs. Br. 11-12; Shah Defs. Br. 12.) Because, on its face, the Complaint alleges timely violations of the federal securities laws, the Defendants raise this defense prematurely, but the SEC will address it. *See Connecticut Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131-32 (2d Cir. 2021). The violations alleged in the Complaint occurred from June 2014 through November 2022 (the "Relevant Period"), inside ten years of the Complaint's filing on November 21, 2023. (Compl. ¶ 1.) Defendants, however, would have this Court ignore the applicability of the William M. Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4626 (2021), which amended Section 21(d) of the Exchange Act [15 U.S.C. 78u(d)] and explicitly set statutes of limitation applicable in Commission enforcement cases. *See SEC v. Ahmed*, 72 F.4th 379, 392 (2d Cir. 2023); *SEC v. Stubos*, 634 F. Supp. 3d 174, 189 (S.D.N.Y. 2022). Commission claims for civil penalties are subject to a five-year statute of limitations under 28 U.S.C. § 2462; however, since the Complaint alleges violations within five years of its filing, the SEC's claims meet this constraint. *See SEC v. Fowler*, 6 F.4th 255, 260 n.5 (2d Cir. 2021).

**A.      The NDAA Applies Retroactively**

On January 1, 2021, Congress enacted the NDAA, which implemented time limitations for the Commission to seek disgorgement pursuant to Section 21(d)(7) of the Exchange Act to "5 years after the latest date of the violation that gives rise to the action" for non-scienter-based violations and "10 years after the latest date of the violation that gives rise to the action" for scienter-based violations, specifically naming Section 10(b) of the Exchange Act and Section

17(a)(1) of the Securities Act. NDAA, § 6501(a) (codified at 15 U.S.C. § 78u(d)(8)(A)). The NDAA also added language that stated the Commission, "may seek a claim for any equitable remedy, including for an injunction . . . not later than 10 years after the latest date on which a violation that gives rise to the claim occurs." *Id*. (codified at 15 U.S.C. § 78u(d)(8)(B)). The NDAA expressly provides that it applies "with respect to any action or proceeding that is pending on, or commenced on or after, the date of the enactment of this Act." NDAA, § 6501(b).

The Second Circuit and courts within and outside this District have overwhelmingly held that the NDAA applies retroactively, as Congress intended. *See Ahmed*, 72 F.4th at 400-02 (holding the NDAA was appropriately applied retroactively to a pending action); *Fowler*, 6 F.4th at 260 n.5 (2d Cir. 2021) (NDAA "retroactively imposed a new ten-year statute of limitations"); *Stubos*, 634 F. Supp. 3d at 197 ("fidelity to legislative intent as well as to the notion that Congress means what it says when it adopts language that has been defined to have an explicit statutory interpretation require that this Court interpret the NDAA to apply retroactively and to revive previously time-barred claims both in pending cases and in subsequently filed cases."); *Xia*, 2022 WL 17539124, at *15; *SEC v. Sharp*, 626 F. Supp. 3d 345, 371 (D. Mass. 2022). Nevertheless, the Ahmed Defendants argue that the NDAA cannot apply retroactively to actions commenced after its enactment. (Ahmed Defs. Br. 12-19.) While conceding the NDAA's application to scienter-based claims, the Shah Defendants argue that the NDAA has no application to the non-scienter-based violations of Section 5 of the Securities Act with which they are charged. (Shah Defs. Br. 8 n.5.) Defendants are incorrect.

Congress expressly prescribed that the NDAA applies retroactively. The NDAA states that it "shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act." NDAA, § 6501(b). The Supreme Court has described

such language as an "explicit retroactivity command." *Landgraf v. Usi Film Prod.*, 511 U.S. 244,

255-56 & n. 8 (1994); *see also Martin v. Hadix*, 527 U.S. 343, 354 (1999). "Congress, in passing

the NDAA, chose to adopt the language that the Supreme Court stated in *Landgraf* would convey

a 'determinate meaning' of retroactivity virtually verbatim." *Stubos*, 634 F. Supp. 3d at 197. The

Second Circuit thus reasoned that "[i]f Congress enacts a provision containing a phrase to which

the Supreme Court has previously ascribed a particular meaning, we will presumptively confer

that meaning to the provision." *Ahmed*, 72 F.4th at 400. As the Supreme Court held in *Bank*

*Markazi v. Peterson*, 578 U.S. 212, 229 (2016), "Congress may indeed direct courts to apply

newly enacted, outcome altering legislation in pending civil cases," and thus logically can direct

courts to apply newly enacted legislation to cases filed after the law is passed. *See Xia*, 2022 WL

17539124, at *15 (holding that the NDAA applies retroactively to claims commenced after its

passage).

