# Exhibit 18

**In the Matter of :** }
***NuRide Transportation (NY-9454)*** }
}
**AFFIDAVIT OF NADIM AHMED** }

I Nadim Ahmed, do solemnly swear and state as follows:

The purpose of this affidavit is to assist the fact-finding subpoena dated November 8, 2016. I believe that this subpoena was instigated as a result of malicious complaints, which I address below. In any event, I welcome this opportunity to introduce the New York City Green Transportation Project (hereafter "NYCGT") and to finally end the incessant blackmail threats that have consistently dogged this project. I welcome the opportunity to clear the air regarding potential wrong doing.

In addition, the below affidavit explains the corporate structure as well as other pertinent matters that may not be as clear from the attached exhibits that were submitted in response to the subpoena.

**NURIDE TRANSPORTATION GROUP: "NURIDE"**

Transportation is an integral part of New York City's infra structure. The NYC transportation industry is highly fragmented amongst many small to medium sized enterprises. The vision behind NuRide was to create a corporate body that would efficiently be able to provide a comprehensive platform to give full service ground transportation. Today NuRide is the largest fleet owner operator in New York City, and one of the largest in the nation, compared to other operators who rely 100% on the affiliation based model of independent owner operators.

The FHV industry has a tremendous job creating capacity which is catered through indirect, independent operators. This project initially came about as a solution for NYC's (and indeed global) problem of how to deal with wheelchair accessible transportation for disabilities. From there, we always knew that we would have to support this project with a

comprehensive FHV service, which included community cars, black corporate and black luxury cars, and of course green borough cars (from where the project takes its name).

NuRide was established as the developer and operator and later assumed the role of manager of the NCE/JCE NYCGreen. The relationship was created between NYC Green and NuRide transportation according to the EB-5 compliance where NYC Green was the NCE also the JCE, due to the direct nature of the model. Below is a more detailed outline of the structure of the company.

We had all the ingredients for a successful project, the most important being management: From the outset, NuRide has attracted the top industry players. Just a couple of weeks ago, the top executives from the failed Karhoo App joined NuRide, bringing the wealth of their experience, contacts and understanding of the industry. From inception, I consulted and discussed the entire project with the top industry players, including Governor Paterson. The accessibility portion of the project attracted the governor, who not only accepted equity along with a monthly salary. He also fully appreciated the vision due to his background with the MTA. He fully understood the model and became part of the vision.

Other then the governor, initial consultation and advise was sought from Matt Daus, who had been the longest serving commissioner for TLC. Later as the project grew, it was my personal policy to encourage the hiring of industry specialists who would be able to take NuRide's vision to a higher level.

**THE STRUCTURE OF THE COMPANY / EB-5 PROJECT**

"New York City Green Transportation (NYCGT) is the New Commercial Enterprise (NCE) and Job Creating Entity (JCE) of the project. It holds the assets, employees, and EB5 investors capital of the project. NYCGT is managed and operated by NuRide Transportation Group LLC who are the developers of transportation, infrastructure, and technology of the project. As the developer and manager of the project, NuRide is subject to 60% ownership in NYCGT with the remaining 40% owned by the 80 EB5 investors of the project at 0.5% equity each.

The project was designed in 3 phases: (1)To establish the initial infrastructure (bases, buildings, technology etc) to operate fleets of FHV's under the compliance and regulations of TLC, DMV and New York City; (2) The second phase was to acquire the assets and create the

necessary support infrastructure for the assets to be road ready (hacked, road ready); (3) To start hiring people to operate the assets through the infrastructure created.

NuRide manages and operates the assets and Human Resources of NYCGT through its 8 divisions or entities. Out of them, 4 divisions are each licensed under their relevant base to satisfy the compliance and regulatory affairs of the Taxi and Limousine Commission (TLC) that every vehicle is to be affiliated with a category specific licensed base. For instance, LaPuma is licensed under non-emergency medical transportation (NEMT) & livery services, GoGreen is licensed under community car services, SLS is licensed under Corporate black car services, and Access under wheel chair accessible transportation services.

