# Exhibit 20

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. NY-09454-A
NURIDE TRANSPORTATION )

WITNESS: Mehreen "Mona" Shah
PAGES: 1 through 131
PLACE: Securities and Exchange Commission
200 Vesey Street
New York, New York 10281
DATE: Monday, March 13, 2017

The above entitled matter came on for hearing, pursuant to notice, at 10:48 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200

A Yes. Some people did look to see if they could possibly get a green card, because there was other programs out at that time, Canadian programs and stuff where you can buy real estate and get a residency, but we didn't do immigration through all of those. It was purely nonlegal really.

Q When you say the company was set up to assist investors, what kind of activities would the company engage in?

A Well, it was set up because Nadim, not being a nonlawyer, could not be a part of the law firm. I was also advised to have a separate firm to handle anything like that away from the law firm. And mainly it was utilized, if we had to purchase a property here or we had to do any sort of dealings on the investor's behalf, it would be through the corporation. There were not many actually. I think there was one or two. And it was mainly sort of people coming in to invest and trying to get property which they could flip.

Q So approximately how long was Edwin Shaw engaged in that kind of activity?

A On and off it continues. Really it wasn't utilized too much. It was utilized in 2006 for other things that Nadim Ahmed used for connected with one of the companies that he worked for with Asif Sadari. I'm



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

sorry. I can't remember the name of that company.

Q Do you know what kind of activities?

A That company did marble, brought in imported marble. Nuquest it was called. N-U-Q-U-E-S-T. It's still current and I believe Nadim is still, he has some part of that. I think he's a bank author or something.

Q When did Edwin Shaw, if ever, get involved in EB-5 investments?

A It didn't. Edwin Shaw never got involved with EB-5 at all. It wasn't involved really. There was no need. It wasn't involved with NYCRC or NYIF.

Q Since then, has it become involved in EB-5?

A Yes, for the last couple of years as a vehicle for bringing in investors for NuRide and for other projects.

Q What other projects?

A Whichever project we have. Well, not really because I say with other projects, but -- okay, let me explain. Sometimes if we have to get a sponsorship for an event, either I have used our office name or I've used Edwin Shaw. We bring in investors, because we have so many direct investors and we have a lot of attorneys who bring investors to us, et cetera, we do have the ability to provide investors to different projects, so we give them sort of, we basically give the investors to

different projects. And the last couple of years, we've utilized Edwin Shaw for getting sponsorships in some places. But I'm trying to recall actually. I think the majority of the times we used our office name and not Edwin Shaw. I think we used Edwin Shaw more as the platform for NuRide.

Q Okay. So just to make sure I understand. You described two different activities. One was sponsoring events.

A Right.

Q And so Edwin Shaw may have been involved in sponsoring some events; is that right?

A I think initially -- I'm sorry, I'm really trying to recall. Back when NuRide was first set up, NuRide of course did not have any income so Edwin Shaw did fund a lot of NuRide's initial stuff.

Q I'm sorry, just for the purposes of these questions if we can focus on the period before NuRide.

A Okay.

Q We'll get to NuRide in a minute.

A Before NuRide, so before 2014, Edwin Shaw was not involved at all in sponsoring anything.

Q Setting aside NuRide, has Edwin Shaw been involved in other EB projects since it became involved in NuRide?





Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

It was drafted by a different attorney. David Aboulafia for the record. It was Nadim Ahmed through ACE Equities. He preferred to do it through a corporation. The reason he wanted to do it through a corporation was because he was taking a major chunk of the shares, he wanted the ability to be able to bring direct investors in at a later point and dilute ACE Equities as opposed to diluting NuRide. Anthony Parrizzi, Governor Paterson, Cameron -- I can't recall the spelling of his second name. I really don't remember who else was there in the original.

Q How has that changed over time?

