# Exhibit 22

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. NY-10138-A
NYC GREEN TRANSPORTATION )

WITNESS: Mona Shah
PAGES: 1 Through 292
PLACE: Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004
DATE: Tuesday, July 18, 2023

The above entitled matter came on for hearing, pursuant to notice, at 10:06 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

**Q Is it Syed Ahmed?**
A Yeah, Syed Ahmed.
**Q Okay. And when did he get involved?**
A 2015-ish. I think that's when he started working there.
**Q What was his role?**
A He was there as a consultant, but he was very much involved with the operations with Uber and logistics.
**Q When did you learn that he had another name?**
A I'm not sure how much I can speak here because I have got--
**Q If you learned in the context of a request for legal advice, you can just tell me that.**
A No, he was a client many years ago.
MR. GILMORE: Okay. So be careful.
THE WITNESS: Yeah. Then I was fired. I'm talking about 2000 or 1999.
**Q Okay.**
THE WITNESS: And I had sat in --
MR. GILMORE: All right.
THE WITNESS: Sorry.
BY MS. WILLENKEN:
**Q Have you ever had access to the computer systems of NuRide or NYC Green?**



A No, I've never needed to.
**Q Have you ever had access to their file room or other paper documents?**
A No.
**Q You mentioned earlier that there were progress reports that were sent out or compiled by your office; is that right?**
A Well, we would -- the data would come from NuRide, and we would just put it in -- in a format for the investors and add the immigration portion.
**Q And is the immigration portion the number of I-526 applications filed --**
A Yeah.
**Q -- their approvals? So I'm handing you a document that's marked as Exhibit No. 11. And this is an e-mail dated June 1st, 2016, and appears to be from you to a number of people including BrandiRobinson@NuRideTransportation.com.**
A Right.
**Q It has an identification number that we added in our systems of NY 09454_Archive-00041545.**
**(SEC Exhibit No. 11 was marked for identification.)**
MR. GILMORE: Can you tell me the production source, please.



MS. CONN: I think we generally don't, yeah. If your client produced it, we can let you know that. But we're not going to disclose who produced various documents.
MS. WILLENKEN: In this case, I'm not certain, but I believe that your client represented the entity that produced these documents at the time it was produced.
MR. GILMORE: Thank you. Let me just take a look, Mona. Okay.
BY MS. WILLENKEN:
**Q Is the document that's attached to this e-mail an example of the kind of progress report that you have testified about, Ms. Shah?**
A Yes, it is. But this is an internal document because it's -- it's not even the final version yet.
**Q Well, you -- it says in your e-mail, "Please distribute the PDF version" --**
A Yeah.
**Q -- "please make sure" --**
**(Whereupon, cross-talk occurred.)**
**Q -- "has been updated."**
A I'm just surprised you have this, that's all.



**Q And the original e-mail here is from Sami Haidar to you. And that's your son, correct?**
A That's right. It was because he was putting it in design. He was doing some internship with us.
**Q So he wasn't involved in the drafting, but he helped in the design of the document?**
A Yes. As I said, he could -- he was the only one in the office -- he could do the design.
**Q I'm handing you a document that's been marked as Exhibit 12.**
**(SEC Exhibit No. 12 was marked for identification.)**
[redacted]





Subject to Protective Order Issued in SEC v. Ahmed, et al., 23-cv-10210 (S.D.N.Y.)

Page 154

[redacted]

Page 155

[redacted]

Page 156

[redacted]

Q Okay. So you've been handed a document that's been marked as Exhibit 13.

A Yes

(SEC Exhibit No 13 was marked for identification )

BY MS WILLENKEN:

[redacted]

Page 157

[redacted]

40 (Pages 154 to 157)



Subject to Protective Order Issued in SEC v. Ahmed, et al., 23-cv-10210 (S.D.N.Y.)

