UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

NADIM AHMED a/k/a NADIM KHAN, MEHREEN SHAH a/k/a MONA SHAH, NURIDE TRANSPORTATION GROUP, LLC, NYC GREEN TRANSPORTATION GROUP, LLC, MED TRANS EB-5 FUND, LLC, NYC EV MOBILITY LLC, GRAVITAS NYC REGIONAL CENTER, LLC f/k/a NYC TRANSPORTATION REGIONAL CENTER, LLC, and MONA SHAH & ASSOCIATES, PLLC,

Defendants.

No. 23 Civ. 10210 (VSB)

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MONA SHAH, MONA SHAH & ASSOCIATES, PLLC, GRAVITAS NYC REGIONAL CENTER, LLC, AND MED TRANS EB-5 FUND, LLC'S RULE 11 SANCTIONS MOTION

Chevon Walker
Austin Thompson
Counsel for Plaintiff
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-0090 (Walker)

October 14, 2026

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

I. THE NURIDE EB-5 OFFERINGS ..... 3

A. The Three Offerings and Their Investor-Qualification Requirements ..... 3

B. Shah and MSA Law's Role ..... 5

II. THE COMMISSION'S PRE-SUIT INVESTIGATION ..... 6

A. The Investigation's Opening and Early Requests ..... 6

B. The June 2023 Requests and Call with Shah ..... 7

C. SEC's Pre-Suit Testimony ..... 8

D. The Follow-Up Requests, MSA Law's July 28 Production, and Additional Pre-filing Submissions ..... 9

III. THE INVESTOR-SPECIFIC EVIDENCE IN THE COMMISSION'S POSSESSION BEFORE FILING ..... 10

A. NYC Green Investor Documentation ..... 11

B. Med Trans Investor Documentation ..... 12

C. EV Mobility Investor Documentation ..... 13

D. Pre-filing Evidence Concerning Investors' United States Residences ..... 13

IV. THE WELLS PROCESS AND PRE-FILING DISCUSSIONS WITH DEFENSE COUNSEL ..... 14

V. THE NOVEMBER 21, 2023 COMPLAINT AND THE CHALLENGED SECTION 5 ALLEGATIONS ..... 14

VI. POSTFILING PROCEEDINGS AND DISCOVERY ..... 15

A. The December 2025 RFA Responses Identified Evidence Supporting the Commission's Allegations ..... 15

B. The January 2026 Production ..... 16

C. The Rule 11 Correspondence, the Amended RFA Responses, and the Motion ..... 18

ARGUMENT ....................................................................................................................18

I. LEGAL STANDARD....................................................................................................18

II. THE COMMISSION CONDUCTED A REASONABLE PRE-FILING INVESTIGATION AND HAD EVIDENTIARY SUPPORT FOR THE CHALLENGED ALLEGATIONS. .......................................................................20

III. MOVANTS' EXEMPTION ARGUMENTS DO NOT ESTABLISH A RULE 11 VIOLATION.....................................................................................................................24

IV. MOVANTS' MISLEADING ACCOUNT OF DISCOVERY DOES NOT UNDERMINE THE COMMISSION'S PRE-FILING EVIDENCE. ...............................27

V. MOVANTS CANNOT USE RULE 11 AS A SUBSTITUTE FOR LITIGATING THEIR EXEMPTION DEFENSE .........................................................28

VI. NEITHER DISMISSAL NOR THE REQUESTED FEE AWARD IS WARRANTED ...........................................................................................................29

CONCLUSION.............................................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)....................29

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990)....................25

*DRE Health Corp. v. Two Canoes, LLC*,
No. 23-cv-10643 (NRB), 2026 WL 550185 (S.D.N.Y. Feb. 27, 2026) ....................24

*Galin v. Hamada*,
283 F. Supp. 3d 189 (S.D.N.Y. 2017)....................20

*Hernandez v. Miller*,
No. 22-cv-6964 (VSB), 2022 WL 17584025 (S.D.N.Y. Dec. 12, 2022)....................28

*Hunichen v. Atonomi LLC*,
No. 19-cv-0615, 2021 WL 5858811 (W.D. Wash. Nov. 12, 2021) ....................4, 25, 27

*Hunichen v. Atonomi LLC*,
No. 19-cv-0615, 2022 WL 3155400 (W.D. Wash. Aug. 8, 2022)....................4, 25, 27

*Kiobel v. Millson*,
592 F.3d 78 (2d Cir. 2010)....................2, 20-21, 25-26, 28, 30

*Mir v. Bogan*,
No. 13-cv-9172 (PGG), 2015 WL 1408891 (S.D.N.Y. Mar. 26, 2015) ....................20

*Nakash v. U.S. Department of Justice*,
708 F. Supp. 1354 (S.D.N.Y. 1988)....................1

*Penzo v. ConEd Co. of N.Y.*,
No. 19-cv-7478 (MKV), 2024 WL 4467412 (S.D.N.Y. Oct. 10, 2024)....................20

*Safe-Strap, Inc. v. Koala Corp.*,
270 F. Supp. 2d 407 (S.D.N.Y. 2003).................... 21, 29-31

*SEC v. GenAudio Inc.*,
32 F.4th 902 (10th Cir. 2022) ....................23, 27

*SEC v. Mahabub*,
343 F. Supp. 3d 1022 (D. Colo. 2018)....................27

*SEC v. Nutra Pharma Corp.*,
No. 18-cv-5459, 2022 WL 3912561 (E.D.N.Y. Aug. 31, 2022) .................... 4, 25, 27-28

*SEC v. Rayat*,
No. 21-cv-4777 (LJL), 2022 WL 1423300 (S.D.N.Y. May 5, 2022) ....................21, 25, 29

*Storey v. Cello Holdings*,
347 F.3d 370 (2d Cir. 2003)....................................................................................21

*Tunne v. Discover Financial Services*,
No. 22-cv-5288 (JGL), 2026 WL 849766 (S.D.N.Y. Mar. 27, 2026) ....................................20

*United States ex rel. Jersey Strong Pediatrics, LLC v. Wanaque Convalescent Center*,
No. 14-cv-6651, 2019 WL 7116208 (D.N.J. Nov. 25, 2019) ..............................................1

*United States v. Wanaque Convalescent Center*,
No. 14-cv-6651, 2019 WL 7049449 (D.N.J. Dec. 23, 2019)..............................................1

**Statutes and Rules**

8 U.S.C. § 1153..................................................................................................5

15 U.S.C. § 77d..................................................................................................4

15 U.S.C. § 77e.....................................................................................3-4, 14-15, 19

Fed. R. Civ. P. 11 ............................................................................................ passim

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") respectfully opposes the Motion for Rule 11 sanctions (ECF No. 104, "Motion" or "Mot.") by Defendants Mona Shah ("Shah"), Mona Shah & Associates, PLLC ("MSA Law"), Gravitas NYC Regional Center, LLC ("Gravitas"), and Med Trans EB-5 Fund, LLC ("Med Trans") (collectively, "Shah Defendants" or "Movants"). The Court should deny the Motion in its entirety.

**PRELIMINARY STATEMENT**

This is not a good-faith Rule 11 motion. It is an unabashed attempt to intimidate the Commission, mislead the Court, and avoid fairly litigating this action's merits, which the Shah Defendants know will result in a finding that they violated the federal securities laws.