 The Ahmed Defendants' reliance on *In re Enter. Mortg. Acceptance Co., LLC, Secs. Litig.*

*v. Enter. Mortg. Acceptance Co.* ("*Enterprise Mortgage*"), 391 F.3d 401 (2d Cir. 2004), is

misplaced. While the Second Circuit held that the statutory language considered there was too

ambiguous to create a retroactive right of action, such language is distinguishable from the

NDAA. *Enterprise Mortgage*, 391 F.3d at 407. The statute considered in *Enterprise Mortgage*

did not include the "pending on" language of the NDAA, but instead included a clause that

"[n]othing in this section shall create a new, private right of action." *Id.* at 406. "The NDAA has

none of the features that the court in *Enterprise Mortgage* relied on to conclude that the

retroactive effect of [the statute] was ambiguous." *Stubos*, 634 F. Supp. 3d 174 at 199. In fact, as

pointed out by the *Stubos* court, in *Enterprise Mortgage*, the Second Circuit specifically referred

to "all proceedings pending on or commenced after the date of enactment" (language of the later

NDAA) as "unambiguous language that the Supreme Court has asserted would amount to an express retroactivity command." *Enterprise Mortgage*, 391 F.3d at 407.

Because the language of the NDAA clearly indicates retroactive intent, the Court need not continue its analysis. *Landgraf,* 511 U.S. at 280. However, the Ahmed Defendants incorrectly argue that retroactive application of the NDAA would have impermissible effects because at the time of the alleged violations, the governing statute of limitations was five years pursuant to § 2462. (Ahmed Defs. Br. 14-16.) This argument is meritless. The Complaint alleges violations associated with the NYC Green Offering, which took place between June 2014 and December 2018. (Compl. ¶ 50.) Prior to the Supreme Court's June 2017 ruling in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), this Circuit applied no limitations period to the equitable remedy of disgorgement. So, unlike Defendant's assertion otherwise (*See* Ahmed Defs. Br. 16, 19), throughout most of the NYC Green Offering, specifically June 2014 through June 2017 (Pre-*Kokesh*), the SEC's claims seeking disgorgement were not subject to a five-year statute of limitations period.

Further, before the NDAA's enactment, no statute of limitations applied to the SEC's injunctive claims, so Defendants could not reasonably have considered themselves immune from liability for the charged conduct at any point. *See SEC v. Gentile*, 939 F.3d 549 (3d Cir. 2019). Both defense briefs cite *SEC v. Cohen*, 332 F. Supp. 3d 575 (E.D.N.Y. 2018), for the proposition that injunctive relief is subject to a five-year statute of limitations (absent the application of the NDAA), and thus the SEC's claims based on violations that occurred beyond a five-year statute of limitations should be dismissed. (Ahmed Defs. Br. 9-12; Shah Defs. Br. 8-12.) However, multiple courts that considered this issue have rejected the *Cohen* court's reasoning and held that injunctive relief is not a penalty and was never subject to a five-year statute of limitations. *See Stubos*, 634 F. Supp. 3d at 192 (holding that "injunctive relief, properly granted and fashioned, is

not a penalty" and that the "SEC's claims for injunctive relief are not subject to the five-year statute of limitations contained in Section 2462 and, therefore, regardless of the applicability of the [NDAA], are not time-barred."); *see also Gentile*, 939 F. 3d at 556-63; *SEC v. Graham*, 823 F. 3d 1357, 1362 (11th Cir. 2016). Indeed Section 2462, which imposes a five-year statute of limitation as to civil penalties, does not mention injunctive relief, but instead states that it applies to "an action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462. The *Stubos* court further explained that "[a] penalty is essentially backward looking – it seeks to punish a defendant for their past wrongs," which "distinguishes it from injunctive relief – the object of which is 'solely to prevent threatened future harm,'" an "essentially remedial purpose[]." *Stubos*, 634 F. Supp. 3d at 191-92. In any event, because the NDAA expressly applies retroactively, the Court need not reach the question of the statute of limitations appliable to claims for injunctive relief prior to the enactment of the NDAA.