The other 2 entities: GetCars and Pegasus, cater to the independent operator model of the project's transportation business. GetCars utilizes the project's community cars to service a network of affiliates such as Uber, Lyft, and Juno for a fee. Pegasus LLC in turn caters to the luxury division of the independent operator model by farming-out luxury fares to an affiliate company called Pegasus Transportation Group. These 2 divisions cater to both on-demand and pre-arranged rides of the affiliate networks. The remaining 2 entities: NuAuto and IRIS, are support divisions that provide fleet maintenance & management and technology infrastructure support to the business, respectively. Along with in-house support, both NuAuto and IRIS would act as profit centres providing support services to third party fleets in the near future.

One of the added advantages of booking assets separately on NYCGT from operations of the business is the mitigation of risk against any claims that may arise from daily operations. In this corporate structure, NYCGT and NuRide share a direct relationship with each other where NYCGT holds the assets and provides it to NuRide for revenue generation and establishes a payable/receivable relationship between the two. On the other hand, NuRide allocates these assets to its licensed and support entities establishing a receivable/payable relationship between itself and the divisions. As the business becomes profitable net of receivable/payables between entities, the retained earnings of the 8 divisions are structured to flow to NuRide, which, in turn would distribute them to the investors of NYCGT as payback

of their capital contribution plus an agreed upon interest on their exit from the project. We have received considerable praise for the company's corporate structure, as it is complex, but manages to comply with both TLC and EB-5 regulations.

**TECHNOLOGY: DATRIDE:**

Other than the ownership of the fleet, NuRide is structured with 100% indigenous support of in-house technology, fleet management and maintenance, compliance.

Considerable effort, time and resources have been dedicated to the technology in this project. We developed DATRide. DATRide is an App designed for the non-emergency medical transportation and Paratransit market. It can be considered a category of service in the accessible transportation business. DATRide ecosystem connects riders who need accessible transportation to fleets capable of meeting their needs. DATRide's goal is to be the largest national aggregator of wheelchair-accessible taxicab fleets. There is no other app on the market like this. The project intends to and is presently making provisions to take this App nationwide.

**MY BACKGROUND IN EB-5 AND INFRASTRUCTURE PROJECTS**

I am not new to EB-5. Back in 2006, I was one of the original members of the first regional center in NYC, the New York City Regional Center, along with George Olson, Sandra Dyche and Mona Shah. I left the group before Paul Levinson joined, as I did not feel comfortable with the model, which centered on getting percentage points rather then focusing on actual projects. I have remained abreast of EB-5 developments and have previously acted as a consultant. I have watched as EB-5 has been utilized for large scale projects in New York City, projects that could easily have obtained bank financing. Like others within the industry, I also wanted to utilize EB-5 funding for projects that would not be able to obtain conventional financing. A project like NYCGT not only solves a very real issue for the city, it also increases the quality of life for an entire sector of society. Further, the project creates thousands of real jobs and has potentially excellent financial returns, that in turn would be able to pay back the investors, with interest. It is no accident that companies like Apple, Amazon, Google etc. have all entered the transportation industry in way or the other.

**DIRECT EB-5 MARKETING:**

This project has several unique aspects. Other than the corporate structure, industry and vision, a large chunk of investors have invested directly with us, without third party agents, subsequently saving the company from paying huge agent commissions.

I personally have many contacts worldwide, that have been valuable in marketing EB-5 outside of China, though it is very difficult to fill up a project without Chinese investors. Initially, back in 2014, we engaged an agent from Guangzhou, China who had previously produced 100's of investors. He assured us that he would easily be able to bring in 40 investors in a few months. He did not. What became quickly apparent was the disparity of understanding within the EB-5 market, a market trained to understand real estate projects only. Whenever Attorney Shah or myself have traveled overseas, and have been able to explain the project, there has always been a positive response.

This project, despite the required layers of divisions, is very transparent. Mona Shah & Associates office heavily encourages every investor to contact us directly. Most of the investors have visited the project. We have lost a couple of confirmed investors after visiting the project. These investors admitted that they were unable to understand the business model and felt more comfortable in a traditional real estate project.