A Because new members were brought in. Founding, founding something, putting venture up and operating it are two different skills. And it's taken a lot of -- it's had teething problems, like most new businesses. The equity structure has changed. I do believe Matt Daus was initially going to be part of the equity as well.

Q Did you know if he ever actually did take part in the equity?

A I was the one who offered him equity, made the original arrangements. He didn't get equity straight away because there was a conflict between Matt and his other equity shareholdings that he had. And so NuRide decided to hold off for a while, but I do believe it's





Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

still on the table and at some point he'll be brought in. He's been material. He's been material in bringing contractors, vendors to NuRide. Not in EB-5. He's come to a few EB-5 events that I have had, but he's been more material in building up the contract for NuRide for the project.

Q What was the nature of you -- at the beginning going back to December of 2014, what was the nature of your involvement with NuRide?

A Well, it was again the same way that we did with NYIF. It was setting everything up, because I just wanted to make sure that this was done properly from the outset. There were other issues that I was involved with. I went to hearings with the TLC. There was that huge escapade with the mayor and Uber of last year, and we went and lobbied the state councilman and I was brought in to explain what EB-5 was and where EB-5 would suffer and how many people had jobs and how they would suffer -- you know which event I mean?

Q Yes.

A I mean, I had nothing to do with NuRide's operational at all. I have no idea how that is structured, but it was just the EB-5 side. We trained Brandi Robinson. She joined I believe in around about June of 2015 I think. We took her to different events and

we trained her on what to do with investors, accredited investors, how to manage the books, what to do with the -- who to give money to, who not to give money to, how to handle the brokers. Most of the stuff that a regional center would do we basically did.

Q And going back to -- when you say "we," are you referring to your law firm?

A Yes. There is -- NuRide called our office practically every day from I9s to, you know, what to do with such and such who's called, how to handle -- small things. For example, the investor forgot green card. He wants to know whether or not he could take interest now. And it's actually not allowed under EB-5 until they get their 829s and it's also in the PPM. So getting involved with things like that. Just getting involved generally. And on top of that we wanted to make sure we were ready for the 829s. So we've been preparing 829s for the last year or so.

Q All of the services you've described are legal services provide through your law firm?

A Everything that I have described just now are all through the law firm, yes.

Q And your compensation for that would be fees generated from your law firm; is that right?

A We billed them every so often. I think we had





Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

decided that for every investor, we would, because we had to take care of the back paperwork and other things, we would do a flat fee of 1500 per investor. And then there was -- the NuRide would come to us to do other corporate work, setting up corporations. There was trademarking. There was -- there has been disputes, all small disputes, between for example, one of the Uber drivers had a fight with a NuRide driver. There was an altercation and a lawsuit. So things of that nature. So we've basically been their go-to lawyers. We have always done immigration work for a couple of employees.

Q Has your law firm been involved in any marketing efforts for the project?

A Yes and No. I think you're aware from everything that we've already provided that we do market them, but we technically the marketing is supposed to be handled by Edwin Shaw, so we then bill Edwin Shaw.

Q So what kind of things do you bill Edwin Shaw for relating to marketing?

A Flights, hotels, travel costs, costs of sponsorships, out-of-pocket disbursements for entertainment. We would have a group of eight to ten investors from China. We would entertain them, wine and dine them, transport them back and from wherever we had to take them. So those type of costs. I had billed

professional time for when we were in China. We bill regardless of whether or not any investor is comes from that event and whether any compensation is received to NuRide. It's just a flat bill. We have not really been on top of that so we haven't really billed properly.

Q Just so I understand, make sure we are talking about the same thing, there have been times when you have gone on overseas trips on behalf of NuRide?

A I wouldn't call it just on behalf of NuRide. Maybe some trips to China specifically where there was an event for NuRide, we were there for NuRide as well, but we market slightly differently. We market as a law firm.

Q I want you to explain what you do when you're on these trips. Maybe that would clarify.