Page 158

[redacted]

Page 159

[redacted]

Page 160

[redacted]

Page 161

[redacted]



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

[redacted]



[redacted]
**Q You've been handed a document that's been marked as Exhibit 14.**
A Yeah.
(SEC Exhibit No. 14 was marked for identification.)
BY MS. WILLENKEN:
**Q And this document --**
MR. GILMORE: May I?
MS. WILLENKEN: (Handing.)
MR. GILMORE: Thank you.
**Q This document has the title "New York City Green Transportation EB-5 Project," and we have added a Bates label to it of SEC-MSA-E-0000487.**
A Right.
**Q So we looked earlier at -- I think it was a September 2015 version of the business plan.**
MR. GILMORE: I'm sorry to interrupt. Was this taken from the documents that we had sent to you?
MS. WILLENKEN: Yes. I don't know whether it's the documents that your law firm sent to us because there have been multiple subpoenas and I think we received some before you were retained. But



it was produced, I believe, by Ms. Shah's law firm.
MR. GILMORE: Thank you.
**Q Ms. Shah, is this the next update of the business plan that took place after the September 2015 version we looked at together?**
A I'm presuming so.
MR. GILMORE: Well, don't presume. If you know, you know. If you don't, you don't. Do you know, yes or no?
THE WITNESS: I'd say yes here.
MR. GILMORE: Don't say yes unless you're certain.
THE WITNESS: I'm not sure whether there was one in between this.
MR. GILMORE: Thank you.
THE WITNESS: Okay.
BY MS. WILLENKEN:
**Q So you testified earlier that you did maintain a file of the key documents for each project, right?**
A Yes.
**Q And is the business plan the kind of thing that you would put in that file?**
A Yes.
**Q And in response to our subpoenas, did you**



**produce all of the business plans that you found in your files?**
A I believe we did. The best we could, yes. But I just thought there might have been one in between. It's just the picture, I did not recognize the picture.
**Q So I asked if you had produced everything that was in your file of the business plans, and you said, "We did our best." What makes you hesitate about whether you actually produced all of the business plans?**
A Just because I don't recognize the -- this picture. But it just could be my recollection.
(Whereupon, a telephonic interruption occurred.)
**Q How does the fact that you don't recognize the picture make you think there was another version of the business plan before this?**
A Because of the -- the covers tended to be more like this where we had -- because the brochure looked like this, so the covers tended to look like this. But, I mean, I could be wrong.
**Q Do you have any reason to doubt that the April 2018 version was used?**
A We filed petitions in 2018, so we must have





Subject to Protective Order Issued in SEC v. Ahmed, et al., 23-cv-10210 (S.D.N.Y.)

Page 206

themselves. Our office has never filled it out. It's always been the investor themselves. We would have to explain -- you probably see many e-mails from the productions where they just don't understand, and we have to go back and forth and explain what it means.

**Q And who came up with the form?**

A Oh, God. It was back in day when I was at NYCRC, and it's just evolved since then.

**Q Have you ever sought securities advice from another -- someone outside your firm on the form that you've been using?**

A I don't believe so, because we've seen the same form given to us from the bigger -- from other regional centers. But we have -- we have investors in every -- lots of projects, and they've used almost exactly the same form, and then our in-house securities counsel didn't have a problem with it. Why, is there an issue with it?

THE WITNESS: Sorry.

MR. GILMORE: You're here to answer.

THE WITNESS: Okay.

BY MS. WILLENKEN:

**Q Okay. I'm handing you a document that's been marked as Exhibit No. 15.**

Page 207

A Right.

(SEC Exhibit No. 15 was marked for identification.)

BY MS. WILLENKEN:

[redacted]

Page 208

[redacted]

Page 209

[redacted]





Subject to Protective Order Issued in SEC v. Ahmed, et al., 23-cv-10210 (S.D.N.Y.)