Although ostensibly predicated on the Complaint's allegations, the Motion comes nearly ***three years*** after filing, ***32 months*** after Defendants' motion to dismiss, ***14 months*** after the Court lifted a stay of discovery over Defendants' objections, and ***six months*** after Defendants first threatened the Commission with Rule 11. As in *United States ex rel. Jersey Strong Pediatrics, LLC v. Wanaque Convalescent Center*, if the Movants "truly felt [the] complaint was worthy of a granting of Rule 11 sanctions," they would have filed their motion long ago. No. 14-cv-6651, 2019 WL 7116208, at *3 (D.N.J. Nov. 25, 2019), report and recommendation adopted *sub nom. United States v. Wanaque Convalescent Ctr.*, No. 14-cv-146651, 2019 WL 7049449 (D.N.J. Dec. 23, 2019). The Motion's timing, its disregard of evidence long known to Movants, and the press release they issued the day after filing underscore its tactical character. Rather than confront the evidence supporting the Complaint, Movants seek to discredit the Commission for bringing it and gain leverage in the underlying litigation. This misuse of Rule 11 as a tactical device is plainly improper. *See id.*; *Nakash v. U.S. Dep't of Justice*, 708 F. Supp. 1354, 1370 (S.D.N.Y. 1988) ("A request for sanctions under Rule 11 is not a tactical device. . . . Attorneys

who choose to submit marginal requests for sanctions . . . in the misguided hope that they will help persuade the court on the merits, run a risk of violating the Rule.").

To be clear, the Complaint's allegations had more than ample evidentiary support when it was filed. The Motion seeks dismissal and nearly $900,000 in fees on the premise that the Commission failed to investigate and lacked evidence to allege that the relevant securities offerings were ineligible for registration exemptions. But records in the Commission's possession before suit—including records MSA Law itself produced—contradict that premise. To prevail, the Shah Defendants would need to show that the allegation was "utterly lacking in support." *Kiobel v. Millson*, 592 F.3d 78, 81 (2d Cir. 2010). They cannot come close.

The Commission's actual investigation bears little resemblance to the Motion's account. It lasted more than two years, not the nine months the Motion describes. As Movants' co-defendants—who likewise threatened Rule 11 sanctions—put it, the ***pre-suit investigation*** included subpoenas "demanding virtually every scrap of paper and communications from the NuRide Defendants [ ] and the Shah Defendants" and yielded "all of the documents and information [the SEC] requires for this matter." (Walker Decl. Ex. 83 at 3-4.)[1] More important, before Shah's July 2023 testimony in the pre-suit investigation, staff subpoenaed MSA Law and others for documents supporting investors' net worth and income. The Motion completely omits these requests and then falsely faults the Commission for not making them.

The investigation revealed more than incomplete paperwork: investors in each offering affirmatively disclosed financial circumstances below the thresholds necessary to qualify as an

[1] "Walker Decl." refers to the Declaration of Chevon Walker, dated October 14, 2026, and the exhibits thereto, filed herewith.

accredited investor. MSA Law's records and explanations, together with Shah's own account of the firm's practices, undermined any claimed basis for treating those investors as accredited.

The Commission has repeatedly identified that evidence to Movants. In December 2025, ten months ago, the Commission identified by Bates number pre-suit documentation supporting its position that specific investors were unaccredited. On March 20, 2026, responding to Defendants' threatened Rule 11 motions, the Commission again identified those forms by Bates number and explained that it possessed them before filing. The Motion nonetheless tells the Court that the Commission obtained those documents after filing. Movants know that is false because they produced some of them themselves.

Movants have long known the evidentiary basis for the allegations they now portray as baseless. The Court should reject their gamesmanship and deny the Motion.

## BACKGROUND

## I. THE NURIDE EB-5 OFFERINGS

### A. The Three Offerings and Their Investor-Qualification Requirements

The EB-5 Immigrant Investor Program permits investors to seek permanent United States residency through qualifying investments that create jobs. The three offerings at issue (the "NuRide Offerings") were made under that program and involved interests in NYC Green Transportation Group, LLC ("NYC Green"), Med Trans, and NYC EV Mobility LLC ("EV Mobility"). From June 2014 to November 2022, the offerings raised more than $66 million from over 100 investors. (Compl. ¶¶ 1-2, 30-34, 50-76, 123-164.)[2]

Section 5 of the Securities Act of 1933 ("Securities Act") requires that offers and sales of securities be registered with the Commission unless an exemption applies. 15 U.S.C. §§ 77e(a),

[2] "Compl. ¶ _" refers to the Complaint, dated November 21, 2023 (ECF No. 1).

(c), 77d. The NuRide Offerings were unregistered and instead claimed exemptions. (Compl. ¶¶ 10, 42.) NYC Green invoked the private-offering exemption (Section 4(2)), which prohibits general solicitation or advertising; the safe harbor for offshore offers and sales under Regulation S; and, most relevant here, Regulation D, and stated that offers would be made only to accredited investors. (*Id.* ¶¶ 67-68.)[3] Med Trans and EV Mobility invoked Regulation D's Rule 506(c) exemption (*id.* ¶¶ 139, 154), which requires that every investor be accredited *and* that the issuer take reasonable steps to verify that status, 17 C.F.R. § 230.506(c)(2).

In pertinent part, a purchaser is accredited if the purchaser has a net worth exceeding $1 million, individually or jointly with a spouse and excluding a primary residence, or annual income above $200,000 individually or $300,000 jointly in each of the prior two years, with the same expected in the current year. (Compl. ¶ 44 n.2); 17 C.F.R. § 230.501(a). The definition also includes purchasers whom the issuer reasonably believed were accredited at the time of sale. (*Id.*)

Under Rule 506(c), a sale to even one purchaser who neither qualifies as, nor is reasonably believed to be, accredited defeats the exemption for the entire offering. *SEC v. Nutra Pharma Corp.*, No. 18-cv-5459, 2022 WL 3912561, at *10 n.6 (E.D.N.Y. Aug. 31, 2022); *Hunichen v. Atonomi LLC*, No. 19-cv-0615, 2021 WL 5858811, at *12 (W.D. Wash. Nov. 12, 2021), *report and recommendation adopted*, 2022 WL 3155400 (W.D. Wash. Aug. 8, 2022). And even if all purchasers meet the financial criteria, the requirement to take reasonable steps to verify accreditation still "must be satisfied." *See* Eliminating the Prohibition Against Gen.

---

[3] Notwithstanding Section 4(a)(2)'s limitations, Defendants marketed the NuRide Offerings nationwide through unrestricted websites, seminars, and podcasts. (Walker Decl. Exs. 3-5; *id.* Ex. 1 at 186:21-187:14, 200:6-24, 201:21-203:3 (2023 Shah Tr.); Ex. 2 at 104:17-106:7 (2017 Shah Tr.).)

Solicitation & Gen. Adver. in Rule 506 & Rule 144A Offerings, Securities Act Release No. 33-9415, 78 Fed. Reg. 44,771 (July 10, 2013) ("Rule 506(c) Adopting Release").

The EB-5 Program imposed separate requirements: investors had to invest at least $500,000 in a "new commercial enterprise" that would create at least ten full-time jobs per investor. (Compl. ¶¶ 31, 63); s*ee* 8 C.F.R. § 204.6(f)(2) (2018).[4] U.S. Citizenship and Immigration Services ("USCIS"), which administers the program, also required investors to document that their invested capital was lawfully obtained. 8 C.F.R. § 204.6(j)(3). That source-of-funds inquiry was distinct from the accreditation inquiry. It asked where the $500,000 investment came from and whether those funds were lawfully obtained; accreditation asked whether the investor had qualifying income or net worth, which was twice the investment minimum. *Compare* 8 C.F.R. § 204.6(f)(2), (j)(3) (2018), *with* 17 C.F.R. § 230.501(a)(5)-(6). Although some documents could bear on both inquiries, establishing a lawful source for the $500,000 investment did not itself establish accreditation.