Defendants argue, in a footnote, that if the five-year statute of limitations has expired (which it has not) for disgorgement and civil monetary penalty relief, then this Court should exclude all relief, including injunctive relief, for such claims. (Shah Defs. Br. 12 n.7.) In support, the Defendants cite cases decided decades before the enactment of the NDAA. With the enactment of the NDAA, "Congress has explicitly decided that a ten-year statute of limitations applies for the SEC's injunctive relief [and bars]." *SEC v. Gallison*, 588 F. Supp. 3d 509, 521 (S.D.N.Y. 2022). If the Defendants' logic were to hold, the NDAA's unambiguous ten-year statute of limitations for injunctive relief would be meaningless beyond five years.

Also, the NDAA provides that the statute of limitations for both scienter- and non-scienter-based claims for disgorgement and injunctive relief run from "the latest date of the

violation that gives rise to the action or proceeding in which the Commission seeks the claim."
NDAA, § 6501(a) (codified at 15 U.S.C. § 78u(d)(8)(A)(i)-(iii)). Thus, the SEC's claims are
timely if they are brought within five or ten years of the latest violation, "that is, when the illegal
conduct comes to an end." *Xia*, 2022 WL 17539124, at *16; *see also SEC v. Almagarby*, No., --
F.4th --, No. 21-13755, 2024 WL 618517, *8 (11th Cir. February 14, 2024) (holding that
pursuant to the NDAA, the Commission's disgorgement claim was timely "[b]ecause the
Commission filed suit within five years of Almagarby's latest culpable act").

### B. The Complaint Alleges Violations within Relevant Statutes of Limitation

All Defendants are charged with violating Sections 5(a) and (c) of the Securities Act [15
U.S.C. §§ 77e(a) and (c)] throughout some or all the Relevant Period. (Compl. ¶¶ 1-3, 7, 9, 12-
13, 30, 50, 57, 73, 88, 123, 144.) These violations occurred in connection with three securities
offerings with overlapping durations: the NYC Green Securities Offering (June 2014 through
December 2018), the Med Trans Securities Offering (February 2018 through October 2020), and
the EV Mobility Securities Offering (October 2021 through November 2022). (Compl. ¶¶ 50,
123, 144.) It is worth noting that the Complaint alleges, and Defendants concede, that Shah and
MSA Law entered into agreements with the SEC, which tolled the statute of limitations
applicable to this case for the period of September 29, 2023 through December 28, 2023.
(Compl. ¶¶ 165-66.)

Ahmed, NuRide, and NYC Green are additionally charged with violating (including
aiding and abetting as to Ahmed and NuRide) antifraud provisions Section 17(a) of the Securities
Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule
10b-5 thereunder [17 C.F.R. § 240.10b-5] between June 2014 and December 2018 in connection

with the NYC Green Securities Offering. (Compl. ¶¶ 1-7, 12, 14-15, 30, 50, 57, 73, 77, 84, 88-90, 93, 100, 105-122.)

The SEC is seeking injunctive relief, disgorgement with prejudgment interest, and civil monetary penalties from all Defendants based on the violations alleged.

The alleged violations under Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, and Section 17(a)(1) of the Securities Act are scienter-based. Sections 17(a)(3) and (2) of the Securities Act, however, do not require proof of scienter; negligence is sufficient. *See Aaron v. SEC*, 446 U.S. 680, 701-02, 697 (1980). Also, Sections 5(a) and (c) do not require the Commission to prove scienter. *See SEC v. Softpoint*, 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997) (citing *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976)).

A plain reading of the NDAA provides that the SEC's claims in its Complaint filed on November 21, 2023, are timely. The scienter-based violations are alleged to have occurred in connection with the NYC Green Offering, between June 2014 and December 2018, well within the ten-year statute of limitations for the SEC to seek disgorgement and injunctive relief under Section 21(d)(7) of the Exchange Act. (Compl. ¶¶ 1-7, 12, 14-15, 30, 50, 57, 73, 77, 84, 88-90, 93, 100, 105-122.) The SEC's claims seeking civil penalty relief are subject to a statute of limitations of five years. 28 U.S.C. § 2462. While most of the NYC Green Securities Offering (June 2014 through December 2018) occurred beyond five years of the Complaint's filing, the Complaint alleges that the NYC Green Offering ended in December 2018, which is within the five-year statute of limitations for civil penalty relief. (Compl. ¶ 50.) Defendants incorrectly assert that only a single investor invested in NYC Green after November 21, 2018. (Ahmed Defs. Br. 12 n.3.) In either event, Defendants concede that the NYC Green Offering extended to within the relevant statutes of limitations and, as the Complaint alleges, even the investment of a single

NYC Green investor was substantial, amounting to over $500,000 paid to the Defendants. (Compl. ¶ 50.)