**MY BACKGROUND IN TRANSPORTATION / LARGE INFRASTRUCTURE PROJECTS:**

Attached is my resume. I have been a senior advisor to diplomatic circles covering South-East Asia, UAE and the Gulf States. My resume contains confidential and sensitive information relating to high level projects concerning the national security of other sovereign nations. For example, I have previously been a senior advisor to BitRage Novis and Bitpak Corp . Bitpak is a US and Pakistan based company, representing US manufactures and companies, providing upgrades to Pakistan's Security Forces, the law enforcement agencies, which are the first responders to terrorism in Pakistan. I had worked diligently to design a proposal for the overall well-being and safety of ordinary citizens. Bitpak Corp's efforts and services are fully endorsed at the highest level of both US and Pakistan's leaderships. I acted

as a liaison between Bitpak and the Government of Pakistan. I have worked closely in an advisory capacity with Mr. Hussain Haqanni and Zahid Hafeez Chaudhry, the former Pakistani Ambassador for the United States and Chief of Chancery at Washington DC, Embassy of Pakistan. In another project, the Cold Chain project, I was a high-level advisor for a project under the "Enhanced Partnership with Pakistan Act, 2009". Here, the US promised to provide $7.5 billion in non-military assistance to Pakistan. An amount of $3.5 billion was earmarked, exclusively for High Impact, High Visibility Infrastructure Programs in Pakistan. As detailed on my resume, I was involved in several projects concerning such infrastructure, logistics and transportation. I have back up for all the previous work that I have been involved with for the past several years.

**FORMER CRIMINAL CONVICTIONS.**

I do have two previous criminal convictions. The first one was for conspiracy to commit mail fraud, which occurred in *1993.* I was sentenced in 1994 to 366 days and 3 years of probation. The second was a misdemeanor charge for receiving stolen goods. This occurred in 2001, though I was sentenced in 2004 to 3 years of probation. Based on my extraordinary equities I was granted early termination of probation (in 2006) and a waiver by an Immigration Judge to any deportability charges.

The crimes occurred 23 and 15 years ago, at this juncture I could set forth a detailed description showing bad judgments and carelessness on my part, however, I choose not to detail these points. I have taken and continue to take full responsibility for my actions. I served my sentence, suffered on a personal level enormously, including lifelong regret. I have proven beyond doubt to be reformed and responsible and have worked ever since to benefit society. For example, I have worked voluntarily for 11 years with law enforcement, I worked very closely with Sergeant John Kenna of the Queens DA and have been responsible for dozens of arrests as well as anti-fraud measures. I also worked as a certified crime identity advisor at the Research Institute of I.D Theft.

From the outset, I was advised that my previous convictions do not fall under the gambit of the "bad actor" rules. However, the existence of the convictions has subjected me to outright threats of blackmail.

**MALICIOUS COMPLAINTS:**

This project is the first of its kind in an industry that was ignorant and suspicious of EB-5. Unfortunately, each time an investor visited, employees were reminded that EB-5 funding had an integral part of this project, unlike real estate projects that are more contained. Each time there was a disgruntled employee or vendor, threats relating to EB-5 emerged.

Even without a copy of the Commission's Formal Order of Investigation (pursuant to *17 C.F.R. §203.7,)* we are aware as to what may have initiated this investigation. We /I have received demands for payment against threats by the following individuals:

1. Shoaib (aka Nicky) Qureshi
2. Peggy O'Boyle
3. Ron Velocci
4. Peter Massa, amongst others

Libelous posts stating outright lies appeared on social media and websites such as Yelp. Shoaib Qureshi, who had claimed to be a FBI agent, sent emails, texts and calls demanding money or else he would expose me and others operating a fraudulent project.

**In conclusion**: We have been sincere with our investors. We have followed the rules relating to use of funds, payments to non-broker dealers to the letter. I welcome you to read my texts and emails. Due to the magnitude of the project, I am sure there must be some error somewhere. However, it would be an innocent error. There is certainly no funneling of investor money, no misstatement to any of the investors.

NuRide is a vision that will bring a quality of life to millions of disabled people in New York City and later other major cities worldwide. I have brought millions of dollars of investments into the US. As you will see from the attached financial details of the company, I take only a salary and some of the company's benefits. To date I have not been compensated for health care, even NuRide's marketing expenses. I have put considerable money from my own pocket

not only to help establish the project, but to pay for the initial expenses. I have never taken this position lightly. The enormity of the creation has always weighed heavily on me.

Today, NuRide is responsible for over 4-500 jobs, the investment of around 60 EB-5 investors and the reputation of the industry.

Dated: November 28, 2016

New York New York

Signed: Nadim Ahmed

Sworn before me this 28th day of November

Notary Public for the State of New York

REBECCA SAVITA SINGH ESQ.
Notary Public, State of New York
No. 02SI6257961
Qualified in New York County
Commission Expires ~~March 19, 2016~~
May 17, 2020