A Okay. Well, it depends on the country. China is a very set pattern. With China, we -- there are two or three different types of events we've gone out there. We have gone on specific marketing events for NuRide where an agent has asked us to come and speak about EB-5 to show that NuRide have us. I'm well-known in China.

So in China they know about eight to ten lawyers well, and if a project doesn't have one of the eight to ten lawyers, then it's not considered to be -- it's marketing point. It's just like having a signature bank and yes, you know, it's like you've checked all the

boxes off. So for China it is specifically NuRide related most of the time. There has only been a couple of times where I have been given a general invitation to come out and speak as Mona Shah from Mona Shah and Associates as opposed to Mona Shah and Associates for NuRide. We have been at events all over the country. I must have been to China 50 or 60 times over the years.

Q So just to shift your focus. When you go on behalf of NuRide.

A Yes.

Q What kinds of meetings do you participate in?

A If I describe an event, perhaps the one where we took Governor Paterson, it would be more specific. There was an event back in December of '14, I recall it because it was one of the most expensive events. We were appearing at a conference, at a seminar, whereby NuRide was exhibiting. Another project of ours, Oheka Castle, up in Long Island was also exhibiting. Governor Paterson was there with us. We spoke on a panel and Governor Paterson spoke as well. We had a number of private meetings related to investors interested in NuRide. I was present at those meetings. We also did another private seminar for NuRide on that particular trip. We did two actually. We had to take a train out to Nanjing. So these particular seminars are set up by agents and



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

they bring in their people, and it's always a requirement that a lawyer goes along. They want a lawyer for not only their own source of funds issues, but just to explain the project and explain if it's EB-5 compatible and just to give credibility to the project.

Q And what would your role be in those?

A Purely legal. I would speak about legal issues. Whether or not -- for example, with NuRide, the necessity for me was because it was pool direct. So it's not the model that everybody understood. Everybody understands regional centers and real estate. In NuRide, everything was different. It's a business. It's an ongoing business. It's all about sort of profits and income. You need to -- it's a completely different model from everything else that was out there in China, so it required a lot of explanation, but most of the time, I rarely spoke about the project itself except when I was doing a presentation on a large scale. I have done that a few times and I presented as a lawyer who's presenting a project that we represent.

Q Who else would attend the private meetings and seminars you described?

A Whoever is with me. So if I had one or two lawyers with me, I would usually take somebody from the office. We have Chinese speaking lawyers, non-Chinese



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

speaking as well.

Q Mr. Ahmed?

A He attended quite a few in the first year. He hasn't been for the last one year because after NuRide started growing here, he was needed here.

Q Anyone else from NuRide?

A No, other than Governor Paterson and Nadim Ahmed, nobody else.

Q Would you use any other materials?

A Yes, of course.

Q Okay. What would you use?

A PowerPoints describing what the project was, what it is. We would, at a later stage people wanted to see -- recently people have been asking for things like audited financials, which I talked to you about, so they would want things like that. They would want to see copies of approvals. They would want to see copies of contracts that NuRide had with projects. They would want to see proof, for example, that NYCGT owned the cars. So we would provide proof. I have shown them the whole project from DMV onward. Sort of like slides showing this is what a TLC license looks like, this is what's different, this is what has to be done and just explaining everything. As I said, it is a completely different model.



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

Q Okay.

MR. FORTINO: I'll ask the reporter to mark this as Exhibit 17.

A Oh, yes, and of course the brochures.

(SEC Exhibit No. 17 was marked for identification.)

Q Handing the witness what's been marked as Exhibit 17. Ms. Shah, do you recognize Exhibit 17?

A I do.

Q And what is it?

A It's a PowerPoint that has been utilized.

Q For what purpose?

A For, as I was describing, at these seminars, regional centers and projects are given a period of time to the public so we would have a big screen. I have pictures of myself sort of doing this. There are a number of direct projects which go up there too actually, as well as regional centers, and you have these slides and you talk it through and there's someone translating.