[redacted]



[redacted]



[redacted]



[redacted]



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

[redacted]



[redacted]



[redacted]



[redacted]





Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

Page 218

[redacted]

Page 219

[redacted]

Page 220

[redacted]

Page 221

[redacted]



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

Page 222

[redacted]

Page 224

[redacted]

Page 223

[redacted]

Page 225

[redacted]

Q I am handing you a document that's been marked as Exhibit 16. And this appears to be an example of a completed investor suitability evaluation form, and it's been Bates labeled MSA PROD 002785, and it's for an investor named Praveen Ponugoti.

(SEC Exhibit No. 16 was marked for identification.)

BY MS. WILLENKEN:

Q So on page 3, the investor has completed that they have annual gross income of $224,000. I notice there's an annual net income box that was not on the version of the form we reviewed together before. What's the gross versus net income supposed to represent for an individual?

A Take-home income. But--

Q Net of taxes and --

A Yes, yes.

Q Okay.

57 (Pages 222 to 225)

Page 226

A Take-home income.
**Q And this particular person has said that they have an annual gross income of $224,000. Would you and your staff routinely seek documentation of this person's gross income?**
A We would, because we would have their bank accounts, and it would be reflected in their bank accounts.
**Q So someone would go through the bank accounts and add up the direct deposit amounts to see whether it added up to 224,000?**
A Yeah. It's painstaking. It's like forensic accounting, doing source of funds, and it can take a long time. A lot of documentation.
**Q So on page 7, the investor discloses 250,000 in a checking account, a million dollars of real estate, a gift of $245,000, and a loan of $55,000. So, altogether, they're reporting a net worth of a little over 1 5 million. But if that real estate was all the person's primary residence, then none of it could be counted, right? So do you routinely obtain and maintain documentation in that situation of whether the real estate is the person's primary residence or not?**
A We have documentation within the file of --

Page 227

of the person's assets.
**Q Okay. So you can produce that to us?**
A For this particular investor? I'm sure it would be in the file.
**Q And this person has listed a loan of $50,000 with no indication of what it represents. Would you have information about what that loan -- whether it was a loan to the person or a loan from that person to someone else?**
A No. It should have been written on the side if it was. I mean, I don't know.
**Q And if we look at the investor source of funds, that $55,000 loan is listed again. So that suggests that's a loan to the investor, not a loan from the investor, right?**
A I don't know.
**Q And the investor lists a gift of 245,000, and only some of that is listed, then, under their source of funds. As part of your process, would the amount of the gift and the legal transfer of the property be documented?**
A Only 500,000 needs to be documented. We might take additional evidence for background purposes, but only 500,000 -- or 500 and whatever the admin fee is.

Page 228

MR. GILMORE: Thanks.
BY MS. WILLENKEN:
**Q Okay. I'm handing you a document that's been marked as Exhibit 17. And this appears to be another investor suitability form. This one is for an investor named Kiran Kumar Chenna.**
A I think he's one of the ones who's withdrawn.
(SEC Exhibit No. 17 was marked for identification.)
BY MS. WILLENKEN:
**Q And if you look at page 3, the person has listed their annual gross income as $80,000, correct?**
A Yes.
**Q And then if you look at page 8, we have the table of assets. And the person has listed $90,000 in their checking account, an inheritance of $2 million, and a gift of $430,000, right?**
A Right.
**Q And then under the source of funds, the investor has listed $90,000 from savings -- presumably, that's the same as the checking listed on the other table -- and then gifts from both a wife and a sister-in-law, right?**
A Correct.