B. Shah and MSA Law's Role

Defendant Nadim Ahmed ("Ahmed") structured and operated the offerings through NuRide Transportation Group, LLC ("NuRide"), where he was executive chairman; Shah, MSA Law's managing partner, provided legal services to NuRide and represented EB-5 investors. (Compl. ¶¶ 3, 8, 22-23, 30.) Although the Shah Defendants call themselves "separate and distinct" from the NuRide Defendants (Mot. at 4-5), Shah and Ahmed have known each other since at least 1999, were "religiously married" in 2013, and each own or owned half of Edwin Shaw LLC. (Walker Decl. Ex. 2 at 12:9-15, 12:24-13:10 (2017 Shah Tr.).) NuRide paid Shah

---

[4]The EB-5 Reform and Integrity Act of 2022, enacted in March 2022, increased the minimum required investment to $800,000. *See* 8 U.S.C. § 1153(b)(5)(C)(i)-(ii). The investments at issue here were at the prior $500,000 minimum.

and MSA Law for their offering-related work, while MSA Law paid Ahmed more than $118,000 in salary between 2014 and 2018. (Compl. ¶¶ 49, 80.)

NuRide used Edwin Shaw for EB-5 marketing, which Shah described as "Edwin Shaw through MSA [Law] really." (Walker Decl. Ex. 2 at 104:17-23 (2017 Shah Tr.).) Through Edwin Shaw and MSA Law, Shah and her employees marketed the offerings, distributed offering documents and eligibility questionnaires, and directed investors to NuRide. (Compl. ¶¶ 36-40.) Shah testified that MSA Law analyzed whether investors in the offerings were accredited. (Walker Decl. Ex. 1 at 205:15-22 (2023 Shah Tr.).) And its questionnaires, distributed at Shah's direction, asked investors to identify their assets, liabilities, net worth, and income (Compl. ¶ 46), but did not elicit information frequently necessary to determine accreditation, such as the value of a primary residence or income information for the prior two years (Walker Decl. Ex. 63 (Sample EB-5 Investor Suitability Evaluation Form)).

## II. THE COMMISSION'S PRE-SUIT INVESTIGATION

### A. The Investigation's Opening and Early Requests

In June 2021, more than two years before filing the Complaint, the Commission issued a Formal Order of Investigation, *In the Matter of NYC Green Transportation* (NY-10138), relating to this action. (Walker Decl. ¶ 4.) In February and March 2022, staff subpoenaed Chase, Santander, Bank of America, TD Bank, Wells Fargo, American Express, and Signature Bank, and requested Fedwire records. (*Id.* Exs. 6-19.) On February 7, 2022, staff also sought access to USCIS's "investigative and other non-public files and information" concerning NYC Green Transportation. (*Id.* Ex. 20.) Thus, by February 2023—when the Motion begins its account of a purported "nine-month investigation" (Mot. at 1, 8)—staff had already been investigating for more than 18 months and had sought and obtained more than 60,000 pages of documents from USCIS and financial institutions. (Walker Decl. ¶ 6.)

On February 6, 2023, staff subpoenaed MSA Law for the offering documents provided to prospective investors in the NuRide Offerings. (*Id.* Ex. 21 at 11, Request 3.) The subpoena also sought post-investment reports; investor lists and contact information; and all communications with USCIS or the State Department concerning fourteen investors across all three offerings. (*Id.* Ex. 21 at 11, Requests 3-6.)

Staff also subpoenaed Gravitas—a Shah-managed company that sponsored and managed Med Trans—for offering materials, investor reports and lists, and communications with USCIS concerning Med Trans. (Compl. ¶ 28; Walker Decl. Ex. 22 at 11-12, Requests 3-6.) Staff subpoenaed Shah for financial account information, ownership agreements, tax returns, and records of payments to her or her companies and their contributions to the EB-5 projects; staff sought similar financial records from Ahmed. (*Id.* Ex. 23 at 11-12, Requests 1-8; Ex. 24 at 11-12, Requests 1-8.) Staff also sought financial and operating records from NuRide and related companies, including general ledgers, tax returns, and support for the capital contributions described in offering materials. (*Id.* Ex. 25 at 12, Requests 8-11, 15-18; Ex. 26, Requests 10-11; Ex. 27, Requests 4-5, 9-10; Ex. 28, Requests 6-7, 11-12; Ex. 29, Requests 10-11.)

B. <u>The June 2023 Requests and Call with Shah</u>

On June 8, 2023, staff sent a second subpoena to NuRide, seeking documents supporting the net worth and income of seventeen investors: ten NYC Green investors, four Med Trans investors, and three EV Mobility investors. (*Id.* Ex. 30 at 10-13, Requests 1-10.) Staff limited the request partly to accommodate concerns counsel had raised the week before about his clients' financial pressures and the burden of reviewing every investor's questionnaire. (*Id.* ¶ 7.)

Five days later, on June 13, staff sent a second subpoena to MSA Law, seeking communications transmitting subscription agreements, investor eligibility questionnaires (termed "suitability forms"), or "supporting documentation evidencing the investor's net worth at the

time of investment and/or the investor's income for the two most recent years." (*Id.* Ex. 31 at 12-23, Requests 1-8 & Ex. A.) The request covered sixteen NYC Green investors, eleven Med Trans investors, and three EV Mobility investors. (*Id.*) The Motion completely omits and ignores this direct request to MSA Law for supporting financial records, issued a month before Shah's July testimony.

The same day, staff spoke with Shah, who was then unrepresented. According to a former staff attorney's notes, Shah stated:

> I have never been asked in my years for actual documentation of accreditation. We always go with what they said. We ask the parents and if they say they gift 1M to student, we go with what they said. Sometimes they don't even put it in their bank account.

(Walker Decl. Ex. 85 (Declaration of Jennifer Ross) at 2.)

MSA Law's initial June and July 2023 productions included investor communications and some suitability forms. (Walker Decl. ¶ 10.) The suitability forms did not elicit information frequently needed to assess accreditation, including income over the past two years, and improperly included the investors' primary residence in net worth. (*Id*. Ex. 63.)

C. <u>The SEC's Pre-suit Investigative Testimony</u>

Staff also sought testimony from individuals positioned to explain the issuers' accreditation determinations and verification efforts, including Ahmed. (*Id.* ¶ 11 & Ex. 32.) On June 8, 2023, Ahmed declined to testify and, through counsel, asserted his Fifth Amendment privilege against self-incrimination. (*Id.* ¶ 12 & Ex. 33.) As executive chairman of EV Mobility and NuRide—the manager of NYC Green—Ahmed could have provided probative testimony concerning the issuers' belief that a purchaser was accredited and the steps taken to verify that status, but he refused.

On July 18, 2023, staff took Shah's testimony under oath. (Walker Decl. Ex. 1 at 5:2-12 (2023 Shah Tr.).) Shah testified that MSA Law assessed whether investors in each offering met the accredited-investor standard and described its use of accredited investor forms (*id.* Ex. 1 at 205:15-206:6), which in some cases facially demonstrated unaccredited status, as discussed below. Shah also testified that MSA Law's practice was not to allow anyone to invest until "we're satisfied with the source of funds and with all the documentation." (*Id.* Ex. 1 at 135:14-23.) But as explained above (*supra* p. 5), establishing that the $500,000 was lawfully obtained did not, by itself, establish net worth above $1 million (excluding primary residence), qualifying income for the preceding two years, or another basis for accreditation.[5]

D. The Follow-Up Requests, MSA Law's July 28 Production, and Additional Pre-filing Submissions

On July 21, 2023, three days after Shah's testimony, staff issued a supplemental subpoena to MSA Law for policies, procedures, training materials, and other guidance provided to employees concerning verification of accredited-investor status. (*Id.* Ex. 37 at 4, 7.) For twelve investors, including investors in each of the three NuRide Offerings, staff also requested the "source of funds document checklist" or similar document identifying the steps and documentation required to establish the lawful source of their investment funds. (*Id.*)

On July 28, 2023, MSA Law produced suitability forms, source-of-funds checklists, and supporting financial documents for the twelve investors, including bank and gift records for

[5] Movants repeatedly assert that Signature Bank, acting as escrow agent, "independently confirmed accreditation" before funds entered escrow and "independently verified accreditation" before funds cleared. (Mot. at 6-7, 20.) The escrow agreements undermine that characterization. They describe Signature Bank's limited role as escrow agent; prohibit representations to subscribers that the bank investigated or approved the investments; state that the bank had "no duty or responsibility" to determine whether the offerings complied with federal or state securities laws; and place responsibility for representing and warranting compliance on the issuer and subscriber representative. (Walker Decl. Ex. 35 at 2, 4, 7 (§§ 7(h)-(i)); Ex. 36 at 10 (§ 7(i)).)