The Complaint alleges non-scienter-based violations in connection with each of the three securities offerings. For remedies associated with such claims, the NDAA imposed a five-year statute of limitations for the SEC to seek disgorgement pursuant to Section 21(d)(7) of the Exchange Act and a ten-year statute of limitations for the SEC to seek injunctive relief. The EV Mobility Offering (October 2021 through November 2022) is alleged to have occurred entirely within five years of the filing of the Complaint. (Compl. ¶ 144.) The vast majority of the Med Trans Offering (February 2018 through October 2020) too is alleged to have occurred within five years of the filing of the Complaint. (Compl. ¶ 123.) As noted above the date range alleged for the NYC Green Offering ends in December 2018, which is within any five-year statute of limitations. [2] (Compl. ¶ 50.) Violations alleged for all three offerings fall within the statute of limitations imposed by the NDAA to seek remedies of disgorgement and injunctive relief and the statute of limitations imposed by § 2462 as to civil penalties. Because the Complaint, on its face alleges violations within applicable statutes of limitations, dismissal of the Complaint is inappropriate.

## III.   The Complaint's Securities Fraud Allegations Satisfy Fed. R. Civ. P. 9(b).

To comply with Rule 9(b), a complaint alleging securities fraud "must state with particularity the circumstances constituting fraud or mistake." Scienter, however, "may be alleged generally." Fed. R. Civ. P. 9(b). The purpose of this rule is "to provide a defendant with

---

[2]   While Defendants Gravitas, Med Trans, and EV Mobility are charged with violating Section 5 of the Securities Act, those violations are not in connection with the NYC Green Offering. (Compl. ¶¶ 176-79.) To the extent that is suggested in the Shah Defendants' brief, that is inaccurate. (Shah Defs. Br. 10.)

fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (citation omitted). To allege fraud based on misstatements, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted). "Rule 9(b) must be read together, however, with Rule 8(a), which calls for 'short and plain statement[s]' of claims of relief." *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (citation omitted).

Ahmed, NuRide, and NYC Green cannot credibly claim to be without fair notice of the nature of the violations of fraud (and aiding and abetting violations of fraud) alleged against them. The Complaint details, often quoting, misrepresentations within NYC Green's own written offering documents, provided to investors over a nearly five year period, and explains why each statement is fraudulent. (Compl. ¶¶ 50, 52, 57, 63, 73, 77, 81-122.) Nothing more is required by Rule 9(b). Defendants incorrectly argue that the Complaint is insufficient because it provides date ranges for violations and does not identify individual investors. (Ahmed Defs. Br. 20-22.)

The SEC's Complaint alleges an organized NYC Green securities offering that took place over nearly five years, in which defendants collected $49.5 million from at least 99 investors who were routinely provided with written NYC Green offering documents containing misrepresentations quoted in the Complaint. (Compl. ¶¶ 50, 52, 57, 61, 63, 73, 77, 81-122.) Defendants have sufficient notice of the misstatements alleged. Listing the precise date and time that each investor received offering documents with the same misrepresentations would contravene the requirements of Rule 8(a), which must be read in conjunction with Rule 9(b). *See*

*SEC v. Feminella*, 947 F. Supp. 722, 733 (S.D.N.Y. 1996) ("Given the long-term nature of the scheme alleged, requiring plaintiff to list each securities transaction or alleged kickback payment by date, amount and markup would contravene the requirements of Rule 8(a) while not furthering the purposes behind Rule 9(b).").