Q Would that be the case in large scale seminars as well as in private meetings?

A Private meetings, we tend not to use these because there are more one-on-one questions and stuff, but yes, if we had to, we would have utilized material like this.

would not have put Edwin Shaw here regardless. There isn't any problem with putting Edwin Shaw, we certainly can, but I wouldn't have thought it was appropriate.

Q My question is just whether factually, historically, has Edwin Shaw's relationship with NuRide, has that been described or explained for investors?

A They don't really have a relationship with investors in that way.

Q My question is whether the relationship between Edwin Shaw, and NuRide, and Mr. Ahmed, the relationship between those three parties has that been disclosed to investors?

A What relationship? I don't understand why that relationship would matter to investors.

MR. SMITH: Ms. Shah, I'll make a recommendation. There may come a time for us to discuss the significance of the answers to the questions and whether it matters or whether it' material or whether it's important. I think what is best is if you just answer the questions.

A I'm not trying to be evasive at all. I'm trying to understand where you're coming from.

Q I know it's an unusual situation. I know you're representing other parties so you want to understand the issues, but today we are trying to





Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

establish the facts as best you can from your direct knowledge. What I'm asking you right now is, are you aware of there being any disclosure about the relationship among Edwin Shaw, and NuRide, and Mr. Ahmed to investors? And that's either a yes or a no.

A It's going to be yes that they are aware because they are aware that we market, MSA markets. And I have said a few times to certain investors, certainly to the agents, that, because the agents bill through Edwin Shaw, they don't bill directly sometimes to us, that there is this entity and that, you know, how it's there. So I would say that is a yes, but maybe not to everybody, but again, it's the relevancy. We didn't think it was relevant. Investors are certainly aware of what we do market. We have been asked this question about conflict of interest. We've gotten the conflict of interest question many times as to whether there is a conflict of interest because we market and we represent NuRide and we also represent the investors. That's the conflict I'm referring to.

Q With respect to your law firm?

A Correct. With respect to myself even.

Q Okay. Go to page 38 of the PPM. On page 38, I want to direct your attention to the bottom of the page there's a section called commissions and fees.

A Yes.

Q And the first sentence says: "The LLC may pay commissions or fees to one or more immigration consultants, brokers, investment advisors or other parties in connection with the sale of interest pursuant to this offering." And then if you skip the next sentence, the next couple sentences, it goes on to say: "The commission payment will only be made to registered brokers either within the U.S. or overseas." Do you see that?

A Yes.

Q Then it further says: "The overseas agents brokers are compliant with overseas laws and regulation regarding securities broker or immigration agencies." Do you see that?

A Yes. This is boilerplate language by the way.

Q My question is whether it is in fact the case that we talked earlier about commissions that were paid to various agents overseas, correct?

A Yes.

Q This language says the commissions will only be made to registered brokers either within the U.S. or overseas. That's what this says, right?

A Yes.

Q So the next question is, were the parties who





Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

received commissions, the agents who received commissions, always registered?

A Within the United States there hasn't been anybody other. We don't have any dealings with anyone within the United States. Overseas, there have been a couple who are not registered with their Exit-Entry in China, but they have their own rules and regulations for that since it's been deregulated. Outside of China, there really is no provision, except for some European countries for registering brokers. So again, this is boilerplate language. You'll find this in every single PPM you look at. I doubt everybody has kept their word to it, but as far as my knowledge, as far as this project is concerned, it is accurate because of the fact there are so many direct.

Q But there were -- so is it your testimony that everyone who received a commission overseas was registered as a broker?

A Not as a broker. It depends. Because if they are registered overseas, how are they registered. They are not necessarily a broker.

Q Okay. Well, what the language here says is that commission payment will only be made to registered brokers.

A If it's in the United States.