Page 229

**Q So in this situation, if the person was listing as their inheritance something that they were only expecting to receive rather than something they hadn't yet received, they would clearly fail to meet the accredited investor standard, right?**
A Right.
**Q And yet it would probably be pretty easy to prove the source of funds because it's all a gift from other people and savings. So they wouldn't need the real estate holdings to prove the source of funds, would they?**
A I don't see -- I'm sorry. Is your question that -- what is your question? Sorry.
MR. GILMORE: Why don't you make sure -- are you on the right page?
THE WITNESS: I'm on the right page. I don't follow your question here.
MR. GILMORE: I think you're looking at different pages.
MS. WILLENKEN: I'm looking at page 8 of the form which is labeled 9979 at the bottom.
THE WITNESS: Right.
MS. WILLENKEN: And then also at the next page which is page 9.
THE WITNESS: Just because he's put





Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

2 million in his inheritance, he doesn't have to use that inheritance for source of funds. He's listed here what -- how he wants to do the source of funds, and he wants to use the source of funds as a -- as a gift from his wife and his sister-in-law.
BY MS. WILLENKEN:
**Q I understand that, and I'm not questioning what he can or can't do --**
A Okay.
**Q -- for USCIS purposes. But my understanding of your prior testimony was that in a situation where someone has listed something ambiguous like real estate or inheritance that you would request documentation of it because you would need to provide it to use as source of funds anyway. So my question is: A, would you need to provide any documentation of this inheritance to USCIS for the source of funds. And if not, would your staff nevertheless request documentation of it from the investor?**
MR. GILMORE: Objection to the characterization of the form as ambiguous.
You can answer the question.
THE WITNESS: The staff should request it. Again, it goes to the overall credibility of the



investor. Whether they did here or they didn't, I don't know. I'd have to look at the file. But they should.
BY MS. WILLENKEN:
**Q Okay. But that's not written down anywhere, right?**
A It's not. But I would have presumed that, you know, if somebody's written "inheritance," it's not future.
**Q Well, I understand that as a default presumption. But given that the person is then not using any of that inheritance, doesn't that kind of cut the other way?**
A Well, not really. There's -- as I said, for many reasons, they may not want to use their inheritance. It might be tied up in something, and most of the time, it usually is. If it's all tied up in real estate, for example, but he wants to put it and label it as inheritance, it doesn't make sense to use it for the source of funds.
**Q Well, if he already has it and it's tied up in real estate, it could have been listed on the real estate line, right?**
A It could have, but he probably wanted to differentiate it. It could have -- don't know where



it is. But I don't think that's conclusive of the fact that he could have used it for his source of funds. There must have been a reason why they didn't want to use it for the source of funds.
**Q Isn't a possible reason that they hadn't actually received the inheritance yet?**
MR. GILMORE: Objection.
Answer the question.
THE WITNESS: No. It could be for tax purposes as well.
BY MS. WILLENKEN:
**Q My question wasn't to give me another reason why it could exist. It was: Isn't it possible that he hasn't actually received the inheritance yet?**
A I would have -- I would have thought my staff would not accept something in the future because that's not an inheritance unless something has been put in his name that he will receive that in the future and it's his name. I'd have to look at his file to see what he has.
**Q If there was something in writing saying he was going to receive it in the future, would you tell your staff that that was sufficient to demonstrate that this investor was an accredited investor?**



A It depends what it was. If it was property which has been put in his name, well, then that would be property; that wouldn't be an inheritance. Inheritance means something that's been given to you upon the death of someone.
MS. WILLENKEN: Okay. I think this would be a good time for a break. So we are off the record at 4:52 p.m.
(Whereupon, a brief recess was taken.)
MS. WILLENKEN: Okay. We are back on the record at 5:08 p.m.
BY MS. WILLENKEN:
**Q We talked earlier about your regional center that you founded which now has another name, but we're referring to it by its original name, the NYC Regional Transportation Center. Did I get that right?**
A Transportation Regional Center.
**Q Transportation Regional Center. And you've said you've done a number of projects through that --**
A Yes.
**Q -- regional center, correct? Okay. And those include the Med Trans EB-5 Fund that we talked about, the AutoCenter, Nu3s funds that we talked about. Those are both NuRide affiliated, right?**





Subject to Protective Order Issued in SEC v. Ahmed, et al., 23-cv-10210 (S.D.N.Y.)