NYC Green investor X.Y. and Med Trans investor J.Y. (*Id.* ¶ 14 & Exs. 38-40.) Its cover letter addressed the firm's basis for treating each of those investors as accredited. (*Id*. Ex. 38.) Thus, before filing, staff possessed not only suitability forms but, for certain investors, the underlying financial records that Movants claim the staff never obtained, together with counsel's explanations. (*Id.* and Enclosures.)

On August 4, 2023, MSA Law supplemented its response with an additional list of information submitted to USCIS for investor X.Y. (*Id.* Exs. 41, 47.) On September 20, 2023, staff issued another subpoena to NuRide seeking financial documents concerning additional Med Trans and EV Mobility investors. (*Id.* Ex. 42.) NuRide's responses to the June and September subpoenas included dozens of suitability forms. (*Id.* ¶ 16.)

In all, the Commission's pre-suit subpoenas to the NuRide Defendants, the Shah Defendants, or both sought accreditation-related documentation for dozens of investors. For many of those investors, the requests covered communications, suitability forms, net-worth and income documentation, documents concerning the process for verifying accreditation, and documents showing the lawful source of investment funds.

## III. THE INVESTOR-SPECIFIC EVIDENCE IN THE COMMISSION'S POSSESSION BEFORE FILING

Before filing this action, the Commission obtained investor suitability forms that affirmatively reported financial metrics below the accreditation thresholds.

### A. <u>NYC Green Investor Documentation</u>

The pre-filing evidence for NYC Green included investors' own financial disclosures that, on their face, indicated they were not accredited. (*Id.* ¶¶ 17, 19 & Exs. 43-46 (X.Y., J.T.S., H.Y., and Y.C. EB-5 Investor Suitability Evaluation Forms).)

X.Y.'s suitability form, for example, identified her as a university student with no income and reported net worth of $550,000. (*Id.* Ex. 43 at 3-4, 7-8.) That net worth figure consisted of $538,643 from her father and $11,357 in savings. (*Id.* at 7-8.)

The additional documents MSA Law supplied pre-filing for X.Y. did not identify additional assets or income sufficient to establish accreditation. (*Id.* ¶ 14 & Ex. 38 at 4-5 (response to Request 2, part e) and Enclosures.) MSA Law's July 28 production included X.Y.'s bank statement, her father's affidavit acknowledging the $538,643 gift, a summary tracing the investment funds, and an exhibit list identifying documents concerning her father's assets. (*Id.* Ex. 39.) MSA Law identified no additional X.Y. assets or income but claimed that she should be considered accredited anyway because of family wealth: "The investment was a gift from her parents. Her parents are wealthy[.]" (*Id.* Ex. 38 at 4-5.) The information about the gift may have established the source of funds, but having wealthy parents is not an accreditation metric under 17 C.F.R. § 230.501(a).

Before filing, the Commission also obtained J.T.S.'s suitability form and source-of-funds documents. (*Id.* Exs. 44, 48.) His form identified him as single and reported net worth of $540,000—consisting of $500,000 from his parents and $40,000 from work—with an annual salary below $25,000. (*Id.* Ex. 44 at 1, 3, 8.) The records identified his father's gift as the investment's source and provided information about the father's assets. (*Id.* Ex. 48.)

Y.C.'s suitability form, also obtained pre-filing, identified her as single, reported net worth of $525,000 supplied by a parental gift, and listed no employment. (*Id.* Ex. 45 at 1, 3, 7.) At least five other investors submitted suitability forms to MSA Law that were largely blank or included net worth or income levels below the accreditation thresholds. (*Id.* Exs. 50-54.)

B. Med Trans Investor Documentation

The pre-filing evidence indicated that at least two of Med Trans's sixteen investors were not accredited. (Compl. ¶ 124; Walker Decl. ¶ 17 & Exs. 40, 55.)

F.E.'s suitability form, obtained pre-filing, reported net worth of $925,000 and left the income section blank. (*Id.* Ex. 55 at 3, 7.) That figure included $320,000 in real estate without indicating whether it was her primary residence, which would be excluded from the net-worth calculation. (*Id.*) Even counting that real estate, her disclosed net worth fell below the $1 million accreditation threshold.

J.Y.'s suitability form, also obtained pre-filing, identified him as single, reported annual income of $138,000—below the individual-income threshold—and claimed $1 million net worth based entirely on a $1 million parental gift. (*Id.* Ex. 40 at 4, 6, 10.) But the gift agreement produced before filing documented only $800,000, and the accompanying bank statement showed a maximum balance just under $807,000 after the $800,000 transfer and before the investment funds were wired out. (*Id.* Ex. 40 at 3, 15-16 (MSAPROD003309-11).) Those records did not substantiate the $1 million net worth J.Y. reported. (*Id.*)[6]

C. EV Mobility Investor Documentation

The pre-filing evidence likewise indicated that at least one of EV Mobility's seventeen investors was not accredited. (Compl. ¶ 145; Walker Decl. ¶ 17 & Ex. 56 at 10-11.) K.P.'s suitability form, which the Commission obtained pre-filing, reported joint net worth with his spouse of $128,664.72 and annual gross income of $85,000 (*id.* Ex. 56 at 11), both below the

[6] MSA Law nevertheless asserted before filing that the bank statement reflected the $800,000 gift, salary, and another parental transfer sufficient "to show over $1 million in assets." (*Id.* Ex. 38 at 5, part g.) The statement did not show additional funds sufficient to bring J.Y.'s assets above $1 million and thus did not support MSA Law's explanation for treating him as accredited. (*Id.* Ex. 40 at 15-17.)

applicable thresholds. The form separately identified $200,000 in joint savings and a $300,000 family loan as the source of his $500,000 investment. (*Id.* Ex. 56 at 10, 12.)

D. Pre-filing Evidence Concerning Investors' United States Residences

The pre-filing records also undermined Defendants' reliance on Regulation S. The issuer safe harbor applies only to offshore transactions and requires, among other things, that the offer not be made to a person in the United States and that the purchaser be outside the United States—or reasonably believed to be outside it—when the buy order originates. 17 C.F.R. § 230.903(a)(1); (Walker Decl. Exs. 40, 43, 45, 50, 55, 56.) Defendants marketed the NuRide Offerings throughout the United States. (*See supra* p. 4 n.3.) Suitability forms identified purchasers in each of the three NuRide Offerings as United States residents. (Walker Decl. ¶ 18 & Exs. 40, 43, 45, 50, 55, 56.) MSA Law's July 28, 2023 cover letter likewise identified investors in all three offerings as living in the United States. (*Id.* Ex. 38 at 4-6.)

## IV. THE WELLS PROCESS AND PRE-FILING DISCUSSIONS WITH DEFENSE COUNSEL

On September 25, 2023, staff discussed Shah's and MSA Law's conduct and potential Section 5 violations with their then-counsel. (*Id.* ¶ 20.) On September 30, 2023, staff issued Wells notices to all defendants (except Gravitas, whose notice was issued on October 3, 2023) inviting written responses to the potential charges by October 16. (*Id.* ¶¶ 21, 22.) Staff extended the response deadline to October 27 after Shah's and MSA Law's newly retained counsel contacted staff on October 18. (*Id.* ¶ 23.)