In a case cited by Defendants, *Defer LP v. Raymond James Financial, Inc.*, 654 F. Supp. 2d 204 (S.D.N.Y.  2009), the court pointed out that allegations of a general time frame are sufficient for Rule 9(b), specifically allegations of false statements by an individual over the course of five years. 654 F. Supp. 2d at 212 n.61 (citing *Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5788 (DLC), 1995 WL 261518, at *9 (S.D.N.Y. May 3,1995) ("Where the plaintiffs have alleged the general time frame of communications, the person who made the statements, and the content of the statement, the inability to provide the exact dates will not defeat the claim.")); *see also Lehman Bros. Commercial Corp. v. China Int'l United Petroleum and Chem. Co., Ltd.*, No. 94 Civ. 8304, 1995 WL 608313, at *2 (S.D.N.Y. Oct. 16, 1995) ("Where misstatements are alleged to have occurred over a period of time, however, the pleadings are not required to provide the date and time of every communication . . .") (citation omitted).

Defendants' reliance on *SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017), and *Cambridge Capital LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420 (S.D.N.Y. Sept. 30, 2021), is misplaced. Those courts took issue with a lack of specificity well beyond the alleged date ranges, finding fault with the descriptions of the misstatements themselves. In *Cambridge Capital*, the court noted that the plaintiff failed to specify how or why the subject statements were false or misleading. *Cambridge Capital*, 565 F. Supp. 3d at 462-63. Similarly, the *Wey* court found that the complaint failed to indicate whether the defendants' alleged misstatements were made in connection with one company's exchange listing application or that of another company

altogether. *Wey*, 246 F. Supp. 3d at 911. Such deficiencies are not present in the SEC's Complaint.

Further, unlike the SEC Complaint's allegations, complaints in the other cases defendants cite lacked most of the circumstances of the misstatements alleged, including "who made the misstatements and to whom, when (other than throughout the Class Period), where, how frequently, and in what form." *Defer,* 654 F. Supp. 2d at 214 (holding insufficient allegations, without more, that Raymond James directed financial advisors to make misstatements to customers); *see also*, *In re Merrill Lynch Auction Rate Securities Litigation*, 704 F. Supp. 2d 378, 388-89 (S.D.N.Y. 2010). *Defer* and *Merrill Lynch* involved allegations of misrepresentations to an unknown portion of numerous customers by unidentified financial advisors. This is not either of those cases.

Additionally, although Rule 9(b) does not require it, the SEC's Complaint does include more specificity than a five-year date range, quoting misrepresentations concerning an $11 million capital contribution from "non-EB5 capital" in a "2014 NYC Green offering memorandum" and other versions of the memorandum dated from "November 2015." (Compl. ¶¶ 89-90.) Reference to an offering memorandum, of which the Complaint has numerous, "satisfies 9(b)'s requirements as to identification of the time, place, and content" of alleged misstatements. *Luce v. Edelstein*, 802 F.2d 49, 55 (2d. 1986) (allegations detailing an offering memorandum that represented a greater general partner contribution than what was actually contributed are sufficient under Rule 9(b)). Also, the SEC's Complaint identifies a specific defrauded investor, referred to as "NYC Green Investor A" and the specific date the investor transferred funds to the defendants, "[o]n or about January 29, 2018." (Compl. ¶ 108.)

**IV.     The Complaint Adequately Alleges Violations of Sections 5(a) and (c) of the Securities Act**

Defendants incorrectly argue that all the NuRide EB-5 Offerings were exempt from registration on the face of the Complaint. (Shah Defs. Br. 12-16.) Although not required, the Complaint plainly alleges the opposite.

Defendant concedes that "to state a cause of action under Section 5," the SEC must allege "'(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication or the mails in connection with the offer or sale.'" *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) (citation omitted). Defendants do not argue that the Complaint's allegations fail to meet this requirement.

After the Commission establishes a prima facie case, the burden then shifts to the defendant to prove any exemption from registration. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953). "The fact that plaintiff anticipated and challenged defendants' affirmative defense in the complaint . . . does not alter" the defendant's burden to prove entitlement to exemption. *Rosen ex rel. Egghead.com, Inc. v. Brookhaven Capital Mgmt. Co.*, 194 F. Supp. 2d 224, 228 (S.D.N.Y. 2002). "Defendants have no right to notice, in the complaint or otherwise, of the manner in which plaintiff may rebut defendants' proof of an affirmative defense." *Id.*