Q It says either within the U.S. or overseas.
A It does sort of mention Reg S further down, so I think it's kind of understood that that's the case. We don't know who is a broker and who is not other than the ones that you get from the names from China. Outside of China, they don't have that system, except maybe the UK. Even in the UK, there are exemptions. I'm certainly getting a good lesson on PPMs here. I'll have to go back and tell everybody.
MR. FORTINO: We'll go off the record at 2:28.
(A brief recess was taken.)
MR. FORTINO: Back on the record at 2:32. Ms. Shah, we have just taken a break for a couple minutes. We didn't have any discussions of substance during the break; is that right?
THE WITNESS: Right.
BY MR. FORTINO:
Q Couple of clarifying questions and hopefully we'll wrap it up soon. With regard to Edwin Shaw, the ownership of that company is 50 percent yours and 50 percent Mr. Ahmed; is that right?
A That's right.
Q Okay. And in terms of your involvement with the company, what is the nature of your involvement on a transaction by transaction basis?

A It's a shell company mostly, and you can see I don't even take any money out of it. I don't have a salary. And I think I took a small withdrawal of 25,000 a few years ago, which was a previous transactions. I think that is the entire amount I have taken. The idea of Edwin Shaw was just as a platform because NuRide did not have a marketing platform at that time. That was all.

Q To the extent there ever were to be distributions of Edwin Shaw, you would be entitled to 50 percent of those distributions?

A If there was. Edwin Shaw makes some money. It's not really a revenue generating. It wasn't meant for the purpose of generating revenue. Although I know Nadim did take salary for sometime because he had billable income there, so he took the salary. He did not take a T and E expense from NuRide and that's how it was all justified. If he wasn't paid a T and E expense from NuRide, then it was balanced out by instead utilizing this platform.

MR. SMITH: Just can you explain for the record what T and E.

THE WITNESS: Yes. It's a sort of travel and expenses allowance. So he's the one who wines and dines all of the vendors and everything else, so if he didn't





Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

get an allowance from NuRide to cover that, he just utilized the platform of Edwin Shaw. One of the main reasons was so that he could use the AMEX, because there is no credit card for NuRide. There is no intention whatsoever of utilizing Edwin Shaw for anything which is close to collecting commissions or excess money of any sort. It was just a vehicle to really assist. There are many, many ways if one wants to collect commission, there is many ways one can do it.

Q I understand. I appreciate that.

MR. FORTINO: Tom, do you have any other questions?

MR. SMITH: In terms of the management of Edwin Shaw, did you have any role in that?

THE WITNESS: There wasn't really any management required. The only management required is bookkeeping, which Shagufta, who works in my office, handled. It seemed sensible at that time for her to do that as an additional chore because she was the one managing the invoices. She manages the invoices for MSA anyway. So as the invoices were one in the same, it just made sense for her to do that. There is no management per se. There is no office. The registered office of Edwin Shaw is our office. There is no real transactions. For the last two, three years especially there has been



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

no transactions other than NuRide. Prior to that, there was income. It was all Nadim's income from his consulting.

Q Is it possible to obtain a copy of QuickBooks file for Edwin Shaw?

A Absolutely. In fact, why don't you come to our office and go through it. We have nothing to hide. We've actually given you everything. How would you like that?

MR. FORTINO: We can talk about that off the record. It was just a question. I don't think we have any other questions right now. We'll conclude testimony for today. Ms. Shaw, I don't know if we'll need to speak to you again, obviously if we do we'll reach out to you, we have been in touch. And as I told Mr. Ahmed after he appeared for testimony, if we ever need to get in touch with him or Mr. Parrizzi, we would obviously go through you since you represent them.

THE WITNESS: Well, Anthony is coming Thursday.

MR. FORTINO: He is. And we talked about that already. Do you have anything else you want to say before we go off the record?

THE WITNESS: Well, only that this was an -- I have been dealing with EB-5 for such a long time. I really wanted to do something positive. I really wanted



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)