A Yes.
**Q And then did you also do a couple of projects through that regional center for National Realty Investment Advisors?**
A We did.
**Q Okay. And I think you referred to them earlier as NRIA?**
A That's right.
**Q Okay. And did you also do a project called the Aarkish Lifesciences Pharmaceutical EB-5 Project for that?**
A We did. We did, yes.
**Q Okay. And did you also do a project called PropMix?**
A Yes. It's an IT project, yes.
**Q So in our earlier investigation, you produced to us a document which I'm handing you. It's been marked as Exhibit 18.**
**(SEC Exhibit No. 18 was marked for identification.)**
MR. GILMORE: Thank you.
BY MS. WILLENKEN:
**Q And this appears to be an invoice from your law firm to NuRide Transportation Group, LLC. And under the description, it says "preparation and**



**submission of regional center application" and the amount the $125,000.**
A That's right.
**Q Was this for preparing the application for NYC Transportation Regional Center to become an approved regional center?**
A Oh, yes. We did a lot of the work to do that. That's why it has that name it and it doesn't have more of a generic name. And then it was never filed, and it just went by the wayside. Then we picked it up again later and filed it ourselves, and we credited back most of this money that has been -- that was charged.
**Q When did you credit back the money?**
A I don't know. It's probably whenever we file -- submitted our regional center. But I do remember specifically that this money was credited back. They also demanded it to be credited back.
**Q So at the time that you were doing the original paperwork, were you thinking that it would be used only for NuRide-related projects?**
A Yes. The direct pool wasn't suppose to be so big.
MR. GILMORE: Thank you.
THE WITNESS: Sorry.



**Q I'm handing you document that's been marked Exhibit 19.**
A Right.
(SEC Exhibit No. 19 was marked for identification.)
BY MS. WILLENKEN:
[redacted]



[redacted]





Subject to Protective Order Issued in SEC v. Ahmed, et al., 23-cv-10210 (S.D.N.Y.)

Page 238

[redacted]

Page 239

[redacted]

Page 240

[redacted]

Page 241

[redacted]

61 (Pages 238 to 241)



Subject to Protective Order Issued in
SEC v. Ahmed, et al., 23-cv-10210
(S.D.N.Y.)

Page 242

[redacted]

Page 243

[redacted]

Page 244

[redacted]
Q So I'm handing you a document that's been marked as Exhibit 20.
(SEC Exhibit No. 20 was marked for identification.)
BY MS. WILLENKEN:
Q This is a --
A Yes.
Q -- a wire transfer record that we received from Signature Bank.
A Yes.
THE WITNESS: Excuse me. I'm just getting a tissue.
Q So the first page of the wire transfer -- sorry. I know these things may be a little difficult to read if you're not used to seeing them.
A Yeah.
Q But there are -- there are kind of two lines in the middle of the page. And below the first line, it says "amount, $150,000; beneficiary, Aria Strategies Group." If you go down, there's various other information. And then closer to the bottom of that section, it says "originator, Nuquest Management Group, LLC."

Page 245

A Yeah.
Q And then at the very bottom of that section, it says "wire date, July 31st, 2020, right?
A Right. Yeah, I'm familiar with this transaction.
Q Okay. So who is Nuquest Management Group?
A That's the group which runs the E-2 group of -- at NuRide.
Q Okay. So it's affiliated with Mr. Ahmed?
A Yes, but it's a separate entity.
Q Does he have an ownership interest in it?
A In Nuquest?
Q Yes.
A I -- I think so.
Q Okay. And so then if you look at the very bottom of this page and continuing --
A Yes.
Q -- into the next page, there's an amount of $150,000 again.
A Yes.
Q There's a beneficiary, Nadim Ahmed.
A Yes.
Q And there's a -- in the middle, there's something that says OBI, which I believe stands for "originator to beneficiary instructions." It says





Subject to Protective Order Issued in SEC v. Ahmed, et al., 23-cv-10210 (S.D.N.Y.)