On October 23, 2023, the NuRide Defendants and Movant Med Trans submitted a written Wells response acknowledging possible shortcomings in the accreditation diligence for the three offerings. (*Id.* Ex. 57 at 38.) They described the accreditation work as performed "*almost* entirely correctly," but stated that "[o]n a few occasions, it appears that the diligence may not

have been 100% complete." (*Id.* Ex. 57 at 10-11, 38 (emphasis added).) They argued that no "material" violation of the securities laws had occurred and urged the Commission to "exercise its discretion" against bringing an action even if every step to ensure accreditation had not been completed. (*Id.*) The submission also threatened that Defendants would "have no choice but to fight back on the PR front" if the Commission filed an action. (*Id.* Ex. 57 at 39.)

The next day, October 24, staff again discussed Shah's and MSA Law's potential Section 5 violations with their new counsel. (*Id.* ¶ 25.) Three days later, October 27, the Shah Defendants (except Med Trans) submitted a letter asking the Commission not to file suit because, in part, the potential Section 5 theories were "hyper-technical." (*Id.* Ex. 58 at 4.) The letter did not argue that all investors in the offerings were accredited. (*Id.*)

## V. THE NOVEMBER 21, 2023 COMPLAINT AND THE CHALLENGED SECTION 5 ALLEGATIONS

On November 21, 2023, the Commission filed this action alleging that all Defendants violated Securities Act Sections 5(a) and (c) through their participation in unregistered offers and sales. (Compl. ¶¶ 173-79.) The Complaint alleged that Shah and MSA Law participated in the unregistered offers and sales through their promotion of the offerings, distribution of offering documents, and assessment of investor eligibility. (*Id.* ¶¶ 36-40, 45-46.) The Commission also charged Ahmed, NuRide, and NYC Green, but not the Shah Defendants, with fraud claims under Securities Act Section 17(a) and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. (*Id.* ¶¶ 12-15.)

The Complaint alleged that the three offerings were ineligible for registration exemptions and identified Rule 506(c)'s requirement that all purchasers be accredited investors, including a purchaser whom the issuer reasonably believed met an applicable criterion at the time of sale. (*Id.* ¶¶ 43-44 & n.2.) Further, the Complaint alleged that, in each offering, at least one investor's

eligibility form indicated that the investor was not accredited, and Defendants permitted investment of at least $500,000 anyway. (*Id.* ¶¶ 47-48.)

## VI. POSTFILING PROCEEDINGS AND DISCOVERY

### A. The December 2025 RFA Responses Identified Evidence Supporting the Commission's Allegations

In November 2025, the Shah Defendants served Requests for Admission ("RFAs") asking the Commission to admit that "all investors" in each of the three NuRide Offerings "are Accredited Investors." (Walker Decl. Ex. 59, Requests 3, 7, 10.) On December 15, 2025, the Commission objected that the requests were premature because discovery remained ongoing and Defendants had not yet produced all documents concerning all investors. (*Id.* Ex. 60 at 5-6, Responses 3, 7, 10.)[7] The Commission therefore neither admitted nor denied the requests. (*Id.*) Those responses, however, identified, by Bates numbers, pre-suit evidence supporting the Commission's allegation that not all investors were accredited at the time of investment. For NYC Green, Response 10 stated that Defendants' documents "provide evidentiary support for the contention that not all investors in the NYC Green Offering were accredited at the time of investment," and cited X.Y.'s suitability form and Bates Number TNGSEC_0018747. (*Id.* Ex. 60 at 11.) Responses 3 and 7 similarly cited F.E.'s Med Trans form and Bates Number TNGSEC_0018168, and K.P.'s EV Mobility form and Bates Number TNGSEC_0018379. (*Id.*

[7] The Commission later amended its responses to deny each request, explaining that the evidence already available in December 2025 supported those denials. *See infra* p. 18.

Ex. 60 at 6, 9.) As described above, the Commission had obtained all three forms before filing. (*Id.* ¶¶ 17, 19.)

RFAs 17 through 19 separately asked the Commission to admit that, before filing, it had not determined whether any investor in each offering was accredited. (*Id.* Ex. 60 at 17-18.) Subject to its objections, including that the term "determined" was undefined, the Commission referred to Responses 3, 7, and 10 and the supporting documents identified there. (*Id.*) The Commission offered to meet and confer and reserved the right to supplement its responses as discovery progressed. (*Id.*)

B. The January 2026 Production

On January 25, 2026, the Shah Defendants produced more than 72,000 pages that they contend establish a reasonable basis to believe every investor was accredited. (Mot. at 12.) Even if the production supported that contention—and it does not—it would present, at most, a factual dispute over the merits of the exemption defense, not a basis for Rule 11 sanctions. That production duplicated forms already in the Commission's possession and added source-of-funds records and other documents, many of which reinforced rather than undermined the Commission's pre-filing evidence. (Walker Decl. ¶ 27 & Ex. 61.)

For NYC Green investors X.Y., Y.C., and J.T.S., for example, the additional records traced parental wealth and gifts but did not identify sufficient income or assets belonging to the purchasers themselves. (*Id.* Exs. 64, 66, 68.) X.Y.'s source-of-funds memorandum detailed her father's assets, consistent with counsel's pre-filing reliance on her parents' wealth, and identified only $68,685 in earned income in over sixteen months for X.Y. and thus did not undermine the evidentiary basis for alleging that X.Y. was unaccredited. (*Id.* Ex. 64 at 16-17.) Y.C.'s source-of-funds memorandum documented her mother's $525,000 gift without identifying other income or net worth attributable to Y.C. (*Id.* Ex. 66.) J.T.S.'s source-of-funds memorandum described

his father's financial circumstances but identified no financial resources belonging to J.T.S. beyond the gift already included in his reported net worth. (*Id.* Ex. 68.)

The production also included subscription agreements in which investors represented that they were accredited investors. (*See, e.g., id.* Ex. 65 at 4, Ex. 67 at 4.) Those representations did not reconcile contrary financial figures in the suitability forms and source-of-funds materials. Nor does an issuer take reasonable steps to verify accreditation merely by requiring an investor to check a box or sign a form, without other information supporting that status. *See* Rule 506(c) Adopting Release, 78 Fed. Reg. 44,771.

For Med Trans, the later production included the same suitability form attributing J.Y.'s claimed $1 million net worth entirely to a parental gift. (Walker Decl. Ex. 69.) It also included his father's statement that he had given J.Y. $800,000—matching the gift agreement the Commission obtained pre-suit, not the $1 million reported on J.Y.'s form. (*Id.* Exs. 70, 71; *compare* Ex. 40 at SEC-MSA-E-0039149, SEC-MSA-E-0039156.)[8]

For EV Mobility, the additional records reinforced the pre-suit evidence that K.P.'s financial circumstances fell below the accreditation thresholds. (*Id.* Exs. 72-74.) His immigration petition reported gross income of $85,000 and net worth of $328,665, both below the applicable thresholds. (*Id.* Ex. 72 at 5.) Other records showed combined annual earnings for K.P. and his spouse below $200,000—well below the $300,000 joint-income threshold—and described multiple family loans used to finance the investment. (*Id.* Ex. 73 at 2, 4; Ex. 74 at 1.)

---

[8] Records produced later raise a possibility that Med Trans investor F.E. may have had additional assets or income but do not alter evidence supporting the allegations in the Complaint when it was filed or change the conclusion that the offering did not qualify for the Rule 506(c) safe harbor.

C. Rule 11 Correspondence, the Amended Responses to RFAs, and the Motion

On March 3, 2026, more than two years after the Complaint and motion to dismiss, Defendants threatened Rule 11 motions unless the Commission withdrew or amended its Section 5 claims. (*Id.* Exs. 75, 76.) The Commission's March 20 response identified, by Bates number, the suitability forms for X.Y., K.P., and F.E. as examples of evidence the Commission possessed before filing, and declined to withdraw its claims. (*Id.* Ex. 86 at 5, 10.)