**A.      The Complaint Establishes a Prima Facie Case for Violations of Sections 5(a) and (c) of the Securities Act**

Here, the Complaint alleges a prima facie case that Defendants violated Section 5(a) and (c) of the Securities Act in connection with the NuRide EB-5 Offerings from June 2014 through November 2022. Despite prevailing law, which they admit, Defendants assert that the SEC failed to allege investors were unaccredited within the statute of limitations. (Shah Defs. Br. 11.) The

30

SEC will not revisit its arguments that its claims are timely. But the SEC simply is not required to rebut an affirmative defense to allege a violation of Section 5. Defendants' insistence that the Complaint is somehow deficient because it does not include greater specificity concerning the unaccredited investors confuses the SEC's burden to establish a prima facie case alleging unregistered offerings, which the SEC's Complaint has met, with rebuttal of an affirmative defense (exemption from registration), which is Defendants' burden to prove.

That the Complaint goes beyond establishing a prima facie case of violations of Section 5 and alleges that investors were unaccredited, does not alter the Defendants' burden to prove affirmative defenses. Defendants incorrectly argue that the Complaint fails to allege that any investor was unaccredited. (Shah Defs. Br. 14-16.) The Complaint contains clear allegations that the NuRide EB-5 Offerings included unaccredited investors. In addition to the allegations Defendants highlight in their brief (Shah Defs. Br. 14-15), the Complaint also alleges that "despite the clear indication that these investors were not accredited, the Defendants permitted the investors to invest in the NuRide EB-5 Offerings and collected more than $500,000 from each of them." (Compl. ¶ 9.) As noted above, the Court must draw "all reasonable inferences from the facts in favor of the plaintiff." *Alpert*, 2018 WL 1156012, at *2. From the facts alleged in the Complaint that investors' "represented net worths and annual incomes were below that of accredited investors," it is reasonable to infer that such investors were unaccredited.

Defendants make much of the timing of investment of any unaccredited investors for purposes of the statute of limitations applicable to relief. However, this argument does not help Defendants' cause to pull their conduct out of the reach of any applicable five-year statute of limitations for disgorgement or civil penalties. Defendants ignore that an exemption from registration pursuant to Rule 506(c) of Regulation D requires that "[a]ll purchasers of securities

sold . . . are accredited investors." So, the sale to an unaccredited investor at any point during the offering, renders the *entire* offering ineligible for exemption under Rule 506(c), which would include any other offers or sales to investors (accredited or otherwise) in the same offering, including those within five years of the filing of the Complaint. Thus, Defendants' persistent argument that the Complaint is somehow deficient for not alleging the timing of unaccredited investors' investments is a complete red herring.

A court may not dismiss a properly pled Section 5 claim based upon a purported exemption from registration unless the exemption is "clear on the face of the complaint." *SEC v. Sason,* 433 F. Supp. 3d 496, 514 (S.D.N.Y. 2020) (citing *SEC v. Bronson*, 14 F. Supp. 3d 402, 411 (S.D.N.Y. 2014)). No exemption is clear on the face of the SEC's Complaint. Defendants' repeated assertions that the SEC's Complaint alleges that the NuRide EB-5 Offerings were exempt from registration are blatantly inaccurate and the SEC has made no such allegations or admissions. (Shah Defs. Br. 12 n.8.) The Complaint, for example, alleges that "Defendants *purported* to offer and sell securities in the NuRide EB-5 Offerings without registration with the Commission pursuant to exemptions, including Regulation D of the Securities Act" and immediately follows with, "The NuRide EB-5 Offerings were *not* eligible for exemptions from registration with the Commission." (Compl. ¶¶ 42-43.) (Emphasis added.) Complaint references to Defendants' claims that the NuRide EB-5 Offerings were exempt from registration are clearly references to Defendants' representations and not SEC endorsements of those representations. (*See* Compl. ¶¶ 42-43, 66-69, 138-140, 153-155.)