After several more months, Movants served proposed motion papers on July 30, 2026. (Walker Decl. ¶ 29 & Ex. 77.) On September 11, the Commission amended its responses to the RFAs to deny that all investors in each offering were accredited and explained in an accompanying email that it had a basis to deny them in December 2025, and that later discovery "does not change our conclusion that each offering included at least one unaccredited investor." (*Id.* ¶ 30 & Exs. 78-79.) The Motion misrepresents that email, claiming that the RFA amendments depended on "evidence developed in discovery." (Mot. at 17.) The email said the opposite. (Walker Decl. Ex. 78.)

The Shah Defendants filed this Motion on September 16, 2026, claiming that the Commission lacked a pre-filing basis to allege that the offerings were nonexempt. (ECF No. 104 at 1-3, 9-10.) The following day, they issued a press release repeating the accusation. (Walker Decl. Ex. 82.) Defendants, however, have known for years that the Commission's allegations had evidentiary support because that evidence is contained in their own records which they produced during the pre-suit investigation.

## ARGUMENT

## I. LEGAL STANDARD

Rule 11 requires attorneys to conduct "an inquiry reasonable under the circumstances" and certify that a filing's legal contentions are warranted by existing law or a nonfrivolous

argument for changing it; its factual contentions have evidentiary support; and it is not presented for an improper purpose. Fed. R. Civ. P. 11(b)(1)-(3). The sanctions standard is "purposefully high": courts apply an objective standard of reasonableness and must "resolve all doubts in favor of the signer." *Penzo v. ConEd Co. of N.Y.*, No. 19-cv-7478 (MKV), 2024 WL 4467412, at *1 (S.D.N.Y. Oct. 10, 2024) (quoting *Galin v. Hamada*, 283 F. Supp. 3d 189, 201 (S.D.N.Y. 2017)).

A factual allegation gives rise to sanctions only when it is "utterly lacking in support." *Kiobel v. Millson*, 592 F.3d 78, 81 (2d Cir. 2010); *Tunne v. Discover Fin. Svcs.*, No. 22-cv-5288 (JGL), 2026 WL 849766, at *3 (S.D.N.Y. Mar. 27, 2026) (denying Rule 11 motion where movant failed to show that challenged statement was "effectively a 'direct falsehood'"); *Mir v. Bogan*, No. 13-cv-9172 (PGG), 2015 WL 1408891, at *22 (S.D.N.Y. Mar. 26, 2015) (denying Rule 11 motion where challenged statements had "at least some basis in fact"). Reasonable inferences from the evidence provide such support, even when competing explanations exist. *Kiobel*, 592 F.3d at 82-83. The party opposing sanctions need not conclusively prove its allegation to demonstrate the allegation was reasonably supported. *Id.* Nor is a legal argument frivolous merely because it is later rejected. *Storey v. Cello Holdings,* 347 F.3d 370, 391 (2d Cir. 2003).

The Commission takes seriously the responsibilities accompanying the exercise of its enforcement authority. Those responsibilities do not, however, create a heightened Rule 11 standard: "the SEC need only satisfy the standards applicable to other litigants in order to file a complaint." *SEC v. Rayat*, No. 21-cv-4777 (LJL), 2022 WL 1423300, at *3 (S.D.N.Y. May 5, 2022). The Commission must investigate and substantiate its allegations, but need not assemble all evidence necessary to prevail before filing a complaint. *Id.*

Here, the Commission's pre-filing investigation and the robust basis for its allegations that the NuRide Offerings were ineligible for an exemption easily clear Rule 11.

## II. THE COMMISSION CONDUCTED A REASONABLE PRE-FILING INVESTIGATION AND HAD EVIDENTIARY SUPPORT FOR THE CHALLENGED ALLEGATIONS.

A party seeking sanctions for an inadequate inquiry owes the Court an accurate account of the inquiry it attacks. *See Safe-Strap, Inc. v. Koala Corp.*, 270 F. Supp. 2d 407, 421 (S.D.N.Y. 2003). The Motion does not provide one. It asserts that staff learned of extensive supporting investor records during Shah's July 2023 testimony but "never asked for those files." (Mot. at 1.) Yet a month earlier, on June 13, 2023, staff had subpoenaed MSA Law for specific investor records across all three offerings: communications providing subscription agreements, suitability forms, and "supporting documentation evidencing that investor's net worth at the time of investment and/or the investor's income for the two most recent years." (Walker Decl. Ex. 31 at 2-3, 12-13.) ***Movants never mention that subpoena***.

Staff also examined MSA Law's accreditation practices. According to staff's notes of the June 13, 2023 call, Shah admitted, in part:

> I have never been asked in my years for actual documentation of accreditation. We always go with what they said. We ask the parents and if they say they gift 1M to student, we go with what they said. Sometimes they don't even put it in their bank account; that's how it has been done.

(Walker Decl. Ex. 85 (Ross Declaration & Exhibit).) Asked during her July 18 testimony how MSA Law ensured that investors were accredited, Shah answered: "We would give them the accredited investor form and explain that they had to fill it out themselves." (Walker Decl. Ex. 1 at 205:15-206:6.) Her description of document review focused on EB-5 source of funds: asked whether MSA Law documented an investor's full gift, she said only the $500,000 investment and administrative fee needed documentation; additional evidence might be obtained "for

background purposes." (*Id.* Ex. 1 at 135:17-23, 227:17-25.) But verifying that investment funds were lawfully obtained did not, by itself, establish that an investor met the separate income or net-worth requirements for accreditation. (*See supra* p. 5.)

Three days after Shah's testimony, staff issued the July 21 supplemental subpoena for accreditation policies, along with source-of-funds checklists for twelve investors. (*Id.* Ex. 37.) Defendants fault that subpoena for not seeking investor financial records (Mot. at 8-9), but ignore that the June 13 subpoena had already requested that category of record for investors across all three offerings. (*See supra* pp. 8, 10.)

On July 28, 2023, MSA Law produced suitability forms, source-of-funds checklists, and the kinds of supporting financial records Defendants claim staff never sought. (Walker Decl. ¶ 14 & Exs. 38-40.) Its cover letter explained the asserted basis for each of the twelve investors' accreditation. (*Id.* Ex. 38.) Those records and explanations, together with other pre-filing evidence, supported the very allegation Defendants now call baseless: that the NuRide Offerings "were not eligible for exemptions from registration." (Mot. at 1, 18; *see supra* pp. 10-13.)

The Commission separately sought investor-specific financial support from NuRide regarding additional investors through the June 8 and September 20 investigative subpoenas. (Walker Decl. Exs. 30, 42.)

Accredited status under Rule 506(c) includes purchasers whom the issuer reasonably believes meet an applicable criterion at the time of sale. 17 C.F.R. § 230.501(a). The rule separately requires the issuer to take reasonable steps to verify that status. *Id.* § 230.506(c)(2)(ii). An issuer does not establish a reasonable belief merely by asserting that it screened purchasers; the information it possessed at the time of sale must reasonably support that belief. *See SEC v. GenAudio Inc.*, 32 F.4th 902, 942-43 (10th Cir. 2022).

***NYC Green Offering***. X.Y.'s investor suitability form, obtained pre-filing, identified her as a university student with no annual salary and a net worth of $550,000—below the accreditation thresholds. (Walker Decl. ¶¶ 17, 19 & Ex. 43 at 3-4, 7-8.) MSA Law's supporting records documented her father's $538,643 gift but identified no additional assets or income sufficient to establish her accreditation. (*Id.* Ex. 39.) Instead, MSA Law simply relied on her family's wealth: "The investment was a gift from her parents. Her parents are wealthy." (*Id.* Ex. 38 at 4-5.) The gift was already included in her reported net worth, and pre-filing counsel identified no other assets or income belonging to her. (*Id.* and Enclosures; *id.* Ex. 43 at 7-8.) Having wealthy parents does not establish accreditation. 17 C.F.R. § 230.501(a).