**B.      The Complaint Adequately Alleges Section 5 Violations Against Mona Shah**

The Complaint alleges that Mona Shah violated Sections 5(a) and (c) of the Securities Act. The Shah Defendants incorrectly argue that the "the crux of the SEC's claim against Mona

is that, by virtue of her control over MSA Law and ownership interest in Gravitas, she is personally liable for any underlying securities violation committed by those entities." (Shah Defs. Br. 16-18.) Defendants ignore the Complaint's numerous allegations of Shah's participation in the NuRide EB-5 Offerings in addition to allegations of her control of MSA Law (Mona Shah and Associates),[3] as managing partner, and Gravitas, as owner and managing member. (Compl. ¶¶ 23, 28, 36-40, 45-46, 50, 123, 144, 156.) For example, the Complaint alleges that "*Shah* and MSA Law assessed investor eligibility for investment in the NuRide EB-5 Offerings . . . Before investors made their investment in [the NuRide EB-5 Offerings], *Shah* and MSA Law encouraged potential investors to meet with project management, including Ahmed and other NuRide personnel, to discuss the investments . . . *Shah* and MSA Law employees provided them with offering documents . . . Prior to investing in [the NuRide EB-5 Offerings], MSA Law employees, *acting at Shah's direction*, provided investors with an investor eligibility questionnaire . . . Ahmed, NuRide, NYC Green, *Shah*, and MSA Law offered and/or sold interests in NYC Green . . ." *Id.* (Emphasis added.) The Complaint also contains allegations that "*Shah* . . . marketed EV Mobility at conferences and seminars throughout the United States . . . For example, in October 2021, *Shah* participated in a seminar in Michigan," which featured an EV Mobility speaker, and promoted the seminar on her own EB-5 website. (Compl. ¶¶ 156–63.)

Section 5(a) and (c) of the Securities Act make it "unlawful for any person, directly or indirectly" to offer or sell securities, using interstate transportation or communication or the mails, without a registration statement in effect. "Liability arises when a principal in the sale of

---

[3]     The SEC's allegation that Mona Shah & Associates, PLLC, was organized as a New York limited liability company in 2014 (Compl. ¶ 29) is based on public records obtained from a search of the New York Department of State, Division of Corporations Entity Database ("NY Entity Database") https://apps.dos.ny.gov/publicInquiry/. Also included within the NY Entity Database is a record of Professional Service Corporation, Mona Shah, P.C., organized in 1998.

an unregistered security is either an issuer, an underwriter, or a necessary participant." *Softpoint*, 958 F. Supp. 846 (S.D.N.Y. 1997). The "indirectly" language in Section 5 means that liability does not require that the defendant actually passed title of the security. *SEC v. Tecumseh Holding Corp.*, No. 03 Civ. 5490 (SAS), 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009) ("Liability does not require that the defendant actually passed title of the security. Any person who 'engaged in steps necessary to the distribution' of the unregistered security is liable under Section 5.") (quoting *SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941)).

The Complaint adequately alleges that Shah directly or indirectly offered or sold securities in connection with the unregistered NuRide EB-5 Offerings, in violation of Section 5. As alleged, Shah personally marketed the NuRide EB-5 Offerings, interacted with investors, was tasked with vetting investors, and directed MSA Law employees in interactions with investors, which is sufficient to establish Shah's liability as a necessary participant in the NuRide EB-5 Offerings. (Compl. ¶¶ 23, 28, 36-40, 45-46, 50, 123, 144, 156.)  Also, the SEC's Complaint need not, but additionally alleges that Shah controlled both MSA Law, as managing member, often directing the actions of MSA Law employees, and Gravitas, as owner and managing member, operating both entities out of the same location in this District. (Compl. ¶¶ 28-29, 46.) While the Complaint may sufficiently establish it, the SEC has not alleged secondary liability as to Shah as a controlling person of MSA Law's or Gravitas's violations of Section 5(a) and (c), pursuant to Section 15(a) of the Securities Act. (*See* Compl. ¶¶ 174, 178-79.)

**CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss should be denied. If the Court

grants any part of Defendants' Motions, the Commission respectfully requests leave to amend to

address those deficiencies identified by the Court in ruling on the Motions.[4]

Dated:  New York, New York
        March 4, 2024

                          Respectfully submitted,


                          By:     s/ *Chevon Walker*
                                  Chevon Walker
                                  Ariel Atlas
                                  SECURITIES AND EXCHANGE COMMISSION
                                  100 Pearl St., Suite 20-100
                                  New York, New York 10004-2616
                                  (212) 336-0090 (Walker)

---

[4]      The Commission does not believe its Complaint is deficient in any respect, and cannot
therefore cite with any specificity those amendments it could make at this time. *See Loreley Fin.
(Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC,* 797 F.3d 160, 190-91 (2d Cir. 2015) (reversing
District Court's dismissal without leave to amend where plaintiff could not anticipate the defects
prior to full briefing and a decision and could not therefore propose specific amendments).