Other forms obtained pre-filing likewise reported finances below the accreditation thresholds. J.T.S., who identified himself as single, reported net worth of $540,000, including a $500,000 parental gift, and annual salary below $25,000. (Walker Decl. ¶¶ 17, 19 & Ex. 44 at 1, 3, 8.) Y.C., also single, reported net worth of $525,000 supplied by a parental gift and listed no employment. (*Id.* Decl. Ex. 45 at 1, 3, 7.) Those disclosures supported the source of the $500,000 investment, not accreditation. (*Id.* Ex. 45 at 1, 3, 7; *id.* Ex. 44 at 1, 3, 8.)

***Med Trans Offering***. Pre-filing evidence supported the conclusion that at least two Med Trans purchasers did not meet the accreditation criteria. F.E.'s suitability form listed assets totaling $925,000 and left the income section blank. (*Id.* Ex. 55 at 3, 7.) The assets included $320,000 in real estate without indicating whether it was her primary residence; even if counted in full, the total remained below the $1 million threshold. (*Id.* Ex. 55 at 7.)

J.Y.'s suitability form, obtained pre-filing, reported annual income of $138,000—below the individual-income threshold—and attributed his claimed $1 million net worth entirely to a $1 million gift. (*Id.* ¶¶ 17, 19 & Ex. 40 at 6, 10.) MSA Law's July 2023 pre-suit production

contradicted that claim; the gift agreement documented only $800,000, and the accompanying bank statement showed a maximum balance of $807,000 after that transfer and before the investment was made. (*Id.* Ex. 40 at 3, 15.) MSA Law nevertheless argued before filing that J.Y.'s bank statement showed the gift, salary, and another parental transfer sufficient "to show over $1 million in assets," but no document supported that conclusion. (*Id.* Ex. 38 at 5; Ex. 40 at 15.)

***EV Mobility Offering***. K.P.'s suitability form reported joint net worth with his spouse of $128,664.72 and annual gross income of $85,000 (*id.* ¶¶ 17, 19 & Ex. 56 at 11), both below the accreditation thresholds. His form attributed most of his $500,000 investment to family borrowing. (*Id.* Ex. 56 at 10-11.)

These records and explanations supported allegations that each offering included at least one unaccredited investor, that the issuers lacked a reasonable basis to believe otherwise, and that they failed to take reasonable steps to verify accreditation. (*See supra* pp.10-13.) Under Rule 506(c), a sale to even one purchaser who neither qualifies as, nor is reasonably believed to be, accredited defeats the exemption for that offering. 17 C.F.R. §§ 230.501(a), 230.506(c)(2)(i); *Nutra Pharma*, 2022 WL 3912561, at *10 n.6; *Hunichen*, 2021 WL 5858811, at *11-12, *report and recommendation adopted*, 2022 WL 3155400. Having obtained that evidence, the Commission did not need every remaining investor's file before filing. *See Rayat*, 2022 WL 1423300, at *3.

Rule 11 requires a reasonable inquiry, not an exhaustive one. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 401-02 (1990); *DRE Health Corp. v. Two Canoes, LLC*, No. 23-cv-10643 (NRB), 2026 WL 550185, at *10 (S.D.N.Y. Feb. 27, 2026) (denying sanctions motion, in part, because "[a] pre-filing investigation need not be exhaustive, merely reasonable"). Given

the requests, testimony, records, and explanations described above, the existence of possible additional investigative steps does not make the inquiry objectively unreasonable. *See Rayat*, 2022 WL 1423300, at *3. Nor do Defendants' competing explanations make the Commission's supported inferences sanctionable. The Second Circuit expressly rejects requiring a party opposing sanctions to prove its allegation true merely because the evidence permits other explanations. *See Kiobel*, 592 F.3d at 82-83.[9]

## III. MOVANTS' EXEMPTION ARGUMENTS DO NOT ESTABLISH A RULE 11 VIOLATION.

The Shah Defendants claim their screening process justified a reasonable belief that every purchaser was accredited and accuse the Commission of ignoring that process and relying instead on omissions in questionnaires and facts unknown to them. (Mot. at 19-21.) But the Commission examined that process, and relied on affirmative disclosures not just omissions. The deficiencies in MSA Law's process, together with contrary financial information in MSA Law's own files, supported the allegation that the issuers lacked a reasonable basis to believe that every purchaser was accredited. (*See supra* pp. 10-13, 20-24.)

MSA Law's financial review focused on documenting the lawful source of the $500,000 EB-5 investment. That inquiry did not, by itself, establish the purchaser's qualifying income or net worth. (*See supra* pp. 5, 8-13, 20-24.) According to staff's June 13 call notes, Shah admitted that the firm accepted parents' statements about $1 million gifts to students even when the money had not been deposited in the students' accounts. (*See supra* pp. 8, 20.)

---

[9] The Shah Defendants also fault staff for refusing to delay filing despite tolling. (Mot. at 9.) That timing says nothing about the merits of this Motion or the action. Staff had already investigated for more than two years, spoken with Shah Defendants' counsel on September 25 and October 24, 2023 about potential charges, and received their October 27 written response to potential charges—all weeks before this suit was filed. (Walker Decl. ¶¶ 20-25 & Exs. 57, 58.)

The suitability forms at the center of the process did not request information often needed to assess accreditation, including income for the preceding two years and the value of the investor's primary residence. (*See supra* p. 8.) Several completed forms also affirmatively reported below-threshold income and net worth. (*See supra* pp. 10-13, 20-24.) MSA Law's explanations did not reconcile those disclosures. For example, it invoked X.Y.'s parents' wealth even though their gift was already included in her below-threshold net worth, and claimed J.Y.'s bank statement showed assets it did not. (*See supra* pp. 11-12, 20-22.)

MSA Law's consultation with investors, investors' checked boxes claiming accreditation, and subscription agreements requiring accreditation do not cure those defects or answer the contrary financial information for those same investors. (Mot. at 5-6, 20; *see supra* pp. 8, 10-13, 20-24.) Defendants' meritless insistence that other evidence outweighs that record does not make the Commission's allegations "utterly lacking in support." *Kiobel*, 592 F.3d at 82-83.

The claim that Signature Bank "independently confirmed accreditation" does not resolve those contradictions either. (Mot. at 6.) The Signature Bank escrow agreements expressly assigned responsibility for securities-law compliance to the issuer and subscriber representative, not the bank. (*See supra* p. 9 n.6.) They disclaimed any bank duty to determine such compliance and prohibited representing that the bank investigated or approved the investments. (*Id.*)

Movants' efforts to distinguish *SEC v. Mahabub* and *GenAudio* miss the point. In *Mahabub*, the court examined the issuer's screening process and rejected the claimed Rule 506 exemption because the evidence did not support the issuer's asserted reasonable belief; the Tenth Circuit affirmed. 343 F. Supp. 3d 1022, 1040 (D. Colo. 2018), *aff'd sub nom. GenAudio, Inc.*, 32 F.4th at 942-43. The information available at the time of sale must support a claimed belief about accreditation. MSA Law's purported screening process did not require the Commission to

accept accreditation representations that the firm's own records gave the Commission reason to challenge. (*See supra* pp. 8, 10-13, 20-24.)

Defendants likewise misapprehend *Nutra Pharma*'s relevance. (Mot. at 20-21.) The Commission cites it for Rule 506(c)'s requirement that every purchaser qualify as accredited, not to deny that an issuer's reasonable belief can support that status. *Nutra Pharma,* 2022 WL 3912561, at *10 n.6; *see also Hunichen*, 2021 WL 5858811, at *12, *report and recommendation adopted*, 2022 WL 3155400. The *Nutra Pharma* defendants' concession that two purchasers were unaccredited established that the exemption failed there; it did not make such a concession necessary to defeat the exemption. 2022 WL 3912561, at *10. Nor does the separate Rule 508 discussion diminish that ruling. *Id.*[10]

Finally, Defendants offer "Investor Y" to illustrate the process they claim they used for every investor. (Mot. at 7.) Even assuming Investor Y was accredited and underwent that process, the example does not explain how MSA Law could reasonably regard other investors as accredited despite records in its files showing they met none of the financial thresholds. Substantiating one purchaser's qualifications does not establish that the offering was exempt from registration. *See Nutra Pharma*, 2022 WL 3912561, at *10 n.6.

---

[10] The March 12, 2025 public "no action" letter Movants cited (Mot. at 7) was issued by Division of Corporation Finance staff, not the Commission, after this lawsuit was filed. It addressed reliance on a substantial minimum investment where the purchaser represented that the investment was not financed by a third party and the issuer lacked knowledge of facts contradicting accredited status. MSA Law's files, by contrast, showed parental funding and below-threshold finances. The letter does not establish that the $500,000 investment amount justified treating those purchasers as accredited, much less that the Commission's contrary assessment was sanctionable. *See Kiobel*, 592 F.3d at 82-83.

## IV. MOVANTS' MISLEADING ACCOUNT OF DISCOVERY DOES NOT UNDERMINE THE COMMISSION'S PRE-FILING EVIDENCE.

The Commission's December 2025 discovery responses did not concede that the Complaint lacked support. The Commission objected to requests to admit that all of the more than 100 investors in the three offerings were accredited as premature and initially neither admitted nor denied them. (*See supra* pp. 15-16.) But its responses identified, by Bates number, suitability forms obtained before suit that supported the Commission's contrary position. (*Id.*) Declining to deny the requests outright while discovery remained ongoing did not erase the cited evidence or establish that the Complaint lacked support when filed. *See Kiobel*, 592 F.3d at 82-83.

The Commission's March 20, 2026 letter again identified the forms as evidence it possessed before filing. (*See supra* p. 18.) Yet the Motion falsely asserts that every questionnaire cited in that letter was obtained after suit. (Mot. at 17.)

The Motion likewise misrepresents the September 2026 amendment to the RFA responses. The accompanying email explained that evidence available when the original responses were served—before any document discovery—already supported denials and that later discovery "does not change our conclusion that each offering included at least one unaccredited investor." (Walker Decl. Ex. 78.) The Motion quotes selectively from that explanation (Mot. at 11), and falsely claims that the amendments rested expressly on "evidence developed in discovery" (Mot. at 17). The email says the opposite: later discovery left the Commission's prior conclusions unchanged rather than supplying a basis for denial. (Walker Decl. Ex. 78.)

Nor does the volume of Movants' January 2026 production establish their claimed reasonable belief that every investor was accredited. (Mot. at 12.) The relevant records

documented family wealth and funding but did not reconcile that information with the purchasers' own below-threshold financial disclosures. (Walker Decl. Exs. 64, 66, 68, 71.) Those records corroborated, rather than supplied, the Commission's pre-filing basis for suit. The Commission need not obtain every document necessary to prevail before filing a factually supported claim. *See Rayat*, 2022 WL 1423300, at *3.

## V. MOVANTS CANNOT USE RULE 11 AS A SUBSTITUTE FOR LITIGATING THEIR EXEMPTION DEFENSE.

This Court has emphasized that merits disputes should be tested through ordinary motion practice, "not a collateral adjudication through a sanctions motion." *Hernandez v. Miller*, No. 22-cv-6964 (VSB), 2022 WL 17584025, at *2 (S.D.N.Y. Dec. 12, 2022). Movants claim they challenge only the Commission's pre-filing investigation and what it uncovered. (Mot. at 22.) But the Commission conducted a reasonable inquiry and obtained evidence supporting the challenged allegations. Movants' demand that the Court instead accept their assessment of that evidence presents the very concern identified in *Hernandez* and *Safe-Strap*. *See Hernandez*, 2022 WL 17584025, at *1-2; *Safe-Strap*, 270 F. Supp. 2d at 416-17.

Movants pursued sanctions despite knowing for years that MSA Law had produced relevant investor records before suit. The Commission specifically identified evidence supporting the allegations nine months before this Motion, in December 2025, and again in response to their initial sanctions threat in March 2026. Against that record, the accusation that the Commission's allegations were "utterly lacking in support" is itself frivolous. *See Kiobel*, 592 F.3d at 81-83.

The Commission investigated the screening process on which Movants rely. Their reliance on investor interviews, subscription-agreement warranties, and purported bank verification (contrary to the provisions of the escrow agreement) does not answer the contrary

information in MSA Law's and NuRide's own files. At most, the Motion presents a merits dispute over whether that process supported a reasonable belief that every purchaser was accredited. Defendants cannot obtain dismissal by asking the Court to resolve that evidentiary dispute in their favor through Rule 11. *See Safe-Strap*, 270 F. Supp. 2d at 416-17; *Kiobel*, 592 F.3d at 82-83.[11]

## VI. NEITHER DISMISSAL NOR THE REQUESTED FEE AWARD IS WARRANTED

Defendants' demand for dismissal and nearly $900,000 in fees fails because there is no Rule 11 violation to remedy. The Commission conducted a reasonable investigation and supported its allegations. Defendants' dismissal demand belies their attempt to disclaim their (improper) use of Rule 11 as a substitute for adjudicating disputed merits. *Safe-Strap*, 270 F. Supp. 2d at 418-20 & n.8.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

[11] *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) does not support a different result. (Mot. at 22.) The footnote cited in the Motion preserves the Court's discretion over when to decide sanctions issues; it does not recognize an exception for motions framed as a challenge to pre-filing investigations. 501 U.S. at 56 n.19. Here, the Commission has demonstrated a reasonable investigation and evidentiary support. There is no Rule 11 violation to sanction.

Dated: New York, New York
October 14, 2026

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

s/ *Chevon Walker*

Chevon Walker
Austin Thompson
Counsel for Plaintiff
(212) 336-0090 (Walker)
(212) 336-9074 (Thompson)
WalkerCh@sec.gov
ThompsonAu@sec.gov

**LOCAL RULE 7.1(c) CERTIFICATION**

I hereby certify that the foregoing Memorandum of Law complies with the word-count limitations set forth in Local Rule 7.1. The foregoing Memorandum of Law contains 8,685 words, exclusive of the caption, index, table of contents, table of authorities, signature blocks, or any required certificates, but does include material contained in footnotes, according to the word processing software used to prepare it.

Dated: New York, New York
October 14, 2026

SECURITIES AND EXCHANGE COMMISSION

s/ *Chevon Walker*_____
Chevon Walker
Counsel for Plaintiff
(212) 336-0090 (Walker)
WalkerCh@sec.gov

**INDIVIDUAL RULE 4.J CERTIFICATION**
**REGARDING THE USE OF GENERATIVE ARTIFICIAL INTELLIGENCE**

Pursuant to Rule 4.J of the Individual Rules and Practices in Civil Cases for the Honorable Vernon Broderick, the undersigned counsel states that an artificial intelligence tool was used to assist in preparing the foregoing Memorandum of Law, and the undersigned counsel certifies that they and those under their supervision personally reviewed the filing for accuracy all portions prepared with the tool's assistance, including independently verifying any legal assertion and/or citation to the law or record, and that the filing complies with counsel's obligations under Federal Rule of Civil Procedure 11(b).

Dated: New York, New York
October 14, 2026

SECURITIES AND EXCHANGE COMMISSION

s/ *Chevon Walker*
Chevon Walker
Counsel for Plaintiff
(212) 336-0090 (Walker)
WalkerCh@sec.gov